# ATTACHMENT 3



Direct: **414.287.9601**
**PHeaton@gklaw.com**

May 2, 2025

**VIA PORTAL AND EMAIL**

Mr. Benjamin Lidholm
U. S. Equal Employment Opportunity Commission
310 W. Wisconsin Avenue, Suite 500
Milwaukee, WI 53203

      Re:    *Mark E. McNulty v. Northwestern Mutual*
             EEOC Charge No.:  443-2025-01752

Dear Mr. Lidholm:

We are writing in response to the March 1, 2025 charge of discrimination submitted to the EEOC by Mark McNulty against his employer, The Northwestern Mutual Life Insurance Company.  Northwestern Mutual appreciates the courtesy of the extension to submit this position statement, which has allowed the company additional time to consult with key individuals and to review many of the company records necessary to respond to McNulty's allegations.

While we have endeavored to provide sufficient facts to respond directly to McNulty's claims, the March 1, 2025 charge itself fails to identify any specific actions undertaken on specified dates that he asserts constitute unlawful discrimination.  Moreover, it is not possible for Northwestern Mutual to encapsulate all of the facts bearing on McNulty's claims, considering the complex organizational changes, his career progression, and the personal choices McNulty made that provide necessary context to evaluate his claims.  Northwestern Mutual reserves the right to supplement and modify this position statement as additional facts are developed, and will provide additional facts and insights that may be deemed helpful to the EEOC in assessing the serious, unfortunate, and unfounded assertion that Northwestern Mutual has violated Title VII in its dealings with McNulty.

## I.      SUMMARY OF ALLEGATIONS

McNulty asserts in his March 1, 2025 charge (referred to as the "Charge") that beginning on June 1, 2020, Northwestern Mutual "enhanced" its diversity initiatives, that he complained about these policies, and that after voicing those concerns, he was denied advancement to the position of Vice President.  McNulty alleges he was passed over for promotion in favor of lesser qualified candidates as a result of Northwestern Mutual's diversity initiatives, and in retaliation for his complaining about those policies.  As demonstrated below, each of McNulty's claims is completely without merit.

OFFICES IN MILWAUKEE, MADISON, GREEN BAY, APPLETON, AND EAU CLAIRE, WISCONSIN AND WASHINGTON, D.C.
GODFREY & KAHN IS A MEMBER OF TERRALEX®, A WORLDWIDE NETWORK OF INDEPENDENT LAW FIRMS.

Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 2 of 227    Document 3-3

First, contrary to his core assertions, when he was not named a Vice President, McNulty told his supervisor on August 2, 2023 that he no longer had any interest in continuing to expend the additional time and effort necessary to discharge the new "stretch" responsibilities as the retail team leader that had been assigned to him in June 2022. Accordingly, McNulty asked his supervisor to be relieved of those new responsibilities, even though they had been entrusted to him, in part, as an opportunity to demonstrate whether he had the qualities necessary to take on more responsibilities. McNulty told his supervisor that he preferred instead to simply continue as the Enterprise AML Officer, rather than continuing to shoulder the additional burdens and responsibilities that had been given him. In short, McNulty claims in his discrimination complaint that he has been unfairly denied promotional opportunities, when he specifically and pointedly rejected keeping additional responsibilities less than two years ago.

Second, the two female colleagues whose promotions McNulty cites as evidence that he was passed over on the basis of his gender were demonstrably more qualified for promotion than McNulty. These employees were responsible for an array of duties exceeding McNulty's in scope and importance to the organization, particularly after McNulty relinquished the new retail group leadership role that had been entrusted to him in June 2022. Northwestern Mutual's decision-makers and their advisors, moreover, uniformly agreed that these two colleagues were far more capable and qualified than McNulty for the VP positions now under scrutiny.

Third, Northwestern Mutual's diversity initiatives did not result in unlawful discrimination against McNulty – or against any other employee or candidate for employment. Northwestern Mutual *expressly* admonishes its employees and people managers that the company's diversity initiatives must not be construed, pursued, or applied in a manner that would result in any hiring or promotion decision being made on the basis of race, sex, or membership in any other protected class. Northwestern Mutual forcefully and directly prohibits "reverse discrimination" in furtherance of otherwise lawful diversity and inclusion goals.

Northwestern Mutual is entitled to a finding by the EEOC that there is no reasonable cause to believe any unlawful discrimination against McNulty has occurred.

## II.     SUMMARY RESPONSE

Each of McNulty's claims against Northwestern Mutual is demonstrably false. McNulty has not attained his career objectives because he does not possess the elevated skills, organizational vision, or perseverance necessary to succeed as a senior leader at Northwestern Mutual. McNulty does have strong technical skills and a depth of regulatory knowledge necessary to succeed in his core sphere of expertise as the Enterprise AML Officer and he does a very good job communicating the contours, consequences, and implications of the governing laws and regulations to the multiple constituencies within this specific realm of expertise. McNulty has been recognized, rewarded, and compensated for those skills and accomplishments, attaining and holding a Senior Director position that many in the organization would envy.

However, McNulty simply has not demonstrated – despite being afforded specific opportunities to do so – the qualities and advanced skills necessary to serve in positions such as

the Chief Compliance Officer for Northwestern Mutual Investment Services or the Northwestern Mutual Wealth Management Company, which require a candidate who not only possesses strong technical knowledge concerning the governing regulations and an understanding of the company home office and field operations, but who also possesses the vision, cross-organizational collaborative skills, proactivity, and dedication necessary to succeed as the NMIS CCO, the WMC CCO, or in comparable positions. Like many successful employees, McNulty is a highly skilled technician who has failed to demonstrate the qualities necessary to attain the more demanding leadership positions to which he now aspires.

This assessment is not theoretical. In April 2016, after spending 14 years with the company, McNulty left Northwestern Mutual to accept a position at a smaller financial services firm in Appleton, Wisconsin (SII Investments), as Vice President – Compliance, where he was expected to take on the overall management and operations of that organization's compliance function. McNulty left that position after only six months, and rather than pursuing a similarly demanding leadership position at another company, he returned to Northwestern Mutual in November 2017 to resume his career as a technical expert in anti-money laundering compliance. There may be reasons unrelated to performance or abilities that caused him to part company with SII. However, if he had the qualities and skills necessary to serve in a role comparable to Northwestern Mutual's Vice President-level positions, McNulty presumably would have sought such a position at another company, rather than returning to Northwestern Mutual to discharge AML responsibilities. McNulty's brief, six-month foray into a position that required the skills necessary to succeed in leadership positions such as the NMIS CCO ended before it began.[1]

Further, in June 2022, McNulty was given the opportunity to demonstrate he had the organizational vision, collaborative skills, proactivity, and dedication Northwestern Mutual expects and demands from its senior leaders. McNulty was asked to lead a team overseeing compliance policies, procedures, and controls in the Wealth & Investment Management function, and he also was given a raise at that time. McNulty was entrusted with these new responsibilities, in part, to give him a chance to demonstrate whether he had the capacity to take on new responsibilities and master a more demanding role in the organization. In August 2023, dissatisfied that he had not yet been elevated to Vice President despite taking on his new "stretch" responsibilities as the leader of the Enterprise Compliance retail investment team, McNulty asked his supervisor, Mike Conmey, to relieve him of those responsibilities.

McNulty told Conmey that if he was not going to be elevated to Vice President, he did not want to put in the additional time, effort, and dedication necessary to discharge the responsibilities of this leadership role. McNulty told Conmey that instead, he would focus on overseeing the best AML program possible. Northwestern Mutual honored McNulty's request to relinquish these responsibilities, which required one of McNulty's colleagues to assume the retail group leadership

---

[1] After returning to Northwestern Mutual in November 2017, McNulty reported that he had held his position at SII Investments for a full year. *See* Exs. 20 and 21 (reflecting McNulty's reported work history). However, public records reflect that McNulty only held his position at SII Investments for a little over six months (September 21, 2016 to April 7, 2017). *See* Ex. 23 (FINRA BrokerCheck Report for McNulty); and Ex. 24 (SEC Investment Adviser Public Disclosure Report for McNulty).

role in his stead. Significantly, Conmey had *not* told McNulty that his aspirations to attain a Vice President position were unattainable, nor had any of McNulty's fellow Senior Directors who *also* had taken on new leadership responsibilities in June 2022 been named a Vice President. While his colleagues continued to persevere in discharging *their* new responsibilities, McNulty made a deliberate choice to forego a leadership role that would have afforded him a continued opportunity to establish he was VP material.

McNulty also claims in his Charge against Northwestern Mutual that his current, continued responsibilities as Enterprise AML Officer alone justified promotion to Vice President. McNulty bases this claim on the fact that one of his colleagues, Jamie Pulsfus, was promoted to Vice President-Supervision in June of 2024. However, as will be demonstrated, McNulty's responsibilities simply are not comparable to the broader and more demanding responsibilities of the Vice President position held by Pulsfus. Further, McNulty's job classifications, titles, and salary ranges (like every position in the company) were determined by human resources professionals who are responsible for ensuring Northwestern Mutual keeps apace with the market. McNulty may quarrel with these HR determinations, but the notion that they are tainted by unlawful "retaliation" is just that – a groundless notion.

Finally, Northwestern Mutual has at all times treated McNulty with dignity; the company has responded fairly and respectfully to his expressed concerns about the company's diversity initiatives over the years; and the company advanced McNulty, increased his compensation, and awarded him annual bonuses, without regard for his periodic expressions of concerns over those company initiatives. Indeed, during one of his annual reviews, McNulty's supervisor complimented McNulty for his "candor and willingness to share his viewpoints" about the company's diversity initiatives. *See* Ex. 19 (2023 Performance Review). For these reasons, and those explained in more detail below, the EEOC should reach a finding of no probable cause.

## III. SUPPORTING FACTS AND ANALYSIS

### A. McNulty Cannot Establish a Claim for Discrimination Under Title VII.

McNulty alleges that he has been denied promotion based on his color, race, sex, and national origin. Such a claim requires proof that (1) he is a member of a protected class; (2) he was qualified for the position; (3) his employer did not promote him; and (4) his employer promoted someone who was outside of the protected class and who was not more qualified. *Cotton v. Milwaukee Area Tech. Coll. Dist. Bd. of Directors*, 756 Fed. Appx. 628, 630 (7th Cir. 2019). McNulty cannot satisfy the second and fourth elements of his claim.

#### 1. McNulty Has not Displayed the Necessary Qualities to Succeed as the NMIS CCO, the WMC CCO, or a Senior Company Leader.

McNulty cannot satisfy the second element of his claim because he was not qualified for the disputed NMIS or WMC Chief Compliance Officer positions, nor any comparable Vice President position calling for the leadership skills necessary for success at that level at Northwestern Mutual.

McNulty has not demonstrated the ability to forge relationships and drive results cross-organizationally to the extent necessary to succeed in such a role. The NMIS and WMC CCO must oversee and manage broad and significant compliance responsibilities, requiring strong, cross-organizational collaboration with other departments and areas of responsibility. Moreover, McNulty was given every opportunity to demonstrate that he possessed such necessary leadership qualities, such as a proactive (rather than reactive) approach to identifying, staying ahead of, and resolving problems; remaining abreast of forthcoming regulatory and industry changes without being asked to address them; assuming added responsibilities when called upon to do so; exhibiting vocal leadership during departmental and company meetings; volunteering for additional leadership opportunities; and building and employing strong relationships cross-functionally.

After McNulty's department head at the time, Rebecca Evenson (Villegas), assigned him to oversee the retail team responsible for compliance functions in the Wealth & Investment Management space (with an increase in pay) in June 2022, McNulty did not display these leadership qualities in leading the "retail" team. McNulty failed to anticipate and address important changes in the industry, only acting when asked to do so. *See, e.g.*, Ex. 3 (December 2, 2022 email exchange). McNulty often waited for work to be assigned to him and his new team, rather than proactively identifying, planning, and addressing issues and forthcoming changes.

Prompted by his supervisor's and department head's observations and corroborated by feedback from his colleagues within the company, McNulty was reminded of the importance of these issues in his 2022 annual review, noting the expectation that he "build a proactive model of compliance program support" that "considers risks proactively to set or change policy." *See* Ex. 18 – 2022 Year-End Performance Review. McNulty had to be reminded of the importance of this issue again in his 2023 year-end review. *See* Ex. 19 ("In the coming year, I would like to see Mark … proactively seek opportunities to build relationships with the business, operations, and compliance teams."). This theme continued through his 2024 year-end review as well. *See* Ex. 22 ("To further enhance Mark's effectiveness, I recommend that he focus on building relationships with business, operations and risk partners supporting the institutional investments compliance team to optimize communication between the compliance teams and explore how they may help him grow his knowledge of the business and product lines."). Proactivity and collaboration by compliance professionals is a *sine qua non* for success as a company leader – and for the protection of the organization, the field, and the company's thousands of policyowners and investors from the regulatory perils that abound in the insurance and financial services industry.

While aspiring leaders are called upon to assist their supervisors and department heads in discharging their vast array of responsibilities, McNulty had to be prodded into doing so. For example, even a year after taking on his new "stretch" responsibilities and having been previously coached, McNulty had to be instructed again by his direct supervisor (Michael Conmey) to prepare his contributions to multiple, draft committee and board reports for his department head. *See, e.g.*, Ex. 6 (July 19, 2023 Conmey-McNulty email exchange). McNulty never took on the responsibility of preparing the elements of the annual report concerning the retail team, letting the responsibility fall on Evenson's already full plate. While he received strong commendation for the discharge of his core AML duties, McNulty's lack of vision and failure to act proactively in areas outside his

comfort zone was noted repeatedly by his supervisors and colleagues within the organization as a point of improvement and remediation.

When a compliance professional fails to act proactively, there can be serious, cascading consequences for his colleagues in Enterprise Compliance, the responsible home office business units, field management and financial advisors, and Northwestern Mutual's policyowners and investors. Northwestern Mutual operates in a highly regulated environment, subject to a labyrinth of state and federal regulatory oversight of its insurance, financial services, wealth management, trust, and advisory functions. Northwestern Mutual does not have the luxury to take a wait-and-see approach to compliance, and the consequences of failing to act proactively are magnified progressively for each level of responsibility within the compliance function. If a department leader charged with oversight of multiple teams and compliance functions fails to act proactively, the consequences could be disastrous for the organization and the thousands of policyowners and investors who have placed their trust and financial well-being in Northwestern Mutual.

Twenty-two years into his career as a compliance professional at Northwestern Mutual, McNulty is still receiving negative feedback from his colleagues with whom he works closely concerning matters that fall outside his core, AML comfort zone. In preparing for the year-end performance evaluations for his team, Conmey solicited feedback from McNulty's colleagues, direct reports, and client constituents. One Enterprise Compliance colleague pointedly noted McNulty's failure to act proactively or collaboratively to meet the needs of the organization:

> My observation is there often seems to be a lack of proactive engagement from Mark or his team's end when issues arise.
>
> A suggestion would be to proactively reaching out to the teams who are impacted by regulatory change or alerts that come through after performing a review of the impact.
>
> Actively reaching out to team members or leads when you encounter issues and suggesting possible solutions can greatly benefit our collaborative efforts. Regularly checking in on the state of tasks and openly communicating challenges early can go a long way to establishing and solidifying relationships.

*See* Ex. 15 (December 15, 2024 Year-End Feedback Email).

While acknowledging McNulty's technical knowledge and expertise, this same individual noted the significant enterprise-wide consequences of McNulty's reactive (rather than proactive) approach (even within the sphere of his core AML responsibilities):

> Mark is knowledgeable and has good intentions and good ideas around application. It has been mostly a one-way approach of me sending items I see related to sanctions or AML instead of notices from Mark and team. The MIFC team would benefit from the expert advice and implementation help with the appropriate groups.
>
> Mark's work with sanctions policy is important. The enterprise level policy will help with building a framework of expectations and ownership of procedures by the front-line.
>
> Overall, Mark is enjoyable to work with and makes the time to meet and discuss items as they come up.

*Id*. These same concerns were echoed in feedback provided by yet another colleague at Northwestern Mutual. *See* Ex. 14 (December 12, 2024 feedback email) (identifying needed improvement in "driving timelines and execution (e.g., foreign Sanctions project); pro-active ownership and communication with stakeholders (e.g., new AML rule); direct engagement with business"). Plainly, McNulty was reactive, not proactive, as noted by his colleagues and supervisors – and his problems with collaboration and proactivity have continued into 2025. *See, e.g.,* Ex. 17 (March 3, 2025 Valters email) ("Mark, can you share anything more about the work systems teams … to prioritize this work and any expected timeline for completion? … Do I read it that it has been 4 years and we haven't made any progress?").

By its very nature, the discharge of compliance responsibilities requires constant, proactive, effective consultation and collaboration across the operational departments and units whose business functions are subject to the state and federal laws governing the company's operations. McNulty simply does not possess (or does not apply) these skills when operating outside the comfort zone of his core AML expertise.

### *McNulty Squanders and Rejects His Opportunity to Shine*

Nor is there anyone to blame for these professional development failures other than McNulty himself. McNulty's supervisors gave him the chance to demonstrate that he possessed the leadership skills necessary to succeed, and to prove he merited promotion to positions of greater and broader responsibilities. McNulty ultimately rejected one of those opportunities out of hand.

In June 2022, upon assuming the role as department head for Enterprise Compliance, Evenson gave McNulty and several of his fellow Senior Directors new "stretch" assignments, prompted by the necessary reallocation of resources within the department. McNulty and his colleagues (Sarah Brach; Paula Storniolo; Jonathan Viard; Jaime Pulsfus; and Nicole Lund) were asked to continue their current responsibilities, while taking on new challenges within the department. Significantly, neither McNulty, Pulsfus, Lund, nor any other Senior Director in this group was elevated immediately to Vice President upon being asked to assume these new duties. Pulsfus and Lund, the two female colleagues McNulty identifies as the beneficiaries of gender preferences in promotions, did not earn a VP promotion until more than two years had passed, in June and November of 2024, after taking on these new responsibilities and expanded duties thereafter. McNulty, by contrast, already had given up on his new retail group leadership responsibilities by August 2023.

McNulty's June 2022 stretch assignment was to expand beyond his core sphere of AML compliance, and lead the team responsible for retail investments compliance:

> • **Mark McNulty – Sr. Director Retail Investments Compliance & Enterprise AML:** Mark's existing role leading enterprise AML will expand to include teams responsible for overseeing the policies, procedures, and controls related to NMIS and NMWMC in the Wealth & Investment Management function. Mark's new team will be responsible for providing advice to enterprise partners regarding anti-money laundering and retail investments topics. Reporting to Mark are the following people: **Dave Granger, Nick Smeshko, Brian Derenne, John Ruedinger, and Bethany Zebell**. To support Mark's new responsibilities and the growing transactional volume in the AML space, Mark will be posting for a new AML Consultant position in the coming weeks.

*See* Ex. 2 (email announcing March 16, 2022 "Enterprise Compliance Organizational Changes"). Significantly, McNulty already had been expressing criticisms of the company's diversity initiatives since at least November 2020. If Northwestern Mutual had been bent on retaliation for his conveying these criticisms, as McNulty contends, Evenson never would have given him this professional development opportunity, nor this viable path to eventual promotion to VP.

Further encouraging his professional development, McNulty also was named to the Enterprise Compliance steering team at that time. The steering team consists of key personnel who are expected to share their thoughts, concerns, and recommendations collaboratively to ensure Northwestern Mutual benefits from a breadth of insights. Vocal leadership is another hallmark of success at Northwestern Mutual (and all quality organizations), and McNulty's ascension to the

steering committee gave him the opportunity to display those skills. However, McNulty contributed only infrequently during these meetings.

McNulty's reticence at steering meetings squandered a golden opportunity to display the knowledge, industry awareness, perspicuity, judgment, and dedication that could alert his supervisor and department head to his potential to become a more senior leader in the company. These meetings offered McNulty an opportunity to shine, and he either would not or could not rise to the occasion. The importance of McNulty's "find[ing] more opportunities and venues to share his expertise and perspective in steering meetings and other department-facing venues" was flagged in his 2023 year-end review. *See* Ex. 19. Despite this admonition, McNulty was still receiving critical feedback from his constituencies on this front a year later. *See* Ex. 15 (December 15, 2024 Year-End Feedback Email).

### *McNulty Abdicates His Development and Advancement Opportunities*

What occurred in August of 2023, however, is particularly remarkable. On August 2, 2023, Conmey met with McNulty for a one-on-one session. During this meeting, they discussed the lack of progress McNulty had displayed since assuming his new responsibilities in June of 2022. Conmey's preparation notes for that meeting have been produced, reflecting the agenda points he had prepared in advance (black type) and the highlights of their discussion during the meeting (red type). *See* Ex. 7. Conmey met with McNulty to discuss the need to "work towards proactively embracing [his] expanded role" as the retail team lead and the technical compliance expert on "Sanctions" (the statutory and regulatory prohibitions against financial transactions with sanctioned countries, organizations or individuals posing security threats). *Id*.

Conmey went into the meeting with the goal of emphasizing the "opportunity for growth" through the new responsibilities McNulty had been given, and the importance of proactive, strategic thinking. *Id*. Conmey also planned to address the critical importance of McNulty's "building relationships and ongoing dialogue" with his colleagues who depended upon his expertise in the retail investment space. *Id*. Lastly, Conmey intended to address the career implications of such dialogues and establishing an "Enterprise presence" that is essential to advancement. *Id*. Rather than embrace these recommendations, McNulty opted to reject the potential advancement opportunities that had been offered to him.

Despite his job classification being elevated from P5 to M4 and an increased salary that he had received upon accepting the new responsibilities in June 2022, McNulty complained he should have been promoted to a Vice President position, that he was not being compensated enough for his efforts, and that he had been given additional responsibility without proper recognition. McNulty asserted that his anti-money laundering compliance responsibilities alone warranted a promotion to Vice President. *Id*. McNulty also told Conmey that he was concerned about the delegation of AML responsibilities that had devolved upon his team, stating he was uncomfortable accepting the "personal liability" he faced as the officer responsible for signing off on AML and Sanctions compliance. *Id*.

Prior to the August 2, 2023 meeting, McNulty already had expressed frustration to Conmey that his increased array of responsibilities had not resulted in a promotion to Vice President. During the one-on-one meeting, McNulty stated that since the company had not made him a VP despite those increased responsibilities, he saw no reason to continue putting in the additional time and effort necessary to discharge those increased responsibilities. Under the circumstances, McNulty told Conmey, he wanted to "step aside" from the additional responsibilities he had assumed in June 2022, preferring to simply serve as a Senior Director responsible for AML. *Id.* Conmey reported McNulty's decision to Evenson, and the increased responsibilities (including his seat on the Enterprise Compliance steering group) were removed from his plate four months later, effective October 16, 2023. *See* Ex. 8 (October 2, 2023 Conmey email announcing EC Programs Team Changes).

McNulty's decision had immediate ramifications for his colleagues, who had to pick up the slack. McNulty's fellow Senior Directors in Enterprise Compliance ramped up their responsibilities significantly, *without* a Vice President title, including Nicole Lund, Senior Director, Compliance Strategy & Execution (one of the purported beneficiaries of the alleged gender discrimination against McNulty). In fact, it was Lund who agreed to take on McNulty's relinquished responsibilities as lead for the retail group, while continuing her existing compliance responsibilities. Ex. 8 (October 2, 2023 Conmey email). Lund also picked up McNulty's direct reports on the retail team, now directly supervising twice as many employees as McNulty – and she did so without being elevated to VP. *Id*. McNulty's assertion that Lund's *eventual* ascension to VP proves he was the victim of discrimination is untenable when considering these events.

Further, the fact that increased delegation to direct reports poses increased "personal liability" as the responsible compliance officer should not have been surprising to a 25-year compliance veteran – much less someone with aspirations to become a Vice President with even broader responsibilities. *See* Exs. 20 and 21 (reflecting McNulty's reported work history). McNulty's reticence to accept the enhanced "personal liability" that comes with the territory for senior leaders in compliance is inconsistent with his aspirations for a higher leadership role.

McNulty's decision to reject the development and advancement opportunities afforded to him and his statement to his supervisor that he preferred to simply serve in the role as Enterprise AML Officer rather than putting in the additional time and effort necessary to continue his retail group leadership role, cannot be reconciled with his assertion that, more than a year later, Northwestern Mutual acted unlawfully by elevating one colleague to the Vice President-Supervision role and naming another colleague as NMIS CCO, rather than bestowing these positions upon an employee who had rejected a leadership role that would have afforded him the opportunity to show that he had the skills, qualities, and capacity to serve as a company Vice President.

2.    **McNulty Cannot Demonstrate That Employees Who are *Less* Qualified Than Himself Were Nonetheless Selected for Vice President Roles Over Him.**

As will be demonstrated, McNulty cannot satisfy the fourth element of his Title VII claim, because each of the three individuals he cites as evidence of unlawful discrimination and retaliation

against him is far more qualified than McNulty. This assessment, moreover, was shared by McNulty's direct supervisor (Conmey); the ultimate decision-maker (Valters); McNulty's prior department head (Evenson); and the Executive Vice President – Chief Legal and Public Affairs Officer (Manista).

### *Laila Valters Reorganization of Enterprise Compliance*

Context is everything in evaluating McNulty's claims about the manner in which the Chief Compliance Officer responsibilities for Northwestern Mutual Investment Services and for Northwestern Mutual Wealth Management Company were assigned. Northwestern Mutual needed to reassign the NMIS and WMC Chief Compliance Officer responsibilities because Evenson, who had held those positions while serving as department head for Enterprise Compliance, had been called upon to assume responsibility for the Underwriting Department. Because it was important to the organization for Evenson to undertake her new responsibilities in Underwriting as soon as possible, it was imperative she be relieved of her CCO responsibilities as soon as practicable.

Laila Valters, who months earlier had assumed the role of NMIS President and CEO (the broker-dealer entity), was asked to succeed Evenson and assume additional roles as Enterprise Compliance department head and Vice President – Enterprise Compliance, Chief Compliance Officer for Northwestern Mutual (the life insurance company). *See* Ex. 13 (November 1, 2024 Valters Email – WMC CCO and NMIS CCO Announcements).

As a result of these changes, it was necessary to reallocate responsibilities within Enterprise Compliance. As President of NMIS, it posed an irreconcilable conflict of interest for Valters to assume the role of the Chief Compliance Officer for either the Northwestern Mutual Investment Services or the Wealth Management Company (roles previously held by her predecessor, Evenson). Because neither the NMIS CCO role nor the WMC CCO role was a full-time job, it was necessary to identify the most suitable candidates to assume those responsibilities in addition to those employees' *existing* employment responsibilities.[2]

Contrary to McNulty's speculation shared during the pre-Charge investigation into his allegations, there was no single qualified candidate available to assume both the NMIS and WMC CCO roles other than Valters (who was conflicted from doing so) and Jeff Schloemer. However,

---

[2] McNulty claimed during his November 13, 2024 interview conducted by Human Resources to investigate his pre-Charge discrimination claims that Valters did not post the NMIS or WMC Chief Compliance Officer "positions" through an open application process because she "knew" this would only highlight his "obvious" superiority as a candidate. Northwestern Mutual did not post these "positions" because there were not enough responsibilities to constitute a full-time position; because it was essential to reassign these CCO responsibilities as soon as possible so that Evenson could concentrate entirely on her new, significant responsibilities as department head for Underwriting; and because Valters and her advisors were able to identify the most qualified available candidates without such a posting. Courts have confirmed the propriety of dispensing with an open application process where the position must be filled quickly and there is a known candidate who meets the needs of the position. *See, e.g., Cahill v. Nike, Inc.,* No. 3:18-CV-1477-JR, 2022 WL 19226181, at *9, 27 n. 25, 27–29 (D. Or. Nov. 22, 2022), *report and recommendation adopted,* No. 3:18-CV-01477-JR, 2023 WL 2587682 (D. Or. Mar. 21, 2023).

Schloemer already had a substantial array of responsibilities precluding him from assuming the NMIS and WMC CCO functions without relinquishing other, equally important responsibilities. Such a reshuffling of Schloemer's roles and responsibilities would have taken more time and would have been more disruptive than acceptable.

It is not possible to overstate the importance of these two positions, moreover, as the NMIS and WMC CCO are responsible for overseeing all compliance functions for those entities and protecting the company from the significant challenges and risks faced in such a highly regulated environment. Northwestern Mutual has thousands of investors and clients who depend upon the company to protect their investments. Further contributing to the importance of making the right decision were recent changes in the regulatory landscape and several rapidly evolving rules and regulations in areas of key concern for Northwestern Mutual. Valters was charged with making these CCO appointment decisions, drawing upon insights not only from her predecessor (Evenson), but also from Ray Manista (Executive Vice President – Chief Legal and Public Affairs Officer).

The proposition advanced by McNulty that Northwestern Mutual, the Chief Compliance Officer, and the Chief Legal and Public Affairs Officer would support the appointment of someone who was not the most qualified available candidate for these two critically important positions is untenable. The potential regulatory consequences of such an ill-advised decision *alone* render McNulty's speculative assertions to the contrary implausible.

### Lund was Far More Qualified than McNulty for the NMIS CCO Role

The comparison of the qualifications and merits of McNulty to Lund, Schloemer, and Pulsfus, as required to evaluate the fourth element of McNulty's Title VII claim, arguably begins and ends with the disqualifying decision McNulty made on August 2, 2023 to abandon his responsibilities as the lead for the retail group. Moreover, Valters will attest that Lund and Schloemer clearly were the best available candidates qualified for those roles.

Even if McNulty had continued in his retail group leadership role, rather than forcing Lund to assume that burden, his experience, skill set, and historic performance rendered him *unqualified* for the NMIS CCO role, much less *more* qualified than Lund. Lund had built strong, important relationships throughout the company cross-functionally, which is essential to the success of the NMIS CCO. McNulty, for his part, repeatedly failed (or refused) to develop and expand those cross-functional relationships to the extent necessary to succeed. *See, e.g.,* Ex. 18 (2022 Year-End Performance Review); Ex. 19 (2023 Year-End Performance Review); and Ex. 15 (December 15, 2024 Year-End Feedback Email). Significantly, Valters had worked with Lund over the prior ten years, most recently in her role as Regional Vice President – East Region, and these interactions had been uniformly positive. Similarly, Lund's previous roles and experiences gave her positive, direct exposure to Manista, the chair of the committee comprised of the company's most senior officers. Well before the need for a new NMIS CCO arose in November 2024, Lund had been identified as a top talent in the organization based on her work performance.

Lund also outshone McNulty in her proactivity and insightful management of the challenges facing the company, without the necessity of the prodding and direction often required to inspire McNulty to act. Lund proactively took on the committee and board reports contributions concerning the retail team. She referenced available materials and devised an effective plan for the reports to be developed, vetted, and submitted. She impressed her department head by volunteering to take over the Enterprise Compliance contributions to one of the company's annual reports – a labor intensive and critically important responsibility. And she executed these tasks masterfully.

Valters views Lund as someone who "looks around corners," gets ahead of issues, and brings creative and timely ideas and solutions to her superiors. Lund impressed Valters as demonstrating a high level of ownership, maturely presenting issues, displaying a broad enterprise vision, and assisting Valters in "connecting the dots" and suggesting thoughtful and pragmatic solutions to challenges. McNulty, in contrast, is not seen as a strategic thinker, and was reactive rather than proactive on many occasions, including his management of the Sanctions responsibilities. Evenson will testify that they had to press McNulty to act, and that Conmey had to bring him along with considerable guidance and direction when McNulty was asked to address issues outside his comfort zone.

Equally important, and in contrast with McNulty, Lund had demonstrated a strong, consistent commitment to her professional development. Indeed, when McNulty decided to abdicate his retail group role in August 2023, it was Lund who took on those duties from him, in addition to her existing responsibilities and the new roles she had been assigned in June 2022. Over the years, Lund actively sought work and responsibilities beyond her core compliance role, such as taking on a leading role in the budgeting process, allowing her to demonstrate her relationship building and working across the organization, solving complex problems, and navigating challenging organizational politics. McNulty, for his part, was criticized by one of his colleagues for failing to "manage[] the senior level relationships with Enterprise Compliance and around the company." *See* Ex. 10 (December 8, 2023 feedback email).

Further overlooked by McNulty, but important to Valters' decision to appoint Lund as the new NMIS CCO, is the fact that Lund already had been assisting Evenson with the performance of NMIS CCO functions during the time period that Evenson was responsible for the New North building improvement project. *See* Ex. 11 (October 11, 2024 article reporting on the construction and makeover project). As a result of this experience, Lund had demonstrated she could succeed in the very NMIS CCO role that was now being filled. Lund also interacted directly with Valters in this capacity, after Valters had been appointed president of NMIS in August 2024. This gave Lund the unique opportunity to impress the very person who ultimately was charged with the decision who to appoint as the NMIS CCO. As a result of having already been assisting with the CCO functions, Lund essentially had auditioned for the position and demonstrated she was uniquely qualified and capable of succeeding in that role. *See Butler v. Escalante*, No. 20-CV-175-WMC, 2023 WL 6441931, at *5 (W.D. Wis. Oct. 3, 2023) (rejecting assertions that the comparator was less qualified than the claimant based on the relevant work experience and performance of the former); *see also Reinebold v. Bruce*, 18 F.4th 922, 925–26 (7th Cir. 2021) (Section 1983 and ADEA case)(rejecting assertions that the comparator was less qualified than the claimant based on the superior interview performance of the former).

Illustrating the same lack of perspective and skewed view of the role of a senior leader that has limited his career potential over the years, McNulty erroneously contends that his purportedly superior technical knowledge and historic compliance roles somehow categorically render him more qualified than Lund. While Northwestern Mutual rejects the premise that his experiences were stronger than Lund's (since Lund, too, has a wealth of relevant compliance experience), McNulty's assertion fails to consider the signal importance of the intangibles that separate skilled technicians from senior company leaders.

Lund, by all accounts, has the superior enterprise vision, collaborative cross-departmental relationships, ability to execute with minimal direction and oversight, and proactive, strategic approach to discharging compliance obligations. McNulty's technical knowledge and acumen do not overcome the deficit created by the absence of the leadership skills essential to succeed at the highest levels at Northwestern Mutual. While McNulty may believe his technical prowess and experiences render Lund less qualified, his is a lonely perspective. *See, e.g.*, Ex. 16 (February 24, 2025 Reuters article, "Brand Watch: Why investing in 'soft' skills makes hard-headed business sense"); Ex. 12 (October 22, 2024 Harvard School of Public Health article, "Why Leadership and Management Skills are Essential for People with Technical Backgrounds").

During the November 2024 interview conducted by the HR officer investigating his pre-Charge discrimination claim, McNulty cited his six-month tenure with SII Investments as a positive – rather than a negative – when comparing his merits to Lund's. When McNulty populated the Workforce database with his employment history, he recorded that he had worked at SII for a year. In fact, it appears from the FINRA BrokerCheck report and the SEC Investment Adviser Public Disclosure report that McNulty only worked for SII for a little over six months. *See* Exs. 23 and 24. Further, after leaving SII, McNulty returned to a technical position as Enterprise AML Officer, rather than seeking a VP-level position elsewhere, comparable to the position he held briefly at SII.

Lund, by contrast, had accepted the new responsibilities she had been asked to undertake in June 2022, patiently fulfilled her new obligations, and took on even more duties in October 2023 (when McNulty forfeited his leadership role for the retail group), all without demanding a promotion to VP or more compensation; without expressing reservations about her "personal liability" as a compliance officer; and without backtracking from her commitment to the company and her colleagues. Lund's patience, persistence, execution, and dedication paid off, as she ultimately was promoted to Vice President on November 1, 2024, after being appointed additional responsibilities as the NMIS CCO. Lund was not promoted to VP until more than two years after she, McNulty, and Pulsfus *each* had been asked to take on additional responsibilities. Because McNulty opted for a different, less demanding course, he has rendered entirely hypothetical how he *might* have fared if he had heeded his supervisors' repeated suggestions for professional development *and* if he had stuck with the retail group leadership role he had been asked to perform.

What *isn't* hypothetical is that McNulty pointedly rejected the stretch responsibilities that had been given to him as an opportunity to further his professional development and career advancement.[3]

McNulty cannot establish that Lund was less qualified than him for the NMIS CCO position.

### Schloemer was Far More Qualified than McNulty for the WMC CCO Role

Since he cannot claim Schloemer (a white male) was appointed over him to the WMC CCO role based on his membership in a protected class, McNulty instead asserts that Schloemer's appointment to the role was simply to cover up the company's alleged, unlawful discrimination against him. Northwestern Mutual only appointed a white male to the position, McNulty argues, to create the appearance the company was not discriminating against him because he is a white male. McNulty also appears to contend that Schloemer – supposedly the less qualified candidate – was only appointed over McNulty in retaliation for McNulty's criticism of Northwestern Mutual's diversity initiatives over the past several years.

These assertions are not only rank speculation, but also are wholly implausible for the same reasons noted in response to McNulty's criticisms of Nicole Lund's appointment to the NMIS CCO position. There is simply too much at stake in ensuring that the best candidate is appointed to such an important role as the WMC CCO, because any significant missteps in this arena could be disastrous for the company, its policy holders, and its constituents. If Northwestern Mutual were a serial discriminator, as McNulty contends, surely the company would have found a safer haven to place these allegedly unqualified candidates than the Chief Compliance Officer for the company's broker-dealer (NMIS) and wealth management company (WMC).

More to the point, McNulty's contention that the company must have seen him as the superior candidate for the WMC CCO position over Schloemer is particularly untenable, as Schloemer was the one available candidate (other than Valters herself) who Evenson, Valters, and Manista considered qualified to immediately assume not only the WMC CCO role, but *both* the NMIS *and* WMC CCO roles. Conmey was considered for the position, but it was determined his assumption of those duties would have been difficult given his other responsibilities, and that he would benefit from more opportunities to interface with the field before taking on such a role. Evenson and Valters did not believe Lund was prepared to assume the WMC CCO role yet either; despite the importance of the NMIS Chief Compliance Officer role, the WMC Chief Compliance Officer position implicated broader, more strategic, and more complex compliance and operational issues for which Lund's experience had not yet fully prepared her.

---

[3] The addition of new responsibilities to a particular position does not typically result in an immediate adjustment of the job level to Vice President. Instead, Northwestern Mutual's Human Resources personnel on the Compensation Team typically defer such an adjustment until sufficient time has passed to assess the duration and demands of those responsibilities and whether other responsibilities have been added or subtracted from the mix. Because this is a longstanding practice at the company, McNulty and Lund knew (or should have known) that it can take time to reap the rewards of additional responsibilities through promotion.

Schloemer was believed to be the most qualified and seasoned candidate for the role – by far – as he already had a substantial percentage of the Enterprise Compliance employees reporting directly or indirectly to him; he had led nearly every team in Enterprise Compliance; and the breadth of his responsibilities had prepared him for taking on the challenging position as WMC CCO. Schloemer had developed strong cross-functional relationships (McNulty had not); Schloemer had a proven ability to lead through complex, cross-organizational problems (McNulty did not); and Schloemer epitomized the proactive approach to identifying solutions necessary for the position (McNulty did not). When Valters informed the Chief Executive Officer for the Wealth Management Company that she was considering appointing Schloemer as the organization's CCO, she received the CEO's unequivocal endorsement, without any alternative candidates being proposed.

When he was interviewed during the pre-Charge investigation of his discrimination complaint, McNulty agreed that Schloemer was more qualified than Lund for the WMC CCO position, but asserted that he had a broader and more in-depth background for the position than Schloemer. McNulty's self-assessment simply is not shared by Valters, Evenson, or Manista, nor is it plausible to maintain that these respected company leaders engaged in a conspiracy to make these important decisions on any basis other than merit.

### McNulty's AML Position does not Include an Equally Demanding Array of Responsibilities As Those Justifying Pulsfus's June 2024 Promotion to Vice President

Finally, turning to the third purported beneficiary of Northwestern Mutual's alleged discrimination, McNulty cannot establish Pulsfus was less qualified than him when her role was evaluated and elevated to a Vice President position, and that McNulty's array of responsibilities was equally deserving of VP status. Contrary to McNulty's bald assertion, Pulsfus was not a "similarly situated female coworker" when she was promoted to VP on June 16, 2024. As explained below, moreover, each job classification at Northwestern Mutual (including Pulsfus's June 16, 2024 VP classification) is conducted by Human Resources professionals who follow a consistent methodology that does not even consider the identity of person who holds that position (much less the gender or color of that person).

In June 2024, Pulsfus's role was evaluated and determined to be at the VP level after her responsibilities had expanded over years. Pulsfus was responsible for the largest division in Enterprise Compliance, imposing more expansive and significant responsibilities upon her than McNulty. When Pulsfus' position was reclassified as Vice President - Advisory Supervision and Alternatives Supervision, additional, new responsibilities had been given to her over a prolonged period of time. Pulsfus also possesses financial management skills that neither McNulty nor anyone else in Enterprise Compliance can match, as she is responsible for forecasting pricing on the field supervisory programs annually, and managing those programs to budget. Since Northwestern Mutual's field management is responsible for funding this program, any missteps in this arena could be damaging to the company's relationship with this important constituency. Pulsfus was entrusted with these responsibilities based on her consistent, proven record of success.

Further, Pulsfus was a company spokesperson responsible for communicating with regulators about supervisory matters and concerns, as well as communicating on such matters to Northwestern Mutual boards and other external audiences. Equally importantly, the position held by Pulsfus, as constituted at the time of the job reclassification, included considerable managerial and supervisory responsibilities, overseeing a division responsible for nearly 100 employees and an $8 million budget, whereas McNulty had jettisoned half of his direct reports when he stepped away from his retail group leadership role.

Pulsfus had been asked to assume the centralized and field supervision programs (requiring strong strategic thinking skills, vision, cross-collaboration, and the ability to drive results cross-organizationally), and she had been charged with setting strategy, evaluating and revising staffing models, and developing capabilities. *See* Ex. 2 (March 16, 2022 Evenson email, Enterprise Compliance Organizational Changes). Indeed, Pulsfus is one of the acknowledged architects for how centralized supervision is structured, organized, and managed at Northwestern Mutual today.

In February 2023, Pulsfus assumed sole responsibility for centralized supervision, including the WMC supervision embedded in this business unit. *See* Ex. 4 (February 2, 2023 Evenson Email – EC Organizational Announcement). Pulsfus assumed WMC Advisory Supervision responsibilities in October 2023, in furtherance of organizational consolidation to bring those responsibilities to Enterprise Compliance. At the same time, Pulsfus also assumed responsibility for annuity supervision. During the same time period Pulsfus was *increasing* her responsibilities, McNulty was *jettisoning* the new responsibilities that had been entrusted to him.

While McNulty asserts Pulsfus's June 2024 promotion to Vice President must be due to gender discrimination because he was not elevated to VP as well, the obvious rejoinder is that the scope of McNulty's responsibilities as Enterprise AML Officer was narrower than the array of responsibilities resulting in the VP classification for Pulsfus's position. Pulsfus acquired this broad array of responsibilities, moreover, because she consistently demonstrated an ability to succeed each time new challenges were thrust upon her. The growth of the supervision function, the company's ability to move supervision responsibilities from the field to the home office, and building new supervision capabilities in support of strategic efforts (such as texting supervision) were all a direct result of Pulsfus's ability to plan proactively and accomplish company objectives.

Pulsfus ultimately was rewarded for meeting the challenges and opportunities that had been given to her, whereas McNulty forfeited his retail group leadership responsibilities because he was frustrated that he was not receiving immediate recognition. McNulty announced his decision to forfeit his retail group role in August 2023; Pulsfus was not made a Vice President until a year later. McNulty's attribution of *her* success and *his* failure to discrimination is patently unfounded.

### 3. Job Classifications are Based Solely on the Responsibilities of the Position.

McNulty's assertion that his job classification as Senior Director rather than Vice President is the result of discrimination or retaliation ignores how Northwestern Mutual undertakes such job classifications.

Northwestern Mutual job classification evaluations are conducted for each position in the company, employing a standard, consistent grading methodology applied by seasoned Human Resources professionals on the Compensation Team. Salary ranges for each position are evaluated annually, whereas job classifications are reviewed when a new job is created or when management in the business unit concludes that a job has changed sufficiently to warrant at least consideration for a reclassification. Further, while input from the business unit is necessary to ensure that HR understands the contours of the position, the professionals on the Compensation Team make the ultimate decisions on job classifications and salary range assignments.

Finally, an employee's membership within a protected class is never used by Northwestern Mutual to conduct job classifications or salary range assignments, nor did that occur on the occasions McNulty's positions and responsibilities were evaluated and determined.

**B.      McNulty Cannot Establish a *Prima Facie* Retaliation Claim Because He Was Not Denied Promotion or Compensation Due to His Engaging in Protected Activity.**

McNulty cannot succeed in his claim for retaliation because he did not experience any adverse employment action as a result of his engagement in protected activity, *i.e.*, his criticisms of Northwestern Mutual's diversity initiatives that began in calendar year 2020. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973); *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996) (each holding there must be a causal relationship between the plaintiff's engagement in protected activity and the challenged adverse employment action).

Northwestern Mutual's timely and respectful discourse with McNulty in response to the criticisms he lodged against the company's diversity initiatives over the years does not reflect a company bent on retaliation. Notably, even after he began to convey his concerns over those diversity initiatives in November 2020, McNulty *afterwards* was elevated from a P5 to M4 job classification; he received base salary increases; he received annual variable compensation awards; and he was afforded career development opportunities that gave him the very real opportunity to demonstrate whether he had the qualities and skills necessary to rise to the next level. Moreover, McNulty was complimented – not punished – for his candor in voicing his concerns. *See* Ex. 19 (2023 Performance Review).

As noted, moreover, McNulty was among the Enterprise Compliance employees who were offered new career growth opportunities by Evenson, the department head, who entrusted McNulty with those new responsibilities for the very purpose of providing him a path for career development and advancement. *See* Ex. 2 (March 16, 2022 Evenson Email). McNulty's supervisors continued to encourage and support McNulty in pursuing his professional development throughout the year and during his annual reviews. *See* Exs. 15, 18, 19 (2022, 2023, and 2024 annual reviews).

Contrary to his core contention that he has been passed over for promotion as a result of Northwestern Mutual diversity initiatives purportedly favoring women and persons of color over white males with allegedly superior qualifications, the same non-discriminatory factors that held McNulty back when Pulsfus and Lund were promoted to Vice President in June and November of

2024 had been holding McNulty back long before he claims he first became the target of discrimination.

As noted, McNulty's pursuit of a position at SII with responsibilities comparable to a Vice President position at Northwestern Mutual ended just six months later, and he did not pursue any comparable position with any Northwestern Mutual competitors. Further, in July 2019, more than a year after returning to Northwestern Mutual, McNulty asked to be considered for the NMIS and WMC Chief Compliance Officer position when Tammy Roou, the recently appointed department head for Enterprise Compliance at the time, had to replace Jeff Williams, who was retiring. When McNulty asked for the opportunity to interview for the position, Roou declined, having concluded that McNulty's experience and his "soft skills" limitations precluded considering him as a viable candidate.

If McNulty first fell victim to Northwestern Mutual's purportedly discriminatory conduct in June 2020, how can he explain being rejected as a candidate for such a promotion as early as July 2019 – and for the substantially same reasons he was passed over in June and November of 2024? Northwestern Mutual's decision-makers will attest that each of the promotion and compensation decisions challenged by McNulty was premised exclusively on merit rather than protected class status. These Northwestern Mutual management employees' accounts are corroborated by (1) a sequence of events that cannot be reconciled with McNulty's own narrative; and (2) contemporaneous documentation of the non-discriminatory justifications for the company's decisions. McNulty, for his part, admitted during his November 2024 interview with the HR professional investigating his pre-Charge complaint that his claims of unlawful discrimination were based on "*breadcrumbs*" that made him "*feel like*" he had been targeted by discrimination and retaliation.

Where, as here, Northwestern Mutual has demonstrable, logical, and contemporaneously documented non-discriminatory reasons for the promotions and compensation decisions McNulty is challenging, his rank speculation will not support a contention that those business decisions are a mere pretext. *See Olson v. Healthdyne Maternity Mgmt.*, 124 F.3d 204 (7th Cir. 1997) (holding that evidence of non-discriminatory business reasons cannot be overcome by a claimant's speculation that s/he is the object of discrimination); *Igasaki v. Illinois Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 960 (7th Cir. 2021) (summary judgment dismissal of retaliation claim that was premised upon multiple layers of "impermissible speculation"); *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). This is true even where there is evidence that the decision-maker was "philosophically favorable to the hiring of" members of a protected class. *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006).

McNulty may sincerely believe he is more qualified than Lund, Schloemer, Pulsfus, and his other colleagues at Northwestern Mutual over whom he claims superiority. However, a claimant's opinions about his own performance or qualifications (even when supported by some co-workers) are insufficient to demonstrate he is a "stronger performer than other candidates." *Rabinovitz v. Pena*, 89 F.3d 482, 487 (7th Cir. 1996). The law does not give weight to such evidence because "subjective beliefs are insufficient to create a genuine issue of material fact" necessary to prevail on a discrimination claim. *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016).

Northwestern Mutual's longstanding commitment to equal opportunity, inclusivity, diversity, and protecting employees from discrimination – as discussed in the final section of this position statement – does not convert legitimate promotion and compensation decisions into a violation of Title VII. *Mlynczak,* 442 F.3d at 1058. Nor do Title VII's retaliation prohibitions insulate a claimant from adverse employment decisions merely because he has asserted a claim for discrimination. While retaliation is an important component of the protections afforded by Title VII, it cannot be wielded by an employee to evade responsibility for performance or deliberate career choices. *See Vaughn v. Vilsack*, 715 F.3d 1001, 1007 (7th Cir. 2013) (an employee "cannot use his prior EEO activity as a shield against the consequences of his inappropriate workplace conduct"). *See also Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (an employee's "inappropriate workplace activities are not legitimized by an earlier-filed complaint of discrimination"). McNulty's unfortunate allegations of unlawful discrimination against Northwestern Mutual must be supported by evidence – not speculation. The claims asserted in the Charge should be rejected.

Regardless of whether any elements of Northwestern Mutual's diversity initiatives could be reasonably criticized, given the wealth of federal court case law rewarding and mandating such practices, McNulty is not a victim of those measures because McNulty is not a victim of unlawful discrimination. Granting summary judgment for the employer in *Mangold v. PECO Energy,* Case No. 19-5912, 2021 WL 6072818 (E.D. Pa., Dec. 23, 2021), the district court held:

> Title VII … exist[s] to protect against discrimination based on—among other things—race or gender. These statutes are not available to correct all perceived employment wrongs. Although Plaintiff attempts to link the events in question to Defendant's [diversity] initiative and a workplace climate seeking to create diversity among the workforce, the record is devoid of evidence showing that any of the events at issue were even remotely connected to this initiative or that Plaintiff was discriminated against as a white male. Given the absence of any evidence on which a reasonable jury could find in favor of Plaintiff on any of his claims, I will grant summary judgment for Defendant.

*Mangold*, 2021 WL 6072818, * 19.

McNulty is a Senior Director at Northwestern Mutual, a title many of his fellow employees would be pleased and honored to attain. McNulty has not been appointed a Vice President title and position because the scope of his duties and responsibilities do not warrant this elevated title. McNulty would have been treated no differently if he were a woman or a different race or national origin; to the contrary, he would hold precisely the same position in the company today.

## C.    Northwestern Mutual Makes Clear to Management and its Employees that Diversity Initiatives Do Not Give License to Hire or Promote Based on Gender, Color, or Race.

Northwestern Mutual strongly believes employers have an obligation to take proactive steps to ensure that hiring and promotion decisions are not based in whole or in part on a person's "race, color, religion, sex [or] national origin," and Northwestern Mutual's philosophy would prevail regardless of whether or not Congress had ever enacted Title VII. Northwestern Mutual

also believes discrimination is equally reprehensible and unlawful regardless of whether the discrimination is directed at a person who is among the minority or the majority within these protected classes.  If a person is hired or promoted in whole or in part because s/he is white or because s/he is black; because s/he is male or because s/he is female; because s/he is Catholic or because s/he is a Jew; because s/he is Irish or because s/he is Chinese, Northwestern Mutual opposes, prohibits, and condemns such decisions as equally discriminatory.  This is axiomatic.

For these reasons, the express goal of Northwestern Mutual's hiring policies and practices is to select the best candidates for each position based solely on merit, without regard to race, gender, or any other protected characteristics.  As stated in the company's published, written policies, Northwestern Mutual does not discriminate on the basis of race, gender, or any other protected characteristic.  The diversity initiatives and practices criticized by McNulty have been pursued in furtherance of the goal of zero discrimination by taking reasonable and legitimate steps to ensure Northwestern Mutual does not erect or maintain any barriers to entry or promotion based on protected characteristics. If Northwestern Mutual does not proactively address, monitor, measure, and reward these efforts, it will not know whether or to what extent unlawfully discriminatory practices may be impeding the hiring or promotion of these individuals.  Nor is it unlawful to set goals and measures designed to prevent the potential perpetuation of unlawful discrimination.

Northwestern Mutual has consistently conveyed these policies and prohibitions to its employees, people managers, and executives, and expects strict adherence to those principles.  *See, e.g.*, Ex. 25 (Equal Employment Opportunity policy & Culture of Respect policy); and Ex. 26 (EEO Officer Policy).  In the company's Equal Employment Opportunity policy, for example, Northwestern Mutual admonishes its employees:

## Equal Employment Opportunity Policy

Northwestern Mutual is an equal opportunity employer who welcomes and encourages diversity in the workforce. We are committed to creating and maintaining an environment in which each employee can contribute creative ideas, seek challenges, assume leadership and continue to focus on meeting and exceeding business and personal objectives.

The company prohibits discrimination based upon an individual's race, color, religion, creed, age, sex, disability, national origin, ancestry, ethnicity, sexual orientation, gender identity/expression, marital status, citizenship status or veteran status or any other characteristics protected by law.

Northwestern Mutual also specifically addresses the specter of "reverse discrimination" in guidance to its leaders, admonishing that "reverse discrimination" is prohibited, that "[d]iscrimination due to a person's race and/or gender is illegal," and that discrimination will not be tolerated "in *any* form, against *any* of our people." Each employee is "expected to make the best decisions on behalf of the company," and the "best decision for the company is to hire, promote and retain the best talent, *regardless of anything else*." Northwestern Mutual makes clear that the company "must remain a *meritocracy*, and that means that we choose *the best person for the job*." Northwestern Mutual plainly instructs in its published policies that diversity goals and initiatives do not give license to unlawful "reverse discrimination," despite the benefits that arise from creating a diverse and inclusive environment for all employees. *See* Ex. 27. For example, Northwestern Mutual advises in the FAQ section of a people leader toolkit, "*Regardless of race and/or gender*, employees who continue to perform at their best will continue to be successful at Northwestern Mutual, *full stop*. Discrimination due to a person's race and/or gender is illegal, and as a company, we will not tolerate discrimination in any form, *against any of our people*." *Id.*

Northwestern Mutual only enacts and enforces policies and procedures that it honestly believes comply with its state and federal statutory obligations – including Title VII – and that are reasonably supported by the courts' current interpretation and application of these laws. Northwestern Mutual well understands, however, that this is an ever-evolving legal landscape, requiring frequent reassessment and evaluation of the company's policies to ensure, to the best of its ability, that its approach is fair and lawful.

McNulty has been a frequent critic of several of these policies and procedures, and Northwestern Mutual has no doubt his opinions are held firmly, sincerely, and passionately. Northwestern Mutual has treated McNulty with the respect he and every other employee deserves, and the company has engaged in civil and direct discussions and communications with him on this topic. Northwestern Mutual has assured McNulty that it actively monitors this evolving legal landscape, keeping abreast of the changes and trajectory of the case law.

McNulty's criticisms fail to acknowledge that we do not live in a perfect world; that there are minority members of protected classes who may be intentionally or unintentionally excluded from a fair opportunity for hiring and promotion by people managers actuated by human biases and assumptions based on their perception of those protected characteristics; and that ignoring this potential problem is equally immoral (and potentially unlawful) as overreacting to the problem by discriminating against the *majority* members of these classes.

McNulty also fails to give due weight to Northwestern Mutual's desire to create an environment and culture where everyone receives the respect they deserve and feels welcome and accepted. McNulty also gives short shrift to the fact that diversity in the workforce is good for business – a tertiary concern in light of the weightier concerns in play here, but something any responsible employer should consider. *See, e.g.*, Ex. 9 (December 5, 2023 McKinsey & Company Report, "Diversity matters even more: The case for holistic impact.") ("A strong business case for ethnic diversity is also consistent over time, with a 39 percent increased likelihood of outperformance for those in the top quartile of ethnic representation versus the bottom quartile.").

Finally, McNulty overlooks that if Northwestern Mutual fails to monitor, measure, and seek lawful ways to address protected class disparities in the workforce, such a failure can expose the company to liability under state and federal anti-discrimination laws. *See, e.g., Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994-997, 1000 (1988) (holding that Title VII claimants may rely on a disparate impact theory to challenge subjective or discretionary promotion systems and discussing the role statistical evidence of disparities plays in establishing or opposing *prima facie* claims); and *Mozee v. American Commercial Marine Service Co.*, 940 F.2d 1036, 1044-1045 (7th Cir. 1991), *supp. on rehearing by* 963 F.2d 929 (7th Cir. 1992) (acknowledging that statistical evidence of such disparities can play a pivotal role in an employer's losing or winning a Title VII action). Forewarned is forearmed, yet McNulty suggests his employer should wear blinders.

None of this is to suggest that an employer's benevolent concerns about creating an inclusive environment gives the company license to violate the very practices Title VII prohibits by unlawfully discriminating against the majority members of a protected class. Northwestern Mutual is aware that well-meaning people managers could misconstrue the lawful goals reflected in the company's diversity policies and initiatives and unwittingly commit such violations. Northwestern Mutual acknowledges its obligation to vigilantly guard against this possibility, and periodically updates its prevailing policies, practices, and procedures to strive to prevent any member of a protected class – *minority member or majority member* – from suffering unlawful discrimination.

Employers operate in a legal and social environment fraught with risk, and it is fair to say that these risks seldom have been so acute, complex, and challenging than over the past several years. Northwestern Mutual believes it is managing these risks in a manner that protects the majority *and* the minority members of protected classes, and the company takes seriously its obligation to do so.

## IV.    CONCLUSION

For each of the reasons set forth in this position statement, Northwestern Mutual requests that the EEOC reject the discrimination and retaliation claims McNulty has asserted. Northwestern Mutual welcomes the opportunity to meet with McNulty and EEOC staff if such a discussion might facilitate resolving the concerns this 22-year employee of the company has expressed. While Northwestern Mutual has been told that this matter is not eligible for mediation, mediation can be an effective means of bridging gaps and resolving disputes. Accordingly, Northwestern Mutual requests that the EEOC reconsider this potential after reviewing this position statement.

Northwestern Mutual looks forward to working cooperatively with the EEOC to address and resolve the claims and concerns that have been asserted.

Very truly yours,

GODFREY & KAHN, S.C.

*Paul F. Heaton*

Paul F. Heaton
Rebeca M. López

Enclosures

cc:    Mr. Mark E. McNulty (w/enc. – via U. S. Mail Only)

## **Schedule of Exhibits**

Exhibit 1.   March 1, 2025 EEOC Charge

Exhibit 2.   March 16, 2022 email (redacted to remove PII)

Exhibit 3.   December 2, 2022 Evenson-Conmey-McNulty email exchange (redacted to remove PII)

Exhibit 4.   February 2, 2023 Evenson Email – EC Organizational Announcement (redacted to remove PII)

Exhibit 5.   May 17, 2023 Pew Research Center article, "Diversity, Equity and Inclusion in the Workplace" (Diversity, Equity and Inclusion in the Workplace: A Survey Report (2023) | Pew Research Center)

Exhibit 6.   July 19, 2023 Conmey-McNulty email exchange

Exhibit 7.   August 2, 2023 One-on-One Planning and Meeting Notes

Exhibit 8.   October 2, 2023 Conmey email announcing EC Programs Team Changes (redacted to remove PII)

Exhibit 9.   December 5, 2023 McKinsey & Company Report, "Diversity matters even more: The case for holistic impact." (Why diversity matters even more | McKinsey)

Exhibit 10.  December 8, 2023 Year-End Feedback Email (redacted to remove PII)

Exhibit 11.  October 11, 2024 BizTimes article (https://biztimes.com/one-year-in-makeover-of-northwestern-mutuals-north-office-building-takes-shape/)

Exhibit 12.  October 22, 2024 Harvard School of Public Health article, "Why Leadership and Management Skills are Essential for People with Technical Backgrounds" (Why Leadership and Management Skills are Essential For People With Technical Backgrounds | Harvard T.H. Chan School of Public Health)

Exhibit 13.  November 1, 2024 Valters Email – WMC CCO and NMIS CCO Announcements

Exhibit 14.  December 12, 2024 Year-End Feedback Email (redacted to remove PII)

Exhibit 15.  December 15, 2024 Year-End Feedback Email (redacted to remove PII)

Exhibit 16. February 24, 2025 Reuters article, "Brand Watch: Why investing in 'soft' skills makes hard-headed business sense" (Brand Watch: Why investing in 'soft' skills makes hard-headed business sense | Reuters)

Exhibit 17. March 3, 2025 Valters to McNulty on "Open Audit Item – Risk Accepted."

Exhibit 18. 2022 Year-End Performance Review

Exhibit 19. 2023 Year-End Performance Review

Exhibit 20. Workday-Source Chart Reflecting McNulty's Reported Job History

Exhibit 21. Workday Source PDF Reflecting McNulty's Reported Job History

Exhibit 22. 2024 Year-End Performance Review

Exhibit 23. FINRA BrokerCheck Report for McNulty

Exhibit 24. SEC Investment Adviser Public Disclosure Report for McNulty

Exhibit 25. Equal Employment Opportunity & Culture of Respect Policies

Exhibit 26. EEO Officer Policy

Exhibit 27. Diversity & Inclusion People Leader Goal Toolkit

32970603.3

# EXHIBIT 1

# CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| **CHARGE PRESENTED TO:** | **AGENCY CHARGE NO.** |
|---|---|
| EEOC | 443-2025-01752 |
| Wisconsin Equal Rights Division | N/A |

Name *(indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.)*: Mr. Mark E. McNulty

Phone No.: (920) 725-1234
Year of Birth: 1970
Mailing Address: 1930 Oakview Dr
NEENAH, WI 54956

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: NORTHWESTERN MUTUAL
No. Employees, Members: 501+ Employees
Phone No.: (414) 665-6543
Mailing Address: 720 E WISCONSIN AVE
MILWAUKEE, WI 53202, UNITED STATES OF AMERICA
Name:
No. Employees, Members:
Phone No.:
Mailing Address:

DISCRIMINATION BASED ON:

Color, National Origin, Race, Retaliation, Sex

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 06/01/2020
Latest: 02/21/2025
Continuing Action

THE PARTICULARS ARE:

I.I was most recently rehired in or about 2017, as an Anti-money Laundering Officer. Beginning in or about 2020, Respondent enhanced its existing Diversity Equity and Inclusion policy by focusing on providing additional support and opportunities for women and people of color. Respondent instructed that women and people of color were to receive additional mentorship and promotional opportunities. Respondent also issued mandatory performance metrics within the company and to third party contractors to advance and promote women and people of color. I made several complaints that I believed the policy was unlawful. Thereafter, I have been denied the advancement of my position to a vice president level. I am aware that a similarly situated female coworker was advanced to a Vice president position. In addition, expressed interest in a Chief Compliance Officer position. The position was given to a female employee who was significantly less qualified without competition.

II.I believe I was discriminated against based upon my sex (male), race (White), color, national origin (American-Irish), and in retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 29 of 227 Document 3-8 MCNULTY-EEOC-PROD-000001

III.I believe Respondents policy has similarly discriminated against others based on their sex (male), race (White), color, national origin (American) in violation of Title VII of the Civil Right Act of 1964, as amended.

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 30 of 227 MCNULTY-EEOC-PROD-000002

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct, and that I have read each page of this form.

Digitally Signed By: Mr. Mark E. McNulty
03/01/2025

Charging Party Signature & Date

If a state or local Fair Employment Practices Agency (FEPA) requires notarization, you may need to sign the charge in the presence of a notary. If so, please do so here.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.

Notarized Signature of Charging Party

Subscribed and sworn to before me this date:

Signature of Notary_____

Printed Name _____

CONFIDENTIAL Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 31 of 227 MCNULTY-EEOC-PROD-000003

## CP Enclosure with EEOC Form 5 (06/24)

### Privacy Act Statement

Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **Form Number/Title/Date.** EEOC Form 5, Charge of Discrimination (06/24).

2. **Authority.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **Principal Purposes.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **Routine Uses.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **Whether Disclosure is Mandatory; Effect of Not Giving Information.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### Notice of Right to Request Substantial Weight Review

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so *within 15 days* of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### Notice of Non-Retaliation Requirements

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA, Section 207(f) of GINA, and 42 USC 2000gg-2(f)(1) of the PWFA it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment, of, rights under the Act.

# EXHIBIT 2



**From:** VILLEGAS, REBECCA <rebeccavillegas@northwesternmutual.com>
**Sent:** Wednesday, March 16, 2022 8:15 AM
**To:** EC-ALLEMPL <EC-ALLEMPL@northwesternmutual.com>; EC-CONTRACTOR-ALL <EC-CONTRACTOR-ALL@northwesternmutual.com>
**Cc:** MANISTA, RAY <raymanista@northwesternmutual.com>; ROOU, TAMMY <tammyroou@northwesternmutual.com>; VILLEGAS, REBECCA <rebeccavillegas@northwesternmutual.com>
**Subject:** Enterprise Compliance Organizational Changes

*Sent on behalf of Tammy Roou & Rebecca Villegas:*

Good morning team:

Our business is gaining momentum – and making a positive difference in the lives of more clients than ever before. There has never been a more critical time for compliance and supervision expertise that helps to earn and keep the trust of our clients, field, business partners, and regulators. As mentioned in previous communications, Tammy Roou and Bob Johnson will retire in June of this year, which gives us an opportunity to review our current organizational structure and adjust accountabilities to meet the needs of our business - now and in the future. At the same time, we will provide new career growth opportunities for several of our compliance and supervision team members. We'll have a chance to dive deeper on these changes during our department meeting this morning, where we'll discuss several organizational changes designed to:

- Create additional clarity across the lines of compliance and supervision within our department
- Align leaders and teams to create additional opportunities for collaboration and efficiencies
- Anticipate evolving & emerging needs for enterprise advice and increasing complexities in our risk environment
- Support the career and talent development needs of our growing department

With these goals in mind, we are excited to announce the following members of Rebecca's leadership team, effective June 1st:

<u>Compliance Programs:</u> These teams and leaders support the enterprise through quality, timely advice and develop and implement compliance policies, procedures, and controls designed to meet regulatory compliance. Each team is organized around distinct business lines, with a centralized team that supports all programs with policy and governance capabilities and provides integrated advice to the enterprise.

- **Sarah Brach – Sr. Director Technology, Governance & Regulatory Compliance**: In this role, Sarah will have responsibility for key functions that support all compliance programs and entities across the enterprise, including policies and procedures, Compliance by Design, compliance testing, and regulatory response. Sarah's team will also provide advice to enterprise partners where an integrated view of

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 34 of 227 MCNULTY-EEOC3 PROD-000005

compliance is required, including planning and client experience efforts. Sarah will also lead the strategic initiative to modernize our compliance regulatory reporting, policy management, and findings management platform. Reporting to Sarah include the following people and teams: ██████████████████████████████, and the Regulatory Response and Testing team, which will be led by ███████████████████, Assistant Director- Regulatory Response. Sarah will be posting two roles in the near future: Assistant Director – Technology Compliance, and Assistant Director – Compliance Governance Platforms.

- **Paula Storniolo – Sr. Director Risk Products & Operations Compliance and Chief Compliance Officer, NM Separate Accounts and Northwestern Long Term Care**: Paula will continue to have responsibilities for designing and overseeing the policies, procedures and controls related to the NM Separate Accounts and all NM risk products including life insurance, disability income, variable products, and long term care. Paula's team also provides support and advice to all enterprise teams and projects covering these business lines. Reporting to Paula are the following people: ████████████████████████████████████████████████████████████.

- **Mark McNulty – Sr. Director Retail Investments Compliance & Enterprise AML:** Mark's existing role leading enterprise AML will expand to include teams responsible for overseeing the policies, procedures, and controls related to NMIS and NMWMC in the Wealth & Investment Management function. Mark's new team will be responsible for providing advice to enterprise partners regarding anti-money laundering and retail investments topics. Reporting to Mark are the following people: ███████████████████████████████████████████████████████████████. To support Mark's new responsibilities and the growing transactional volume in the AML space, Mark will be posting for a new AML Consultant position in the coming weeks.

- **Mike Conmey – VP – Managed Investments Compliance & Chief Compliance Officer – MSA, NMSF, and NMIMC:** Mike's responsibilities and team will remain unchanged by the re-organization, and he will continue to design, implement, and oversee the policies, procedures, and controls related to the compliance programs of Mason Street Advisors, LLC, Northwestern Mutual Series Fund, Inc., and Northwestern Mutual Managed Investment Management Company, LLC. Continuing to report to Mike are the following people: ████████████████████████████████████████████████.

Sales Practices and Marketing Compliance: These teams provide oversight, advice, and review of field sales practices through field inspections, investigations, and complaints, and provide critical support through the review and approval of home office and field advertising and marketing materials. The expertise of these teams will be paired with the teams and systems responsible for sales practice surveillance and analytics, to bring together human and data centered risk management and decision making.

- **Jeff Schloemer – VP Enterprise Compliance:** Jeff will continue to be responsible for compliance teams providing advice and controls regarding field sales practices and marketing. To accelerate our work in using data and analytics to understand and evaluate sales practice risk, Jeff will expand his responsibilities to include compliance analytics, partnering closely with the enterprise data science and analytics teams, and integrating this work into our compliance surveillance systems and controls. Finally, the existing Marketing Materials Compliance team and the Field Engagement team in Jeff's function will come together under the leadership of ██████████████, who is being promoted to Sr. Director – Field Oversight & Marketing Compliance in recognition of these new responsibilities. On Emily's team, Coreen Mills will be promoted to Assistant Director – Field Engagement to lead the field inspections and field consulting operations. In addition to Emily, reporting to Jeff include the following leaders and their teams: ████████████████████████████████ ██████████████ Jeff will be posting for a Compliance Analytics Lead in the coming weeks.

Supervision: Following the retirement of Bob Johnson, the supervision teams will be led by Jaime Pulsfus and Jonathan Viard, who have shared accountability for delivery of centralized supervision strategy and outcomes. To consolidate supervision responsibilities within Enterprise Compliance, the home office supervision team and the field supervision program will join the division.

- **Jonathan Viard – Sr. Director - Supervision**: Jonathan will lead the enterprise supervision teams responsible for electronic communications review, in addition to serving as the liaison between supervision and the Managing Partner Association. Jonathan will also continue his critical work as the enterprise lead of

the Sustained Action for Racial Equality (SARE), team. Reporting to Jon are █████████████████████████████████.

- **Jaime Pulsfus – Sr. Director – Supervision Programs and Operations:** Jaime will increase her responsibilities to include the centralized and field supervision programs, including strategy setting, supervision staffing models, and capabilities development. To support with this work, ██████████ will be promoted to Field Supervision Program Lead and ████████████ will be promoted to Assistant Director Centralized Supervision Change Management**.** Supervision operations will re-organize under the new leadership of ██████████, Assistant Director – Supervision Operations, and will continue to deliver transactional supervision services to all 76 network offices. To support James' additional responsibilities, ███████████████ will be promoted to Manager – Centralized Supervision**.** ██████████**,** Assistant Director – Centralized Supervision, will expand his current responsibilities for field incentive supervision, field performance and outreach, and interim supervisor support, to include new accountabilities for the home office supervision program, overseeing home office supervisors and home office trade desk and unassigned investment client services supervision. To support this work, ████████████ will be promoted to Assistant Director HO Supervision, and both she and █████████████ will report to Nick**.** Also reporting to Jaime include the following people and their teams: ████████████████████████████**.**

Strategy and Execution: This is a newly formed role designed to support the needs of our growing department, including business and tech strategy, talent strategy, and department integration and external outreach.

- **Nicole Lund – Sr. Director Strategy & Execution**: In this newly created role, Nicole will lead a team providing several critical areas of department operations including: workforce planning and talent strategy, compliance business and technology strategy, evolving our shared resource team, Inter-Business Operations, and field and enterprise compliance training and communications. Reporting to Nicole will be the following people and teams: ████████████████████████████████████████████████████████████████.

With these changes, ████████████ position will be eliminated and he will be leaving the company to pursue other opportunities. We'd like to thank ██████ for his many years of contributions, including his leadership of compliance analytics, Inter-Business Operations, and compliance governance platform strategy, and we wish him well on his future endeavors. He will be working to transition his work over the next couple of months, and his last day in the office will be June 5th.

Your leaders will be engaging with you over the coming weeks to make any refinements necessary to the work and accountabilities of our department teams. We encourage you to be open and transparent with your leader about questions you may have. We're so proud of all that we have achieved in Enterprise Compliance, and we are looking ahead toward our continued success in the critical role we each play as trusted advisors and culture builders across the enterprise and field.

We're looking forward to talking to you this morning.

*Tammy & Rebecca*

# EXHIBIT 3

| | |
|---|---|
| **From:** | VILLEGAS, REBECCA |
| **Sent:** | Friday, December 2, 2022 4:28 PM |
| **To:** | CONMEY, MICHAEL |
| **Cc:** | VILLEGAS, REBECCA |
| **Subject:** | FW: [EXTERNAL] Morgan Stanley to Make 'Modest Cuts' of Staff, CEO Says |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Hi Mike,

Thought I'd pass along a timely example of where I'd like Mark's retail teams to take more accountability and ownership for reviewing trade press and proactively identifying areas for assessment and enhancement as needed.

Have a great weekend!

Rebecca

**Rebecca Villegas**
VP – Enterprise Compliance
(she/her)

---

**From:** VILLEGAS, REBECCA
**Sent:** Friday, December 2, 2022 4:26 PM
**To:** ████████████ @northwesternmutual.com>; ██████████████
████████ @northwesternmutual.com>
**Cc:** MCNULTY, MARK <markmcnulty@northwesternmutual.com>; VILLEGAS, REBECCA
<rebeccavillegas@northwesternmutual.com>
**Subject:** FW: [EXTERNAL] Morgan Stanley to Make 'Modest Cuts' of Staff, CEO Says

Hi ████████████,

I'm sending you the 5th article regarding FINRA's guidance on red flags when opening options accounts. I'm particularly interested in whether our account opening guidance to CST team members includes requirements to look for logical inconsistencies in new account profiles – for options accounts or any other account. If not, we should consider updating those procedures/processes and making corresponding updates to the Field supervision manual as well. Please read through the rest of the guidance and make other updates as needed to our options-specific procedures.

Thanks,
Rebecca

**Rebecca Villegas**
VP – Enterprise Compliance

(she/her)

**From:** Financial Advisor IQ <news@financialadvisoriq.com>
**Sent:** Friday, December 2, 2022 3:45 PM
**To:** VILLEGAS, REBECCA <rebeccavillegas@northwesternmutual.com>
**Subject:** [EXTERNAL] Morgan Stanley to Make 'Modest Cuts' of Staff, CEO Says



December 2, 2022

## Morgan Stanley to Make 'Modest Cuts' of Staff, CEO Says

## UBS Refocuses on the Very Wealthy But Prioritizes Digital Build-out

## Schwab to Hire 400+ in Orlando, Including in Wealth Management

## BlackRock CEO: Most Crypto Firms Will Fail in Wake of FTX Collapse

## Finra Urges Firms to Address Red Flags in Opening of Options Accounts

## Auto Enrollment May Become the Law for New 401(k)s

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 39 of 227    Document 3-8    MCNULTY-EEOC-PROD-000009

**Industry Moves**

## Wells Advisors Managing $180M Bolt for Prospera

## Wealthspire Advisors to Add $194M RIA

---

**On FinancialTimes.com**

## Florida to Pull $2bn from BlackRock in Spreading ESG Backlash

---

| PRINT ISSUE | WHO WE ARE | HOME |
|---|---|---|

**Forwarded this email?**

SIGN UP



Unsubscribe & Preferences   |   Forgot Password   |   Request Access   |   Send Feedback   |   About Us

- Unsubscribe & Preferences
- Forgot Password
- Request Access
- Send Feedback
- About Us
- Copyright
- Privacy Policy

**Customer Support (212) 542-1245 or support@financialadvisoriq.com**

Money-Media Inc.

330 Hudson Street, New York, NY 10013

Privacy Policy | © 2022 Copyright

# EXHIBIT 4

| | |
|---|---|
| **From:** | VILLEGAS, REBECCA |
| **Sent:** | Thursday, February 2, 2023 1:01 PM |
| **To:** | EC-ALLEMPL |
| **Cc:** | MANISTA, RAY; VILLEGAS, REBECCA |
| **Subject:** | EC Organizational Announcement |

Good afternoon EC Team,

I hope you found this morning's New North announcement and news about our investment in the future of our workforce and downtown Milwaukee campus inspiring. I am excited about our future centralized and world-class class campus, and for the personal opportunity to lead this project over the next few years.

While the future of our workplace is critical to our success, so too is our work in enterprise compliance. While my role as enterprise compliance department head and chief compliance officer for NMIS and NMWMC isn't changing, I am pleased to announce several new and expanded compliance leadership roles that will provide a continuation of the highest quality compliance support for the organization, while I take on new responsibilities in leading the New North work.

**Mike Conmey**, vice president – enterprise compliance, will continue to report to me and take an expanded role leading the compliance program teams, which support all business lines across the enterprise and serve a critical role in providing regulatory support, policy setting and enterprise advice. Mike will continue to serve as chief compliance officer for the Northwestern Mutual Series Fund (NMSF), Mason Street Advisers (MSA), and the Northwestern Mutual Investment Management Company (NMIMC). Reporting to Mike will be:

- o **Sarah Brach** – senior director- enterprise compliance, who will continue leading the teams that provide regulatory examination response, compliance testing, enterprise technology consulting, compliance by design, and governance support.
- o **Paula Storniolo** – senior director- risk products compliance, who will continue to serve as the chief compliance officer for the Northwestern Mutual Separate Accounts and Northwestern Long Term Care Insurance Company, in addition to leading her team in supporting the risk products business line.
- o **Mark McNulty** – senior director- enterprise AML Officer and retail investments compliance, who will continue to serve as the AML Officer for the enterprise and lead the compliance program teams serving NMIS and NMWMC.
- o **Jonathan Viard** – Who will take a new role as **senior director- institutional investments and fund compliance**, where he will lead the compliance program teams supporting NM's managed investments function and the compliance programs for NMSF, MSA, and NMIMC. We're excited to add Jon's leadership in this growing area of compliance.

Mike and his direct reports will continue to serve on the EC Steering team, leading strategic decision making and long-term planning for the department.

Also reporting to me, and continuing in their roles on the EC Steering are the following leaders and teams:

- o **Jeff Schloemer**, vice president – enterprise compliance, leading the MMC, Field Oversight & Engagement, Market Conduct, Compliance Systems and Data teams.
- o **Nicole Lund,** senior director – compliance strategy & execution, leading teams delivering compliance business and technology strategy, centralized compliance operations, and compliance training and communications.
- o **Jaime Pulsfus**, senior director – supervision, in a newly expanded role that now includes all centralized supervision services supporting field offices, along with home office and field supervision programs. In

CONFIDENTIAL MCNULTY-EEOC-PROD-000011

Jaime's organization, we're happy to announce that ████████ has been promoted to **assistant director- supervision,** leading the electronic communication work.

Finally, I am pleased to welcome ████████, senior director – market conduct, and ████████, senior director – enterprise compliance, to the EC Steering team, both of whom will add new perspective and broadened impact to our leadership decisions.

Transitions have already begun for these changes and new roles and reporting lines will be effective February 16th. Other than the leadership announcements outlined above, we anticipate these changes should have little impact on the important work you do each day.

Times of change require flexibility and agility from all of us, and I'm grateful to these leaders for stepping into new roles and reporting relationships in support of delivering our critical compliance work and our broader enterprise outcomes.

Stay tuned for more details and resources on the New North project in Slack.  I appreciate your support and I'm excited about what's to come.

Warmly,
Rebecca


**Rebecca Villegas**
VP – Enterprise Compliance
(she/her)

P: 414.665.8536



# EXHIBIT 5



FOR RELEASE MAY 17, 2023

# Diversity, Equity and Inclusion in the Workplace

*A majority of U.S. workers say focusing on DEI at work is a good thing, but relatively small shares place great importance on diversity in their own workplace*

**BY** *Rachel Minkin*

**FOR MEDIA OR OTHER INQUIRIES:**

**Kim Parker,** Director, Social Trends Research
**Juliana Horowitz,** Associate Director, Research
**Tanya Arditi,** Communications Manager

202.419.4372

www.pewresearch.org

**RECOMMENDED CITATION**
Pew Research Center, May 2023, "Diversity, Equity and Inclusion in the Workplace"

# About Pew Research Center

Pew Research Center is a nonpartisan, nonadvocacy fact tank that informs the public about the issues, attitudes and trends shaping the world. It does not take policy positions. The Center conducts public opinion polling, demographic research, computational social science research and other data-driven social science research. It studies politics and policy; news habits and media; the internet and technology; religion; race and ethnicity; international affairs; social, demographic and economic trends; science; research methodology and data science; and immigration and migration. Pew Research Center is a subsidiary of The Pew Charitable Trusts, its primary funder.

© Pew Research Center 2023

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 46 of 227 Document 3-3 MCNULTY-EEOC-PROD-000014

# How we did this

Pew Research Center conducted this study to better understand how adults in the United States think about diversity, equity and inclusion efforts in the workplace. This analysis is based on survey responses from 4,744 U.S. adults who are working part time or full time, are not self-employed, have only one job or have multiple jobs but consider one their primary job, and whose company or organization has 10 or more people. The data was collected as part of a larger survey of workers conducted Feb. 6-12, 2023. Everyone who took part is a member of Pew Research Center's American Trends Panel (ATP), an online survey panel that is recruited through national, random sampling of residential addresses. This way nearly all U.S. adults have a chance of selection. The survey is weighted to be representative of the U.S. adult population by gender, race, ethnicity, partisan affiliation, education and other categories. Read more about the ATP's methodology.

Read more about the questions used for this report and the report's methodology.

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 47 of 227 Document 3-3 MCNULTY-EEOC-PROD-000015

# Terminology

References to workers or employed adults include those who are employed part time or full time, are not self-employed, have only one job or have multiple jobs but consider one their primary job, and whose company or organization has 10 or more people.

References to White, Black and Asian adults include those who are not Hispanic and identify as only one race. Hispanics are of any race.

References to college graduates or people with a college degree comprise those with a bachelor's degree or more. "Some college" includes those with an associate degree and those who attended college but did not obtain a degree.

References to disabled workers include those who say a disability or handicap keeps them from fully participating in work, school, housework or other activities.

All references to party affiliation include those who lean toward that party. Republicans include those who identify as Republicans and those who say they lean toward the Republican Party. Democrats include those who identify as Democrats and those who say they lean toward the Democratic Party.

**CONFIDENTIAL** Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 48 of 227 Document 3-2 MCNULTY-EEOC-PROD-000016

# Diversity, Equity and Inclusion in the Workplace

*A majority of U.S. workers say focusing on DEI at work is a good thing, but relatively small shares place great importance on diversity in their own workplace*

Workplace diversity, equity and inclusion efforts, or DEI, are increasingly becoming part of national political debates. For a majority of employed U.S. adults (56%), focusing on increasing DEI at work is a good thing, according to a new Pew Research Center survey. But opinions about DEI vary considerably along demographic and political lines.

Most workers have some experience with DEI measures at their workplace. About six-in-ten (61%) say their company or organization has policies that ensure fairness in hiring, pay or promotions, and 52% say they have trainings or meetings on DEI at work. Smaller shares say their workplace has a staff member who promotes DEI (33%), that their workplace offers salary transparency (30%), and that it has affinity groups or employee resource groups based on a shared identity (26%). Majorities of those who have access to these measures say each has had a positive impact where they work.

***Related**: How Americans View Their Jobs*

### A majority of workers say focusing on DEI at work is a good thing

*% of employed adults saying that in general, focusing on increasing diversity, equity and inclusion at work is mainly …*



Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer (<0.5%) not shown.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

This nationally representative survey of 5,902 U.S. workers, including 4,744 who are not self-employed, was conducted Feb. 6-12, 2023, using the Center's American Trends Panel.[1] The survey comes at a time when DEI efforts are facing some backlash and many major companies are laying off their DEI professionals.

**Jump to:**

▪ The value of DEI efforts at work

▪ The importance of a diverse workforce

▪ DEI measures and their impact

▪ How gender, race and ethnicity impact success in the workplace

**Some key findings from the survey:**

▪ **Relatively small shares of workers place a lot of importance on diversity at their workplace.** About three-in-ten say it is extremely or very important to them to work somewhere with a mix of employees of different races and ethnicities (32%) or ages (28%). Roughly a quarter say the same about having a workplace with about an equal mix of men and women (26%) and 18% say this about a mix of employees of different sexual orientations.

▪ **More than half of workers (54%) say their company or organization pays about the right amount of attention to increasing DEI.** Smaller shares say their company or organization pays too much (14%) or too little attention (15%), and 17% say they're not sure. Black workers are more likely than those in other racial and ethnic groups to say their employer pays too little attention to increasing DEI. They're also among the most likely to say focusing on DEI at work is a good thing (78% of Black workers say this), while White workers are the least likely to express this view (47%).

▪ **Women are more likely than men to value DEI at work.** About six-in-ten women (61%) say focusing on increasing DEI at work is a good thing, compared with half of men. And larger shares of women than men say it's extremely or very important to them to work at a place that is diverse when it comes to gender, race and ethnicity, age, and sexual orientation.

▪ **There are wide partisan differences in views of workplace DEI.** Most Democratic and Democratic-leaning workers (78%) say focusing on DEI at work is a good thing, compared with 30% of Republicans and Republican leaners. Democrats are also far more likely than Republicans to value different aspects of diversity. And by wide margins, higher shares of Democrats than Republicans say the policies and resources related to DEI available at their workplace have had a positive impact.

---

[1] For details, see the Methodology section of the report. The analysis in this report is based on U.S. workers who are employed full time or part time, who are not self-employed, and who have only one job or have multiple jobs but consider one their primary job (99% of workers who are not self-employed have one job or a primary job). Additionally, the analysis is restricted to workers at companies or organizations with at least 10 employees as certain federal requirements such as non-discrimination mandates apply to larger workplaces.

**CONFIDENTIAL** Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 50 of 227    MCNULTY-EEOC-PROD-000018

▪ **Half of workers say it's extremely or very important to them to work somewhere that is accessible for people with physical disabilities.** About three-in-ten workers (29%) say this is somewhat important to them, and 21% say it's not too or not at all important. A majority of workers (76% among those who do not work fully remotely) say their workplace is at least somewhat accessible for people with physical disabilities.

▪ **Many say being a man or being White is an advantage where they work.** The survey asked respondents whether a person's gender, race or ethnicity makes it easier or harder to be successful where they work. Shares ranging from 45% to 57% say these traits make it neither easier nor harder. But far more say being a man and being White makes it easier than say it makes it harder for someone to be successful. Conversely, by double-digit margins, more say being a woman, being Black or being Hispanic makes it harder than say it makes it easier to be successful where they work.

**CONFIDENTIAL** Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 51 of 227 Document 3-3   MCNULTY-EEOC-PROD-000019

## The value of DEI efforts at work

A majority of workers (56%) say focusing on increasing diversity, equity and inclusion at work is mainly a good thing; 28% say it is neither good nor bad, and 16% say it is a bad thing. Views on this vary along key demographic and partisan lines.

Half or more of both men and women say focusing on increasing DEI at work is a good thing, but women are more likely than men to offer this view (61% vs. 50%). In turn, men are more than twice as likely as women to say it is a bad thing (23% vs. 9%).

About two-thirds or more of Black (78%), Asian (72%) and Hispanic (65%) workers say that focusing on DEI at work is a good thing. Among White workers, however, fewer than

**Views of DEI in the workplace vary along demographic and partisan lines**

*% of employed adults saying that in general, focusing on increasing diversity, equity and inclusion at work is mainly …*



| | A bad thing | A good thing | Neither good nor bad |
|---|---|---|---|
| All workers | 16 | 56 | 28 |
| Men | 23 | 50 | 27 |
| Women | 9 | 61 | 30 |
| White | 21 | 47 | 31 |
| Black | 1 | 78 | 20 |
| Hispanic | 9 | 65 | 25 |
| Asian* | 10 | 72 | 18 |
| Ages 18-29 | 8 | 68 | 24 |
| 30-49 | 16 | 56 | 28 |
| 50-64 | 22 | 46 | 32 |
| 65+ | 12 | 52 | 35 |
| Rep/Lean Rep | 30 | 30 | 39 |
| Dem/Lean Dem | 4 | 78 | 18 |

*Estimates for Asian adults are representative of English speakers only.
Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer not shown. White, Black and Asian adults include those who report being only one race and are not Hispanic. Hispanics are of any race.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

half (47%) say it's a good thing; in fact, 21% say it's a bad thing. But there are wide partisan, gender and age gaps among White workers, with majorities of White Democrats, women and those under age 30 saying focusing on DEI at work is a good thing.

Workers under 30 are the most likely age group to say focusing on DEI at work is a good thing. About two-thirds (68%) of workers ages 18 to 29 say this, compared with 56% of workers 30 to 49, 46% of those 50 to 64, and 52% of those 65 and older.

CONFIDENTIAL   Case 2:25-mc-00053-BHL      Filed 11/21/25      Page 52 of 227   MCNULTY-EEOC-PROD-000020

Views also differ by educational attainment, with 68% of workers with a postgraduate degree saying focusing on DEI at work is a good thing, compared with 59% of those with a bachelor's degree only and 50% of those with some college or less education.

Democratic and Democratic-leaning workers are much more likely to say focusing on DEI at work is a good thing (78%) than to say it is a bad thing (4%) or that it is neither good nor bad (18%). Views among Republican and Republican-leaning workers are more mixed: Some 30% say focusing on DEI at work is a good thing, while the same share (30%) say it's a bad thing, and 39% say it's neither good nor bad.

**A majority of workers say their employer pays the right amount of attention to DEI**

When it comes to the focus of their own employer, 54% of workers say their company or organization pays about the right amount of attention to increasing diversity, equity and inclusion. The remainder are divided between saying their employer pays too much (14%) or too little attention (15%), or that they're not sure (17%).

Women are more likely than men to say their employer pays too little attention to increasing DEI (17% vs. 12%). In turn, men are more likely than women to say too much attention is paid to this where they work (18% vs. 10%).

Black workers (28%) are the most likely to say their company or organization pays too little attention to

### About three-in-ten Black workers say their employer pays too little attention to DEI

*% of employed adults saying their company or organization pays ____ to increasing diversity, equity and inclusion*

| | Too little attention | Too much attention | About the right amount of attention | Not sure |
|---|---|---|---|---|
| All employed | 15 | 14 | 54 | 17 |
| Men | 12 | 18 | 54 | 15 |
| Women | 17 | 10 | 53 | 19 |
| White | 11 | 16 | 56 | 16 |
| Black | 28 | 3 | 48 | 20 |
| Hispanic | 19 | 11 | 49 | 21 |
| Asian* | 17 | 18 | 56 | 9 |
| Rep/Lean Rep | 7 | 24 | 50 | 19 |
| Dem/Lean Dem | 21 | 6 | 57 | 15 |

*Estimates for Asian adults are representative of English speakers only.
Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer not shown. White, Black and Asian adults include those who report being only one race and are not Hispanic. Hispanics are of any race.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 53 of 227 MCNULTY-EEOC-PROD-000021

increasing DEI, compared with smaller shares of White (11%), Hispanic (19%) and Asian (17%) workers who say the same.

Views on this question also differ by party. While half or more of both Republican and Democratic workers say their company or organization pays the right amount of attention to DEI, Democrats are more likely than Republicans to say their employer pays too little attention to it (21% vs. 7%). In turn, Republicans are more likely than Democrats to say their employer pays *too much* attention to DEI (24% vs. 6%).

## The importance of a diverse workforce

While a majority of workers say focusing on increasing diversity, equity and inclusion at work is a good thing, relatively small shares place great importance on working at a place that is diverse when it comes to gender, race and ethnicity, age, and sexual orientation. About three-in-ten workers say it's extremely or very important to them to work somewhere with a mix of employees of different races and ethnicities (32%) and ages (28%), while 26% say the same about having about an equal mix of men and women. And 18% say this about having a mix of employees of different sexual orientations at their workplace.



**Workers have mixed opinions on the value of different aspects of diversity where they work**

*% of employed adults saying that regardless of how diverse the place where they work is, it is ____ to them personally to work at a place that has a mix of employees of …*

|  | Extremely/Very important | Somewhat important | Not too/Not at all important |
|---|---|---|---|
| Different races and ethnicities | 32 | 30 | 38 |
| Different ages | 28 | 34 | 37 |
| About an equal mix of men and women | 26 | 29 | 44 |
| Different sexual orientations | 18 | 24 | 58 |

Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer not shown.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

Women are more likely than men to say it's extremely or very important to them to work at a place that is diverse across all measures asked about in the survey. For example, there are 11 percentage point differences in the shares of women compared with men saying it is extremely or very important to them to work somewhere that has a mix of employees of different races and ethnicities (37% vs. 26%) and about an equal mix of men and women (31% vs. 20%).

CONFIDENTIAL  Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 54 of 227  Document 3-3  MCNULTY-EEOC-PROD-000022

Black workers are among the most likely to value racial, ethnic and age diversity in the workplace. Some 53% of Black workers say it is extremely or very important to them to work somewhere with a mix of employees of different races and ethnicities, compared with 39% of Hispanic workers and 25% of White workers who say the same; 43% of Asian workers say this is important to them. (There is no statistically significant difference between the share of Asian workers and the shares of Black and Hispanic workers who hold this view.) And while 42% of Black workers highly value working somewhere with a mix of employees of different ages, smaller shares of Hispanic (33%), Asian (30%) and White (24%) workers say the same.

When it comes to diversity of sexual orientation, 28% of Black workers and 22% of Hispanic workers say it is extremely or very important to them to work somewhere that is diverse in this way; 15% each among White and Asian workers say the same.

Workers under age 50 are more likely than those 50 and older to say racial and ethnic diversity in their workplace is extremely or very important to them (35% vs. 26%). Workers younger than 50 are also more likely to say having about an equal mix of men and women is important to them, with workers ages 18 to 29 the most likely to say this (34% vs. 26% of workers 30 to 49, and 20% each among those 50 to 64 and 65 and older).

There are also differences by educational attainment, with larger shares of workers with a postgraduate degree than those with less education saying it's extremely or very important to them that their workplace is diverse across all measures asked about in the survey. For example, 44% of workers with a postgraduate degree say having a mix of employees of different races and ethnicities is extremely



**Democrats are much more likely than Republicans to see value in different aspects of workplace diversity**

*% of employed adults saying that regardless of how diverse the place where they work is, it is extremely/very important to them personally to work at a place that has a mix of employees of …*

|  | Rep/Lean Rep | Dem/Lean Dem | All employed |
|---|---|---|---|
| Different races and ethnicities | 13 | 49 | 32 |
| Different ages | 17 | 39 | 28 |
| About an equal mix of men and women | 12 | 39 | 26 |
| Different sexual orientations | 7 | 27 | 18 |

Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

CONFIDENTIAL   Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 55 of 227   Document 3-8   MCNULTY-EEOC-PROD-000023

or very important to them, compared with 34% of those with a bachelor's degree only and 27% of those with some college or less.

Democratic workers are much more likely than Republican workers to say working somewhere that is diverse when it comes to gender, race and ethnicity, age, and sexual orientation is extremely or very important to them. In fact, about half of Democrats (49%) place great importance on having a mix of employees of different races and ethnicities where they work, compared with 13% of Republicans. And there are differences of at least 20 points between the shares of Democrats and Republicans saying it's extremely or very important to them to work somewhere that has about an equal mix of men and women (39% of Democrats say this vs. 12% of Republicans) and a mix of employees of different ages (39% vs. 17%) and sexual orientations (27% vs. 7%).

Overall, a majority of workers say their workplace has a mix of employees of different ages (58% say this describes their current workplace extremely or very well). Smaller shares say their workplace has about an equal mix of men and women (38%) and a mix of employees of different races and ethnicities (46%) and sexual orientations (28%). These assessments do not vary much across demographic groups.

### Half of workers place great importance on working at a place that is accessible for people with physical disabilities

Half of workers say it is extremely or very important to them to work somewhere that is accessible for people with physical disabilities; 29% say it is somewhat important and 21% say it is not too or not at all important to them.

Highly valuing an accessible workplace varies by gender, race and ethnicity, and party, but there is no significant difference in responses between those who do and don't report having a disability.

About six-in-ten women (58%) say it is extremely or very important to them that their workplace is accessible, compared with 41% of men.

Black workers are more likely than workers of other racial and ethnic groups to place great importance on their workplace being accessible: 62% of Black workers say this is extremely or very important, compared with 51% of Hispanic, 48% of White and 43% of Asian workers.

A majority of Democrats (59%) say it is extremely or very important to them to work somewhere that is accessible for people with physical disabilities; 40% of Republican say the same. Some 27%

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 56 of 227 MCNULTY-EEOC-PROD-000024

of Republicans say this is not too or not at all important to them, compared with 15% of Democrats.

There is no statistically significant difference in the shares of workers who have a disability and those who do not saying it is extremely or very important to work somewhere that is accessible for people with physical disabilities. But workers who do not have a disability are more likely than those who do to say this is not too or not at all important to them (21% vs. 15%).

Among those who don't work fully remotely, about three-quarters of workers (76%) say their workplace is at least somewhat accessible for people with physical disabilities, with 51% saying it is extremely or very accessible. Some 17% say their workplace is not too or not at all accessible, and 8% are not sure.

### Half of workers place great value in working somewhere that's accessible to those with physical disabilities

*% of employed adults saying that regardless of how accessible the place where they work is, it is ____ to them personally to work at a place that is accessible for people with physical disabilities*



|  | Extremely/ Very important | Somewhat important | Not too/ Not at all important |
|---|---|---|---|
| All employed | 50 | 29 | 21 |
| Men | 41 | 31 | 28 |
| Women | 58 | 28 | 14 |
| White | 48 | 29 | 22 |
| Black | 62 | 24 | 13 |
| Hispanic | 51 | 27 | 21 |
| Asian* | 43 | 36 | 21 |

*Estimates for Asian adults are representative of English speakers only.

Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer not shown.

Source: Survey of U.S. workers conducted Feb. 6-12, 2023. "Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 57 of 227 Document 3-3    MCNULTY-EEOC-PROD-000025

## DEI measures and their impact

When asked whether the company or organization they work for has a series of measures that are typically associated with diversity, equity and inclusion efforts, a majority of workers say their employer has policies that ensure everyone is treated fairly in hiring, pay or promotions (61%), and 52% say there are trainings or meetings on DEI where they work.

Smaller shares say their workplace has a staff member whose main job is to promote DEI at work (33%), a way for employees to see the salary range for all positions (30%), and groups created by employees sometimes known as affinity groups or employee resource groups (ERGs) based on shared identities such as gender, race or being a parent (26%).

Responses do not vary much by most demographic characteristics. However, workers with at least a bachelor's degree are consistently more likely than those with less education to say each of these five measures is available where they work.

**Majority of workers say their workplace has policies to ensure fairness in hiring, pay or promotions**

*% of employed adults saying the company/organization they work for has each of the following*



Policies to ensure everyone is treated fairly in hiring, pay or promotions — 61

Trainings or meetings on DEI at work — 52

A staff member whose main job is to promote DEI at work — 33

A way for employees to see the salary range for all positions — 30

Affinity groups or ERGs* — 26

*Full question wording asked about groups created by employees, sometimes called affinity groups or employee resource groups (ERGs), based on their shared identities or interests such as gender, race or being a parent.

Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people.

Source: Survey of U.S. workers conducted Feb. 6-12, 2023.

"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

### Workers tend to see positive impact from policies and resources associated with DEI where they work

Among those whose workplace offers each policy or resource, a majority of workers say each measure has had a somewhat or very positive impact where they work. About a third or fewer workers say each resource has had neither a positive nor negative impact, and about one-in-ten or fewer say each of these has had a somewhat or very negative impact.

CONFIDENTIAL   Case 2:25-mc-00053-BHL     Filed 11/21/25     Page 58 of 227   MCNULTY-EEOC-PROD-000026

Democrats and Republicans are about equally likely to say their workplace has these measures in place, but Democrats are more likely than Republicans to say the impact of each has been positive by margins ranging from 10 to 32 points (among those who say their workplace has these measures). For example, 66% of Democrats who say their workplace has a way for employees to see the salary range for all positions say this has had a somewhat or very positive impact, compared with 56% of Republicans who say this. And while about three-quarters of Democrats (74%) say having a staff member whose main job is to promote DEI at work has had a positive impact, fewer than half of Republicans (42%) say the same.

### A majority of workers say DEI-related policies and resources have had a positive impact at their workplace

*Among employed adults who say each of the following is available where they work, % saying each has had a ____ impact where they work*



*Full question wording asked about groups created by employees, sometimes called affinity groups or employee resource groups (ERGs), based on their shared identities or interests such as gender, race or being a parent.
Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer not shown.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

Women are more likely than men to say each of these policies and resources has had a very or somewhat positive impact where they work. This is mainly driven by gender differences among Republicans: There are double-digit differences in the shares of Republican women and Republican men who say many of these resources have had a positive impact. For example, 58% of Republican women say having a staff member whose main job is to promote DEI at work has had at least a somewhat positive impact where they work, compared with 31% of Republican men who hold this view. The same share of Republican women (58%) say having affinity groups or ERGs has had a positive impact, compared with 38% of Republican men who say the same.

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 59 of 227    MCNULTY-EEOC-PROD-000027

Among Democrats, majorities of both men and women offer positive assessments of these resources in their workplace, but Democratic women are more likely than Democratic men to say having trainings or meetings on DEI at work have had a positive impact (72% vs. 65%).

While there are differences by race, ethnicity and age on overall attitudes about DEI in the workplace, there are no consistent differences along these dimensions in how workers with access to these policies and resources at their workplace assess their impact.

### About half of workers who have participated in DEI trainings in the last year say they've been helpful

Out of all workers, about four-in-ten (38%) have participated in a DEI training in the last year. A similar share (40%) did not participate or say their workplace does not offer these trainings, and 21% are not sure if their employer offers these trainings.

Looking only at those whose company or organization has trainings or meetings on DEI, about three-quarters (73%) say they have participated in such trainings in the past year. And assessments of these trainings tend to be positive, with 53% of workers who've participated saying they were very or somewhat helpful. About a third (34%) give a more neutral assessment, saying the trainings were neither helpful nor unhelpful, and 13% say they were very or somewhat unhelpful.



**Republican women are more likely than Republican men to say the DEI trainings they have participated in have been helpful**

*Among employed adults who say their company/organization has trainings or meetings on DEI and have participated in such trainings at work in the last year, % saying the DEI trainings they participated in have been …*

|  | Very/Somewhat unhelpful | Very/Somewhat helpful | Neither helpful nor unhelpful |
|---|---|---|---|
| All who have participated | 13 | 53 | 34 |
| Men | 16 | 46 | 38 |
| Women | 10 | 60 | 31 |
| Rep/Lean Rep | 19 | 36 | 46 |
| Dem/Lean Dem | 9 | 66 | 25 |
| *Among Republican and Republican-leaning workers* | | | |
| Men | 22 | 28 | 50 |
| Women | 14 | 47 | 39 |
| *Among Democratic and Democratic-leaning workers* | | | |
| Men | 10 | 63 | 26 |
| Women | 7 | 68 | 25 |

Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer not shown.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

CONFIDENTIAL Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 60 of 227 MCNULTY-EEOC-PROD-000028

While men and women are about equally likely to have participated in trainings on DEI in the past year, women are more likely than men to say the trainings have been at least somewhat helpful (60% vs. 46%).

Republicans and Democrats are also equally likely to say they've participated in these trainings in the past year, but Democrats are far more likely than Republicans to say the trainings have been helpful (66% vs. 36%). About one-in-five Republicans say they've been unhelpful (19%), compared with 9% of Democrats.

While both Democratic men and women offer similar assessments of the DEI trainings they've participated in, there are gender differences among Republican workers. Republican women are more likely than Republican men to say the trainings they've participated in have been helpful (47% vs. 28%). Conversely, 22% of Republican men, compared with 14% of Republican women, say the trainings have been unhelpful.

### Few workers are members of affinity groups or ERGs at work

While 26% of workers say there are affinity groups or employee resource groups (ERGs) where they work, members of these groups account for a very small share of workers overall. Just 6% of workers say they are members of an affinity group or ERG, with 58% of workers saying these groups are either not available at their workplace or that they aren't a member. Another 37% say they are not sure if their workplace offers these groups.

Among workers who say there are affinity groups or ERGs at their workplace, 22% say they are personally a member. Women are more likely than men to be members of these groups (28% vs. 16%). And 28% of non-White workers say they are a member of an affinity group or ERG, compared with 18% of White workers.[2]

---

[2] Non-White adults include Black, Hispanic, Asian and other races besides White, as well as people who identify as more than one race. The sample sizes among Black, Hispanic and Asian workers who have affinity groups or ERGs at work are too small to analyze separately.

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 61 of 227 MCNULTY-EEOC-PROD-000029

## How gender, race and ethnicity impact success in the workplace

When asked about the impact a person's gender, race or ethnicity has on their ability to succeed at work, workers tend to say these characteristics neither make it easier nor harder to be successful at their workplace.

Still, when it comes to gender, workers are more likely to say being a man makes it easier to be successful where they work than to say it makes it harder (36% vs. 6%). In contrast, a larger share says being a woman makes it harder to be successful than say it makes it easier (28% vs. 11%).

Men and women have different views on the impact gender has on a person's



**More than a third of workers say being a man makes it easier to be successful where they work**

*% of employed adults saying each of the following makes it ____ to be successful where they work*

| | A lot/A little harder | A lot/A little easier | Neither easier nor harder | Not sure |
|---|---|---|---|---|
| Being a man | 6 | 36 | 45 | 13 |
| Being a woman | 28 | 11 | 49 | 12 |
| Being White | 5 | 31 | 49 | 14 |
| Being Black | 25 | 8 | 50 | 17 |
| Being Hispanic | 20 | 8 | 52 | 20 |
| Being Asian | 11 | 8 | 57 | 23 |

Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer not shown.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

ability to succeed where they work. Some 44% of women say being a man makes it at least a little easier to be successful, including 24% who say it makes it *a lot* easier. This compares with 29% of men who say being a man makes it at least a little easier to be successful.

Similarly, 34% of women say being a woman makes it harder to be successful where they work, compared with 21% of men.

Women under age 50 are especially likely — more so than women ages 50 and older or men in either age group — to say being a man makes it easier to be successful where they work and that being a woman makes it harder. For example, 38% of women ages 18 to 49 say being a woman makes it harder to be successful where they work. This compares with 29% of women 50 and older, 25% of men younger than 50, and an even smaller share of men 50 and older (13%).

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 62 of 227 Document 3-3 MCNULTY-EEOC-PROD-000030

When it comes to views about how race or ethnicity affects people's ability to succeed at work, 51% of Black workers say being Black makes it harder to be successful where they work. This is significantly higher than the shares of Asian (41%), Hispanic (23%) and White (18%) workers who say the same about the impact of being Black.

Similarly, about four-in-ten Asian workers (39%) say being Asian makes it harder to be successful in their workplace, a higher share than workers of other racial and ethnic groups who say the same about being Asian.

### About a third of women say being a woman makes it harder to be successful where they work

*% of employed men and women saying each of the following makes it _____ to be successful where they work*



Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer not shown.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

Hispanic, Black and Asian workers are about equally likely to say being Hispanic makes it harder to be successful where they work. A smaller share of White workers say the same about being Hispanic.

When asked about the impact of being White in their workplace, workers across racial and ethnic groups are more likely to say it makes it easier than to say it makes it harder to be successful. This is especially the case among Black and Asian workers. About half of Black (52%) and Asian (51%) workers say being White makes it easier to be successful where they work, compared with 37% of Hispanic and 24% of White workers who say the same about being White.

[Previously released findings](#) from this survey found that Black workers are more likely than White, Hispanic and Asian workers to report that they have experienced discrimination or have been treated unfairly by an employer in hiring, pay or promotions because of their race or ethnicity at some point in their careers (though not necessarily where they currently work). Women are also more likely than men to say they've experienced such discrimination because of their gender.

### About half of Black and Asian workers say being White makes it easier to be successful where they work

*% of employed adults in each racial or ethnic group saying each of the following makes it _____ to be successful where they work*

| | A lot/A little harder | A lot/A little easier | Neither easier nor harder | Not sure |
|---|---|---|---|---|
| **Being White** | | | | |
| White | 7 | 24 | 59 | 11 |
| Black* | | 52 | 25 | 23 |
| Hispanic | 2 | 37 | 43 | 18 |
| Asian** | 5 | 51 | 28 | 14 |
| **Being Black** | | | | |
| White | 18 | 8 | 57 | 17 |
| Black | 51 | 4 | 32 | 12 |
| Hispanic | 23 | 9 | 44 | 23 |
| Asian** | 41 | 11 | 32 | 14 |
| **Being Hispanic** | | | | |
| White | 15 | 7 | 59 | 18 |
| Black | 25 | 6 | 32 | 37 |
| Hispanic | 29 | 9 | 47 | 13 |
| Asian** | 30 | 12 | 40 | 16 |
| **Being Asian** | | | | |
| White | 8 | 7 | 65 | 20 |
| Black | 10 | 15 | 34 | 41 |
| Hispanic | 11 | 11 | 51 | 27 |
| Asian** | 39 | 6 | 45 | 7 |

*Less than 0.5% of Black workers say being White makes it a lot/a little harder for someone to be successful where they work.
**Estimates for Asian adults are representative of English speakers only.
Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer not shown. White, Black and Asian adults include those who report being only one race and are not Hispanic. Hispanics are of any race.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

**PEW RESEARCH CENTER**

There are large partisan gaps in views of whether gender, race or ethnicity make it easier or harder to be successful at work. Some 47% of Democratic workers say being a man makes it at least somewhat easier to be successful at their workplace, compared with 25% of Republican workers. Democrats are also more likely than Republicans to say being a woman makes it harder to succeed (37% vs. 17%).

Democratic and Republican women are more likely than their male counterparts to say being a woman makes it harder — and being a man makes it easier — to be successful where they work. The differences between Republican women and Republican men are particularly striking. About a quarter of Republican women (26%) say being a woman makes it harder to be successful, compared with 10% of Republican men. And while 36% of Republican women say being a man makes it easier to be successful where they work, just 16% of Republican men say the same.

### Democrats and Republicans differ in views of how gender, race and ethnicity impact success at their workplace

*% of employed Democrats and Republicans saying each of the following makes it ____ to be successful where they work*

| | A lot/A little harder | A lot/A little easier | Neither easier nor harder | Not sure |
|---|---|---|---|---|
| **Being a man** | | | | |
| Rep/Lean Rep | 10 | 25 | 54 | 12 |
| Dem/Lean Dem | 3 | 47 | 38 | 12 |
| **Being a woman** | | | | |
| Rep/Lean Rep | 17 | 14 | 56 | 12 |
| Dem/Lean Dem | 37 | 9 | 43 | 10 |
| **Being White** | | | | |
| Rep/Lean Rep | 9 | 13 | 64 | 14 |
| Dem/Lean Dem | 2 | 48 | 38 | 12 |
| **Being Black** | | | | |
| Rep/Lean Rep | 9 | 12 | 62 | 17 |
| Dem/Lean Dem | 39 | 5 | 40 | 16 |
| **Being Hispanic** | | | | |
| Rep/Lean Rep | 8 | 10 | 65 | 17 |
| Dem/Lean Dem | 30 | 6 | 43 | 20 |
| **Being Asian** | | | | |
| Rep/Lean Rep | 6 | 7 | 66 | 20 |
| Dem/Lean Dem | 16 | 9 | 50 | 24 |

Note: Based on workers who are not self-employed and work at a company or organization with 10 or more people. Share of respondents who didn't offer an answer not shown.
Source: Survey of U.S. workers conducted Feb. 6-12, 2023.
"Diversity, Equity and Inclusion in the Workplace"

PEW RESEARCH CENTER

Democratic workers are more than three times as likely as Republican workers to say being White makes it easier to succeed where they work (48% vs. 13%), and they are also more likely than Republicans to say being Black, Hispanic or Asian makes it harder. About four-in-ten Democrats (39%) say being Black makes it harder for someone to succeed at their workplace, compared with

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 65 of 227    Document 3-3 MCNULTY-EEOC-PROD-000033

just 9% of Republicans. Similarly, 30% of Democrats say being Hispanic makes it harder to succeed, compared with 8% of Republicans. And while smaller shares in both parties say being Asian makes it harder to succeed, Democrats are more likely than Republicans to say this (16% vs. 6%). These partisan differences remain when looking only at Democrats and Republicans who are White.

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 66 of 227    Document 3-2    MCNULTY-EEOC-PROD-000034

# Acknowledgments

This report is a collaborative effort based on the input and analysis of the following individuals. Find related reports online at [pewresearch.org/topic/economy-work](pewresearch.org/topic/economy-work).

Kim Parker, *Director of Social Trends Research*
Juliana Horowitz, *Associate Director, Research*
Rachel Minkin, *Research Associate*
Anna Brown, *Research Methodologist*
Khadijah Edwards, *Research Associate*
Luona Lin, *Research Associate*
Kiley Hurst, *Research Assistant*
Dana Braga, *Research Assistant*
Shannon Greenwood, *Digital Producer*
Janakee Chavda, *Assistant Digital Producer*
Peter Bell, *Design Director*
Anna Jackson, *Editorial Assistant*
David Kent, *Senior Copy Editor*
Tanya Arditi, *Communications Manager*
Julia O'Hanlon, *Communications Associate*
Mimi Cottingham, *Communications Associate*

In addition, the project benefited greatly from the guidance of the Pew Research Center methodology team: Courtney Kennedy, Andrew Mercer, Ashley Amaya, Dorene Asare-Marfo, Dana Popky and Arnold Lau.

CONFIDENTIAL   Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 67 of 227   Document 3-2   MCNULTY-EEOC-PROD-000035

# Methodology

## The American Trends Panel survey methodology

### Overview

The American Trends Panel (ATP), created by Pew Research Center, is a nationally representative panel of randomly selected U.S. adults. Panelists participate via self-administered web surveys. Panelists who do not have internet access at home are provided with a tablet and wireless internet connection. Interviews are conducted in both English and Spanish. The panel is being managed by Ipsos.

Data in this report is drawn from the panel wave conducted from Feb. 6 to Feb. 12, 2023, among a sample of ATP members who indicated that they currently work either full or part time for pay. A total of 5,902 panelists responded out of 6,494 who were sampled, for a response rate of 94% (AAPOR RR3). The cumulative response rate accounting for nonresponse to the recruitment surveys and attrition is 4%. The break-off rate among panelists who logged on to the survey and completed at least one item is 1%. The margin of sampling error for the full sample of 5,902 respondents is plus or minus 1.9 percentage points.

### Panel recruitment

The ATP was created in 2014, with the first cohort of panelists invited to join the panel at the end of a large, national, landline and cellphone random-digit-dial survey that was conducted in both English and Spanish. Two additional recruitments were conducted using the same method in 2015 and 2017, respectively. Across these three surveys, a total of 19,718 adults were invited to join the ATP, of whom 9,942 (50%) agreed to participate.

### American Trends Panel recruitment surveys

| Recruitment dates | Mode | Invited | Joined | Active panelists remaining |
|---|---|---|---|---|
| Jan. 23 to March 16, 2014 | Landline/cell RDD | 9,809 | 5,338 | 1,504 |
| Aug. 27 to Oct. 4, 2015 | Landline/cell RDD | 6,004 | 2,976 | 881 |
| April 25 to June 4, 2017 | Landline/cell RDD | 3,905 | 1,628 | 434 |
| Aug. 8 to Oct. 31, 2018 | ABS | 9,396 | 8,778 | 4,116 |
| Aug. 19 to Nov. 30, 2019 | ABS | 5,900 | 4,720 | 1,473 |
| June 1 to July 19, 2020; Feb. 10 to March 31, 2021 | ABS | 3,197 | 2,812 | 1,541 |
| May 29 to July 7, 2021; Sept. 16 to Nov. 1, 2021 | ABS | 1,329 | 1,162 | 788 |
| May 24 to Sept. 29, 2022 | ABS | 3,354 | 2,869 | 1,700 |
| **Total** | | **42,894** | **30,283** | **12,437** |

Note: RDD is random-digit dial; ABS is address-based sampling. Approximately once per year, panelists who have not participated in multiple consecutive waves or who did not complete an annual profiling survey are removed from the panel. Panelists also become inactive if they ask to be removed from the panel.

PEW RESEARCH CENTER

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 68 of 227 MCNULTY-EEOC-PROD-000036

In August 2018, the ATP switched from telephone to address-based recruitment. Invitations were sent to a stratified, random sample of households selected from the U.S. Postal Service's Delivery Sequence File. Sampled households receive mailings asking a randomly selected adult to complete a survey online. A question at the end of the survey asks if the respondent is willing to join the ATP. In 2020 and 2021 another stage was added to the recruitment. Households that did not respond to the online survey were sent a paper version of the questionnaire, $5 and a postage-paid return envelope. A subset of the adults who returned the paper version of the survey were invited to join the ATP. This subset of adults received a follow-up mailing with a $10 pre-incentive and invitation to join the ATP.

Across the five address-based recruitments, a total of 23,176 adults were invited to join the ATP, of whom 20,341 agreed to join the panel and completed an initial profile survey. In each household, one adult was selected and asked to go online to complete a survey, at the end of which they were invited to join the panel. Of the 30,283 individuals who have ever joined the ATP, 12,437 remained active panelists and continued to receive survey invitations at the time this survey was conducted.

The U.S. Postal Service's Delivery Sequence File has been estimated to cover as much as 98% of the population, although some studies suggest that the coverage could be in the low 90% range.[3] The American Trends Panel never uses breakout routers or chains that direct respondents to additional surveys.

### Sample design

The overall target population for this survey was non-institutionalized persons ages 18 and older living in the U.S., including Alaska and Hawaii, who work for pay either full time or part time. All active panel members who reported working either full or part time for pay in ATP Wave 119 (fielded in December 2022), were invited to participate in this wave. Respondents were again asked about their current employment situation at the beginning of this survey, and those who indicated that they were not currently working for pay were screened out.

### Questionnaire development and testing

The questionnaire was developed by Pew Research Center in consultation with Ipsos. The web program was rigorously tested on both PC and mobile devices by the Ipsos project management team and Pew Research Center researchers. The Ipsos project management team also populated test data that was analyzed in SPSS to ensure the logic and randomizations were working as intended before launching the survey.

---

[3] AAPOR Task Force on Address-based Sampling. 2016. "AAPOR Report: Address-based Sampling."

CONFIDENTIAL Case 2:25-mc-00053-BHL     Filed 11/21/25     Page 69 of 227 MCNULTY-EEOC-PROD-000037

## Incentives

All respondents were offered a post-paid incentive for their participation. Respondents could choose to receive the post-paid incentive in the form of a check or a gift code to Amazon.com or could choose to decline the incentive. Incentive amounts ranged from $5 to $20 depending on whether the respondent belongs to a part of the population that is harder or easier to reach. Differential incentive amounts were designed to increase panel survey participation among groups that traditionally have low survey response propensities.

## Data collection protocol

The data collection field period for this survey was Feb. 6-12, 2023. Postcard notifications were mailed to all ATP panelists with a known residential address on Feb. 6.

Invitations were sent out in two separate launches: soft launch and full launch. Sixty panelists were included in the soft launch, which began with an initial invitation sent on Feb. 6. The ATP panelists chosen for the initial soft launch were known responders who had completed previous ATP surveys within one day of receiving their invitation. All remaining English- and Spanish-speaking panelists were included in the full launch and were sent an invitation on Feb. 7.

All panelists with an email address received an email invitation and up to two email reminders if they did not respond to the survey. All ATP panelists who consented to SMS messages received an SMS invitation and up to two SMS reminders.

### Invitation and reminder dates, ATP Wave 121

|  | Soft launch | Full launch |
|---|---|---|
| Initial invitation | February 6, 2023 | February 7, 2023 |
| First reminder | February 9, 2023 | February 9, 2023 |
| Final reminder | February 11, 2023 | February. 11, 2023 |

PEW RESEARCH CENTER

## Data quality checks

To ensure high-quality data, the Center's researchers performed data quality checks to identify any respondents showing clear patterns of satisficing. This includes checking for very high rates of leaving questions blank, as well as always selecting the first or last answer presented. As a result of this checking, two ATP respondents were removed from the survey dataset prior to weighting and analysis.

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 70 of 227 MCNUTOU-EEOC3-PROD-000038

## Weighting

The ATP data is weighted in a multistep process that accounts for multiple stages of sampling and nonresponse that occur at different points in the survey process. For this wave, each respondent was initially given the value of their final weight from Wave 119. This was done because the sample was comprised exclusively of W119 respondents who reported working full or part time for pay in that wave, and accounts for their probability of selection for both their initial ATP recruitment

### American Trends Panel weighting dimensions

| Variable | Benchmark source |
|---|---|
| Age | |
| Gender | |
| Education | |
| Race/Ethnicity | |
| Years lived in the U.S. | |
| Volunteerism | |
| Voter registration | Full- or part-time workers from American Trends Panel Wave 119. |
| Party affiliation | |
| Frequency of internet use | |
| Religious affiliation | |
| Census region | |
| Metro/Non-metro | |
| Work full time/Work part time | |

Note: American Trends Panel Wave 119 was conducted Dec. 12-18, 2022. See the W119 survey methodology for details at www.pewresearch.org/science/2023/02/15/ai-awareness-methodology/.

**PEW RESEARCH CENTER**

survey and Wave 119 as well as the adjustments for any nonresponse and attrition that occurred prior to the completion of Wave 19. For details on Wave 119's weighting, see the W119 survey methodology.

To adjust for nonresponse to the current wave, this weight was further calibrated to align with a set of weighting parameters calculated among all Wave 119 respondents who reported working either full or part time for pay. The specific weighting dimensions are listed in the accompanying table. In a final step, these weights were trimmed at the 1st and 99th percentiles to reduce the loss in precision stemming from variance in the weights. Sampling errors and tests of statistical significance take into account the effect of weighting.

CONFIDENTIAL   Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 71 of 227   Document 3-2   PCNULDMX-EEOC3-PROD-000039

The following table shows the unweighted sample sizes and the error attributable to sampling that would be expected at the 95% level of confidence for different groups in the survey.

### Sample sizes and margins of error, ATP Wave 121

| Group | Unweighted sample size | Plus or minus ... |
|---|---|---|
| Total sample | 5,902 | 1.9 percentage points |
| All employed adults who are not self-employed, have one job or multiple jobs and consider one their primary job, and their company or organization has 10 or more people | 4,744 | 2.1 percentage points |

PEW RESEARCH CENTER

Sample sizes and sampling errors for other subgroups are available upon request. In addition to sampling error, one should bear in mind that question wording and practical difficulties in conducting surveys can introduce error or bias into the findings of opinion polls.

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 72 of 227 MCNULTY-EEOC-PROD-000040

## Dispositions and response rates

### Final dispositions, ATP Wave 121

|  | AAPOR code | Total |
|---|---|---|
| Completed interview | 1.1 | 5,902 |
| Logged on to survey; broke off | 2.12 | 40 |
| Logged on to survey; did not complete any items | 2.1121 | 23 |
| Never logged on (implicit refusal) | 2.11 | 316 |
| Survey completed after close of the field period | 2.27 | 3 |
| Completed interview but was removed for data quality |  | 2 |
| Screened out | 4.7 | 208 |
| **Total panelists in the survey** |  | **6,494** |
| Completed interviews | I | 5,902 |
| Partial interviews | P | 0 |
| Refusals | R | 42 |
| Non-contact | NC | 3 |
| Other | O | 0 |
| Unknown household | UH | 0 |
| Unknown other | UO | 339 |
| Not eligible | NE | 0 |
| Screen out | SO | 208 |
| **Total** |  | **6,494** |
| Est. eligibility rate among unscreened: e = (I+R)/(I+R+SO) |  | 97% |
| AAPOR RR1 = I / (I+P+R+NC+O+UH+UO) |  | 94% |
| AAPOR RR3 = I / (I+R+[e*UO]) |  | 94% |

PEW RESEARCH CENTER

### Cumulative response rate as of ATP Wave 121

|  | Total |
|---|---|
| Weighted response rate to recruitment surveys | 12% |
| % of recruitment survey respondents who agreed to join the panel, among those invited | 71% |
| % of those agreeing to join who were active panelists at start of Wave W121 | 49% |
| Response rate to Wave W121 survey | 94% |
| **Cumulative response rate** | **4%** |

PEW RESEARCH CENTER

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 73 of 227 MCNULTY-EEOC-PROD-000041

**A note about the Asian adult sample**

This survey includes a total sample size of 259 Asian workers. The sample primarily includes English-speaking Asian adults and, therefore, may not be representative of the overall Asian adult population. Despite this limitation, it is important to report the views of Asian adults on the topics in this study. As always, Asian adults' responses are incorporated into the general population figures throughout this report. Because of the relatively small sample size and a reduction in precision due to weighting, we are not able to analyze Asian adults separately when looking at specific categories, such as gender.

© Pew Research Center, 2023

CONFIDENTIAL Case 2:25-mc-00053-BHL     Filed 11/21/25     Page 74 of 227 MCNULTY-EEOC-PROD-000042

# EXHIBIT 6

**From:** Conmey, Michael
**Sent:** Wednesday, July 19, 2023 10:00 AM
**To:** McNulty, Mark
**Subject:** RE: RV - NMIS/WMC Committees

Yes. Broadly speaking, the ask is if Rebecca has deliverables/presentations for these committees (and boards), the program leads should structure and administer a process to identify those items and prepare drafts for her review in advance. My approach would be to have a quarterly board & committee materials production schedule like the draft I showed you for the NMIS/WMC board meetings, which has (1) an early-quarter initial meeting with Rebecca to review what's upcoming for the quarter and chance to get her comments/reactions, and (2) a meeting with her later in the quarter to review drafts of the materials prepared by the team and prior to final submission in order to provide the opportunity for her comments/final changes. I showed her the same draft approach I shared with you for the Q3 NMIS/WMC board meetings, and it seemed to resonate with her. (It's a similar approach I have used for Series Fund board production, which has a lot of moving parts each quarter.) Ultimately, we are trying to move the administration and logistics for the preparation of the board and committee materials off of her plate. So, the process is yours to structure however works best and adjust if there is feedback from Rebecca. Happy to discuss further. Thanks Mark.

Mike

Michael J. Conmey, JD | Chief Compliance Officer
Mason Street Advisors, LLC & Northwestern Mutual Series Fund, Inc.
Northwestern Mutual Investment Management Company, LLC
720 East Wisconsin Avenue
Milwaukee, WI 53202-4797
(414) 665-3487 (phone)
(414) 625-3487 (fax)
michaelconmey@northwesternmutual.com

**From:** McNulty, Mark <markmcnulty@northwesternmutual.com>
**Sent:** Wednesday, July 19, 2023 9:03 AM
**To:** Conmey, Michael <michaelconmey@northwesternmutual.com>
**Subject:** RE: RV - NMIS/WMC Committees

Thanks Mike,

So, if I'm understanding the ask correctly, we should reach out to the secretaries of these committees and ask what standing reports/presentations Rebeca is responsible for and have the program team leads take ownership of preparing the materials for the board (sharing the drafts with Rebecca for review in advance of the meetings). Correct?

Mark

**Mark McNulty**
Enterprise AML Compliance Officer

Enterprise Compliance, T17
Milwaukee, WI
P: 414.665.4437



**CONFIDENTIAL** Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 76 of 227 MCNULTY-EEOC-PROD-000043

**From:** Conmey, Michael <michaelconmey@northwesternmutual.com>
**Sent:** Wednesday, July 19, 2023 5:35 AM
**To:** McNulty, Mark <markmcnulty@northwesternmutual.com>
**Subject:** RV - NMIS/WMC Committees

Hi Mark, based on my discussions with Rebecca, she attends the following committees:

NMIS
- NMIS Executive Committee
- NMIS Products and Services Committee
- Retail Investments Compliance Committee
- Enterprise Conflicts of Interest Committee (Sarah B/Meghan C run this committee)
- Enterprise Policy Committee

WMC
- Oversight Committee (Brian said that Rebecca has set up regular meetings with him and John for this – you may want to confirm with Brian/John)
- IT Steering Committee

Michael J. Conmey, JD | Chief Compliance Officer
Mason Street Advisors, LLC & Northwestern Mutual Series Fund, Inc.
Northwestern Mutual Investment Management Company, LLC
720 East Wisconsin Avenue
Milwaukee, WI 53202-4797
(414) 665-3487 (phone)
(414) 625-3487 (fax)
michaelconmey@northwesternmutual.com

# EXHIBIT 7

At the end of this month, out on PTO for a week, go up north. Falls in the week of P4/P5 review so needs to connect with Sarah/other pgm team leaders on John, Brian, Bethany reviews. He will have no internet connection.

**8.2.2023**

PRE-DISCUSSION WITH MATT SALMON
- Work towards proactively embracing expanded role with program lead and NMSF sanctions.

PRE-WORK
- I scheduled this time for mid-year check-in and career conversations to give those topics the time they deserve, and then if we have time we can go through regular stuff.
- Role
  - Core work – AML
  - Expanded role – retail investments program, Series Fund AML Officer, sanctions work
  - Opportunity for growth is in these new areas - proactively and strategically thinking about these spaces like you do AML
    - Series fund AML - how are you approaching learning and evaluating their programs? What do you need from MIFC/me other to learn more about the NMSF / MI? What is your plan to make sure annual OFAC filings are made on time?
    - Same for MI sanctions - one blocked asset in GASA. Who is making that filing? Who can I introduce you to?
  - Retail investments
    - Wholistic, proactive, outside in perspective - How to think about the regulatory environment, trends, etc. strategically, identify risks, raise issues for update, etc.
    - What do you need to learn to have that full view into the program?
- Career discussions
  - How are you building relationships and ongoing dialogue with Wealth leaders?
  - Enterprise presence

Discussion
- Concerned with level of additional work and pushdown; is there enough room to recognize
- AML should be VP; need to expand the role; "act in the role b/f you get the role".
- More things more important than chasing VP, personal things. Of interest to take a step aside and be SD w/ AML.
- Concerned with additional work; pushing more AML work down to team and not as involved.
- He is primary contact on FINRA exam. Additional responsibly and no recognition; what matters to him is $ (not BRAVOs).
- He got LTIP, same amount as previous year (little over 9%). Mine we down as a % of salary.
- Writing on the wall is on long term plan for future VP in EC but something has to give.
- Last icing on the cake - his job was recalibrated to the market - salary increased (midpoint) but no actual increase. Then don't do the exercise (underpaid by $21k).
- There is more value to him to be with family than chasing the next level (VP) and continue to deliver top line AML/Sanctions program, and give on the other he would be interested. He has growing concern with all being piled on that he is pushing more down on AML/sanctions to the team and he has direct personal liability.
- AML staffing: need IBO & Interns, otherwise we are at minimum support level.
- Mark: "What I appreciate about Chuck is he is so appreciative and pro about his role."

# EXHIBIT 8

| | |
|---|---|
| **From:** | michaelconmey@northwesternmutual.com |
| **Sent:** | Monday, October 2, 2023 3:56 PM |
| **To:** | EC-INVCOMPLIANCE@northwesternmutual.com; EC-MSACOMPLIANCETEAM@northwesternmutual.com; EC-AMLTEAM@northwesternmutual.com; EC-TGR@northwesternmutual.com; EC-RISKPRODCOMPL@northwesternmutual.com; brianderenne@northwesternmutual.com; bethanyzebell@northwesternmutual.com; johnruedinger@northwesternmutual.com |
| **Cc:** | |
| **Subject:** | EC Programs Team Changes |

Good afternoon, Programs Team,

It is critical to the successful design and operation of our compliance programs that we continuously monitor and adjust to changes in the business and regulatory environment. The programs team structure that was put into place in 2022 has been effective in bringing compliance support for our programs closer together and helping us to enhance collaboration, align advice, and identify efficiencies in response to changing business and regulatory compliance risks.

An area of changing risk due to new business lines and geopolitical developments in recent years relates to economic sanctions surveillance and compliance, which has historically been a shared area of support between the Managed Investments and Enterprise AML Compliance teams. To bring a more consistent and centralized approach to this important compliance work, primary responsibility for all aspects of enterprise sanctions surveillance and compliance support will move to **Mark McNulty**, Senior Director – Enterprise AML Officer, and the Enterprise AML Compliance team, including the evaluation and oversight of sanctions programs of the company's increasing number of sub-advisers. In recognition of these growing responsibilities for Mark and his team, **Nicole Lund**, Senior Director – Compliance Strategy & Execution, will expand her role leading business operations, strategy and execution (BOSE) to also lead the retail investments compliance team supporting NMIS and WMC. Nicole will join the programs team reporting to me and will retain a dotted reporting line to Rebecca with respect to her department strategy work.

Reporting to Nicole will be:



Reporting to Mark will be:



While the transition for these changes has already started, the new roles and reporting lines will be effective October 16th.

We continue our commitment to the career growth and development of all our department members and colleagues. The new roles announced above will give these leaders the opportunity to develop new skills and deepen technical expertise to drive our department and business forward. I want to recognize and thank them for their leadership and flexibility in taking on these new assignments.

Best,
Mike

Michael J. Conmey, JD | Chief Compliance Officer
Mason Street Advisors, LLC & Northwestern Mutual Series Fund, Inc.
Northwestern Mutual Investment Management Company, LLC
720 East Wisconsin Avenue
Milwaukee, WI 53202-4797
(414) 665-3487 (phone)
(414) 625-3487 (fax)
michaelconmey@northwesternmutual.com

# EXHIBIT 9



# Diversity Matters Even More

The case for holistic impact

November 2023

CONFIDENTIAL

MCNULTY-EEOC-PROD-000048

# Table of contents



Executive summary ...................................... 03

Introduction .......................................... 08

Chapter 1 ............................................. 10
An expanding business case stands

Case Study 1 .......................................... 19
IHG Hotels & Resorts: Centering inclusion, from local to global

Chapter 2 ............................................. 20
Equitable representation at the top is within reach

Case Study 2 .......................................... 27
DHL Group: Cultivating belonging and embracing broad diversity

Special feature on boards .............................. 28
Opening the aperture

Case Study 3 .......................................... 31
Air New Zealand: Doing more, hand in hand with the community

Chapter 3 ............................................. 32
Diversity and inclusive growth

Case Study 4 .......................................... 37
Edison International: Advancing DEI in and beyond the organization

Chapter 4 ............................................. 38
From commitment to action: 5 levers for change

Conclusion ............................................ 46

Methodology ........................................... 47

Acknowledgements ...................................... 50

CONFIDENTIAL    MCNULTY-EEOC-PROD-000049

Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 85 of 227    Document 3-8



# Executive summary

For almost a decade through our Diversity Matters series of reports, McKinsey has delivered a comprehensive global perspective on the relationship between leadership diversity and company performance. This year, the business case is the strongest it has been since we've been tracking and, for the first time in some areas, equitable representation is in sight. Further, a striking new finding is that leadership diversity is also convincingly associated with holistic growth ambitions, greater social impact, and more satisfied workforces.

CONFIDENTIAL MCNULTY-EEOC-PROD-000050

At a time when companies are under extraordinary pressure to maintain financial performance while navigating a rapidly changing business landscape, creating an internal culture of transparency and inclusion, and transforming operations to meet social-impact expectations, the good news is that these goals are not mutually exclusive. On the contrary, our research suggests a strong, positive relationship between them. And in an increasingly complex and uncertain competitive landscape, diversity matters *even more*.

For this report, the fourth edition of *Diversity Matters*, we drew on our largest dataset yet—spanning 1,265 companies, 23 countries, and six global regions. We also extended our research beyond the relationship between diversity and financial performance, for the first time exploring the [holistic impact](#) of diversity on communities, workforces, and the environment.

## The most compelling business case yet

There have been far-reaching changes in the business environment over the past few years, yet, companies with diverse leadership teams continue to be associated with higher financial returns. Our expanded dataset shows this is true across industries and regions, despite differing challenges, stakeholder expectations, and ambitions.

The business case for gender diversity on executive teams[1] has more than doubled over the past decade. Each of our reports—2015, 2018, 2020, and now 2023—has found a steady upward trend, tracking ever greater representation of women on executive teams. At each time point we have assessed the data, the likelihood of financial outperformance gap has grown: Our 2015 report found top-quartile companies had a 15 percent greater likelihood of financial outperformance versus their bottom-quartile peers; this year, that figure hits 39 percent.

A strong business case for ethnic diversity is also consistent over time, with a 39 percent increased likelihood of outperformance for those in the top quartile of ethnic representation versus the bottom quartile. This has persisted even with eight new economies added in our analysis of 2022 financial data.[2]





---

1. The business case is the percent difference in likelihood of outperformance between companies in the top and bottom quartile for a characteristic. Outperformance is calculated as the likelihood to place above the median profitability of other companies in the same industry and region. For more information on our calculation of the likelihood of outperformance analysis, see "Methodology for financial performance."
2. Our 2023 report draws on data that was collected in both 2021 and 2022. For this analysis, we used data collected in 2022.

CONFIDENTIAL   Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 87 of 227   Document 3-3   MCNULTY-EEOC-PROD-000051

## Equitable representation at the top is within reach

Companies in our top cohorts have shown rapid, groundbreaking growth in representation, with some even attaining gender parity. In fact, diversity-leading companies in the United Kingdom have reached an ethnic-representation average, at 28 percent, that exceeds the region's general population. Diversity-leading US companies have reached 50 percent representation of women on executive teams. In addition, leading companies in the United States now have on average 39 percent of executives from historically underrepresented ethnicities.

Companies with average levels of diverse representation have also shown substantial progress. Eight in ten companies now have at least one woman on their executive team, compared to less than two-thirds in 2020's *Diversity Wins*.

Considering the dataset as a whole, however, there is still a substantial gap in ethnic representation at top levels. For companies included in both our 2020 and 2023 reports, only 16 percent of leaders on executive teams belong to historically underrepresented ethnicities.[3] These gains have slowed since 2019. In 2020, 61 percent of companies had at least one person in leadership from a historically underrepresented group; this figure has grown only slightly (68 percent).

Because each region has a unique ethnic makeup and cultural norms, we have assessed rates of ethnic representation by evaluating equitable representation levels—how closely leadership mirrors regional demographics.[4] US companies are currently the closest to representing the population at 20 percent ethnic representation, but still lag behind the population share of 41 percent.

We have continued to look at boards, given the association of diverse boards with better financial performance and inclusive growth;[5] even more than executive teams, they can also be a strong positive influence on the societal disposition of a company. This year we once again found that financial impact is linked to increased representation of women on boards. For the first time, we also see a significant association with ethnic representation.

## Diversity supports inclusive growth

Business success is not only about financial returns: with companies across the world considering their holistic impact, we've broadened our research lens to include environmental and social-impact performance.

Our findings are striking. Across all industries surveyed, more diversity in both boards and executive teams, in both gender and ethnicity, is robustly correlated with higher social and environmental impact scores.

We recognize that creating social impact, alongside other business priorities, is a challenging task, even for companies who have strong intentions to do so. Yet, over half of sampled companies in our dataset perform well in community involvement.[6] We find that diverse leadership teams could help to bolster community involvement, positively impacting ethical disposition, community orientation, and the general image of a company.

---

3. Historically underrepresented group refers to populations who have historically not been represented within leadership teams at the same rate that they exist within the general population.
4. Equitable representation refers to the level at which a leadership team's diverse representation matches the level of representation of historically underrepresented ethnicities within a given region's population.
5. Companies in the top quartile of board-gender diversity are 27 percent more likely than those in the bottom quartile to outperform financially, and companies in the top quartile for ethnically diverse boards are 13 percent more likely to outperform than those in the bottom quartile. We tested a variety of inclusive growth metrics, including social and environmental impact. For every woman added to a company board with ten directors, there was on average a two-point increase in holistic impact scores. Additional detail located on page 16.
6. Defined as scoring above 75 on the community measure.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 88 of 227    Document 3-8    MCNULTY-EEOC3-PROD-000052

## Five levers for change

Our data shows that the more diverse the leadership team, the more likely they are to have made public, mature commitments to diversity, equity, and inclusion (DEI) in their decision-making strategies. Transforming this commitment into bold action is the natural next step. Insights from diversity leaders interviewed for this report surfaced five strategies to turn words into action:

1. **Commit to a systematic, purpose-led approach to benefit all stakeholders.** Companies should frame and pursue their DEI aspirations—internally and publicly—as core to their mission and embedded into their strategic goals. Having diverse perspectives and backgrounds may be uniquely helpful, as suggested by the relationship between ethnic and gender diversity and companies' inclusive-growth performance.

2. **Embed your strategy in company-wide business initiatives while tailoring to local context.** While DEI strategy is typically shaped at the top, giving local teams license to tailor to local contexts is key to building ownership and local impact. Agilely launching test and learn cycles for DEI initiatives in specific localities before rolling them out corporate-wide can also support larger DEI goals. In crafting a "global-local" approach to establishing their DEI strategy and values, leaders should build open lines of communication to develop a deep understanding of their workforce, community, and customers. This ensures DEI moves from abstract ideals to concrete actions.[7]

3. **Prioritize belonging and inclusive practices to unlock performance.** Diverse representation will have the most impact within a culture that fosters inclusion and belonging—which also facilitates retaining diverse talent, innovation, and customer centricity. This support should include making inclusive leadership the norm through management training and accountability, as well as providing high-impact support to affinity and Employee Resources Groups (ERGs) to boost employee satisfaction.

4. **Embolden and activate champions and allies by providing adequate resources and support.** DEI efforts of individual leaders, particularly women, are often less high-profile or officially rewarded, including their contributions to inclusive leadership, allyship, and employee wellbeing. Companies that recognize these efforts and provide a supportive environment can help these leaders thrive. This support could include mentorship and sponsorship, as well as encouraging and celebrating allyship. Leaders could be measured on their contributions to DEI and employee wellness in their performance evaluations.

5. **Act on feedback, including dissenting voices.** A culture of feedback on DEI strategy from the workforce and wider stakeholders can provide valuable insights, identifying both strengths and opportunities for change. Leaders can use routine company pulse surveys to collect feedback internally, and social listening externally. It is important for dissenting voices to also be heard to pinpoint root causes of any roadblocks and contribute towards optimizing impact of the DEI strategy.

---

Despite a challenging business environment, the business case for diverse leadership teams is clear and growing stronger. In this report, our findings also show a statistically significant link between diverse boards and executive teams and higher holistic-impact scores, including on environmental and social measures.

To achieve lasting impact along these dimensions, companies must move boldly beyond increasing diverse representation to integrating DEI in a purpose-driven approach, broadening the company's positive impact across stakeholders, employees, the external community, and the environment.

---

7. Ella Washington, "The five stages of DEI maturity," *Harvard Business Review*, November 1, 2022.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 89 of 227    Document 3-3    MCNULTY-EEOC-PROD-000053



The case for diversity and holistic impact 7

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 90 of 227 MCNULTY-EEOC-PROD-000054



# Introduction

**Over the past nine years, we have built a growing database of countries and companies that allow us to look at the relationship between diversity and business performance outcomes. We see that diversity does indeed matter. Companies that make diversity happen also tend to boast better financial results.**

This year, *Diversity Matters Even More* adds striking new insights to that clear story. Compellingly, the business case for diversity at the top levels of companies has only strengthened over time.[8] Further, we can now also say with statistical significance that outperformance of companies with diverse leadership is strongly linked to positive holistic impact, particularly environmental and social outcomes—including a more satisfied workforce. And these results are based on a reinforced dataset: we have expanded our sample to 1,265 companies in 23 economies (eight newly added) and six global regions (Exhibit 1).

Businesses are under unprecedented pressures: simultaneously taking on building inclusive, transparent cultures, and transforming to meet stakeholder expectations, while seeking financial outperformance. But in today's environment, it's more important than ever to double down on anchoring diversity, equity, and inclusion (DEI) to strategy.

---

8.  The business case is the percent difference in likelihood of outperformance between companies in the top and bottom quartile for a characteristic. Outperformance is calculated as the likelihood to place above the median profitability of other companies in the same industry and region. For more information on our calculation of the likelihood of outperformance analysis, see "Methodology for financial performance."

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 91 of 227    Document 3-3    MCNULTY-EEOC-PROD-000055

Exhibit 1

## The dataset this year includes 1,200+ companies across 23 countries.[1]

Distribution of sample by country and industry group (n = 1,265), %


Gender data being analyzed

Gender and ethnicity data being analyzed

**Global footprint,** % company representation



8%
United Kingdom

22%
Continental Europe

30%
North America

7%
Middle East and North Africa

26%
APAC

7%
Latin America

**Countries**



| 2014 | 2017 | 2019 | New in 2022 |
|------|------|------|-------------|
| Brazil | Australia | Denmark | Canada |
| Mexico | France | Norway | Colombia |
| United Kingdom | Germany | Sweden | Egypt |
| United States | Japan | | Israel |
| | India | | Italy |
| | Nigeria | | Malaysia |
| | Singapore | | New Zealand |
| | South Africa | | Spain |

**Industries,** %



| Energy, basic materials, and environment | 23% |
|---|---|
| Consumer goods and retail | 22% |
| Finance, insurance, and professional services | 14% |
| Telecommunications, media, and technology | 14% |
| Heavy industry | 13% |
| Healthcare and pharmaceuticals | 7% |
| Transportation, logistics, and tourism | 7% |

1. When looking at ethnic diversity, we only compare data from countries with a consistent definition of ethnic and cultural diversity, and where our data is reliable. Therefore, we have a much more limited dataset for ethnic diversity. Our analysis of ethnic diversity includes Brazil, Canada, Mexico, New Zealand, Singapore, South Africa, United Kingdom, United States. Equitable ethnic representation is calculated based on diverse representation in each country's population.
Note: The boundaries and names shown on maps do not imply official endorsement or acceptance by McKinsey & Company.
Source: *Diversity Matters* Even More dataset — for more information on the collection and/or analysis of data in this report, see our Methodology on page 47–49

CONFIDENTIAL   Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 92 of 227   Document 3-3   MCNULTY-EEOC-PROD-000056



### Chapter 1

# An expanding business case stands

In the past few years, companies have had to respond and even transform rapidly in the face of disruptive events such as the COVID-19 pandemic, accelerating digitization, the growth of AI, and rising inflation. It may have been thought possible for these challenges to shift the business case for diversity—instead we find it to be even stronger, as businesses with diverse executive teams and boards continue to show a competitive edge. Such companies are significantly more likely to outperform financially, while the impacts of lagging in this area grow.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 93 of 227    MCNULTY-EEOC-PROD-000057

As we expand our global dataset, a nuanced view of leadership diversity benefits across economies and industries surfaces. Emerging economies typically have lower levels of corporate gender representation in corporate leadership than advanced ones, but also face unique competitive dynamics.[9] And industries which are traditionally male dominated and predominately White still have a long way to go to achieve parity. But even here, more diverse leadership teams remain positively correlated with outperformance.

### Diverse teams are thriving

Our McKinsey *Diversity Matters* reports span nearly a decade (2015, 2018, 2020 and now 2023); in this time, the business case for gender diversity on executive teams, as measured by an increased likelihood of financial outperformance, has more than doubled.[10]

Across our widened dataset, companies in the top quartile for gender diversity are 39 percent more likely to outperform peers, continuing an upwards trend from 15 percent in 2015. This coincides with a steady increase in representation of women in leadership teams. Some top-quartile companies have now reached gender parity, while many bottom-quartile companies have not made progress since our last report.

When it comes to ethnic diversity, too, a consistently strong business case is apparent over time.[11] Our analysis indicates a 39 percent increased likelihood of outperformance for the top quartile in ethnic representation versus the bottom quartile (Exhibit 2).[12]





---

9. Advanced and emerging economies were determined using the World Bank economic classification. See box.
10. The business case is the percent difference in likelihood of outperformance between companies in the top and bottom quartile for a characteristic. Outperformance is calculated as the likelihood to place above the median profitability of other companies in the same industry and region. For more information on our calculation of the likelihood of outperformance analysis, see "Methodology for financial performance."
11. When looking at ethnic diversity, we only compare data from countries with a consistent definition of ethnic and cultural diversity, and where our data is reliable. Therefore, we have a much more limited dataset for ethnic diversity. Our analysis of ethnic diversity includes Brazil, Canada, Mexico, New Zealand, Singapore, South Africa, United Kingdom, United States. Equitable ethnic representation is calculated based on diverse representation in each country's population.
12. Our 2023 report draws on diversity data that was collected in 2022 and financial data from 2021. For more detail, see "Data analysis strengthens the business case for diversity."

Exhibit 2

## The business case for diversity on executive teams and financial outperformance.

Difference in likelihood of outperformance of 1st vs 4th quartile[1]

| | Why Diversity Matters[2] | Delivering Through Diversity[3] | Diversity Wins[4] | Diversity Matters Even More[5] |
|---|---|---|---|---|
| | 2015 | 2018 | 2020 | 2023 |

**Women representation**

| | 15% | 21% | 25% | 39% |
|---|---|---|---|---|
| Companies included | 383 | 985 | 1,039 | 1,265 |

**Ethnic diversity representation**

| | 35% | 33% | 36% | 39% |
|---|---|---|---|---|
| Companies included | 363 | 586 | 533 | 590 |

In 2023, 8 new countries were incorporated in gender analyses and 2 new countries for ethnicity analyses

1. Likelihood of financial outperformance vs the regional industry median. p-value for regression analysis <0,01.
2. Gender: n = 383; ethnicity: n = 363; US, UK and Latin America. Average EBIT margin 2010–13.
3. Gender: n = 985; Australia, Brazil, France, Germany, India, Japan, Mexico, Nigeria, Singapore, South Africa, UK, and US; ethnicity: n = 586; Brazil, Mexico, Singapore, South Africa, UK, and US; average EBIT margin 2011–15.
4. Gender: n = 1,039; 2017 companies for which gender data available in 2019 plus Denmark, Norway, and Sweden; ethnicity: n = 533; 2017 companies for which ethnicity data available in 2019; average EBIT margin 2014–18.
5. Gender: n = 1,265; 2019 companies for which gender data available in 2022 plus Canada, Colombia, Egypt, Israel, Italy, Malaysia, New Zealand, and Spain; ethnicity: n = 590; 2019 companies for which ethnicity data available in 2022 plus Canada and New Zealand; average EBIT margin 2017–21.

Source: *Diversity Matters* Even More dataset — for more information on the collection and/or analysis of data in this report, see our Methodology on page 47-49



CONFIDENTIAL   Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 95 of 227   Document 3-3   MCNULTY-EEOC-PROD-000059

Exhibit 3

# The difference in likelihood of financial outperformance.

Likelihood of financial outperformance for…
Bottom quartile[1]   Top quartile[1]



Diversity Wins 2020,[2] %   Diversity Matters Even More 2023,[3] %

| | Diversity Wins 2020,[2] % | | Diversity Matters Even More 2023,[3] % | |
|---|---|---|---|---|
| Women representation | –19 | 11 | –31 | 18 |
| Ethnic diversity representation | n/a | 20 | –24 | 27 |
| Gender and Ethnicity[4] | –27 | 12 | –66 | 9 |

1. Top quartile company likelihood of financial outperformance over average from bottom 3 quartiles; Bottom quartile company likelihood of financial outperformance below average from top 3 quartiles. For more information on the collection and/or analysis of data in this report, see our Methodology on page 47–49
2. Gender: n = 1,039; 2017 companies for which gender data available in 2019 plus Denmark, Norway, and Sweden; ethnicity: n = 533; 2017 companies for which ethnicity data available in 2019; average EBIT margin 2014–18.
3. Gender: n = 1,265; 2019 companies for which gender data available in 2022 plus Canada, Colombia, Egypt, Israel, Italy, Malaysia, New Zealand, and Spain; ethnicity: n = 590; 2019 companies for which ethnicity data available in 2022 plus Canada and New Zealand; average EBIT margin 2018–22.
4. Advantage/penalty for companies that are in the top quartile/bottom quartile of both gender and ethnicity.

Source: *Diversity Matters* Even More dataset

The penalties[13] for low diversity on executive teams are also intensifying. Companies with representation of women exceeding 30 percent (and thus in the top quartile) are significantly more likely to financially outperform those with 30 percent or fewer. Similarly, companies in our top quartile for ethnic diversity show an average 27 percent financial advantage over others (Exhibit 3).

Both forms of diversity in executive teams appear to show an increased likelihood of above-average profitability. Companies in the top quartile for both gender and ethnic diversity in executive teams are on average 9 percent more likely to outperform their peers. (This gap has closed slightly since our previous report.) Meanwhile, those in the

bottom quartile for both are 66 percent less likely to outperform financially on average, up from 27 percent in 2020, indicating that lack of diversity may be getting more expensive.

## The impact of board diversity is increasing

With boards of directors, our analysis indicates a similar pattern of financial outperformance with greater diversity—and for the first time since we began to track this data, these results are statistically significant with respect to ethnicity as well as gender (Exhibit 4).[14]

13. Rewards and penalties refer to the likelihood of outperformance, or underperformance, on profitability compared to companies in the other three quartiles.
14. When looking at ethnic diversity, we only compare data from countries with a consistent definition of ethnic and cultural diversity, and where our data is reliable. Therefore, we have a much more limited dataset for ethnic diversity. Our analysis of ethnic diversity includes Brazil, Canada, Mexico, New Zealand, Singapore, South Africa, United Kingdom, United States. Equitable ethnic representation is calculated based on diverse representation in each country's population.

CONFIDENTIAL   Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 96 of 227   Document 3-3   MCNULTY-EEOC-PROD-000060



14    Diversity Matters Even More

Companies in the top quartile of board-gender diversity are 27 percent more likely than those in the bottom quartile to outperform financially. We also see that companies with boards in the last quartile for gender diversity are an average of 17 percent less likely to outperform than those with boards in the top quartiles.

In *Diversity Wins* (2020), we reported a statistical association between financial outperformance and board diversity in gender, but not ethnicity. Three years later, companies in the top quartile for ethnically diverse boards are 13 percent more likely to outperform than those in the bottom quartile.

One possible explanation for this statistical significance is that our dataset has expanded. Our company sample size has increased by 18 percent, from 468 in 2019 to 572 currently. Additionally, there has been an overall rise in ethnic diversity representation on boards, from 16 percent in 2020 to 19 percent (20 percent if we look only at those companies in both our 2020 and 2023 datasets).

These findings support our hypothesis that diversity benefits extend across top corporate leadership to boards, where as our interviews show, DEI policy decisions for the whole organization are often made in board meetings. Boards with higher diversity may spark more DEI initiatives, more diversity of thought and innovation, and better organizational outcomes.[15]

---

15. Molly Stutzman, Yusuf George, Kayva Vaghul, Janet Tran, "A growing number of companies are recognizing the benefits of racially diverse boards," Just Capital, 2022.

Exhibit 4

**The relationship between ethnic diversity and financial outperformance on boards is now statistically significant for both gender and ethnicity.[1]**



Diversity Wins 2020,[2] %          Diversity Matters Even More 2023,[3] %

Women representation — 28 — 27

Ethnic diversity representation — *Not statistically significant* — 13

1. We considered any correlations with a p-value of <0.05 as statistically significant. We also noted p-values <0.1 given past social science research suggests this is low enough to suggest potential relationships between variables.
2. Gender: n = 1,025; 2017 companies for which gender data available in 2019 plus Denmark, Norway, and Sweden.
3. Gender: n = 1,246; 2019 companies for which gender data available in 2022 plus Canada, Colombia, Egypt, Israel, Italy, Malaysia, New Zealand, and Spain; ethnicity: n = 572; 2019 companies for which ethnicity data available in 2022 plus Canada and New Zealand; average EBIT margin 2017–21.

Source: *Diversity Matters* Even More dataset

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 98 of 227    Document 3-8    MCNULTY-EEOC-PROD-000062

## Analysis of synchronous data reinforces the business case for diversity

The analysis in this report is based on 2022 data on diversity in leadership teams and 2017–21 data on financial performance. This is consistent with our previous *Diversity Matters* approach, which due to the timing of availability of audited financial data, used historical financial data averaged over five years up to a year prior to the point of collection of the diversity data. With a dataset that now spans nearly ten years of financial data, for over 1,200 large, publicly-traded companies across 23 countries, we are uniquely positioned to examine the business case for diversity using synchronous diversity and financial data. We ran four synchronous analyses: simultaneous, midpoint, level, and forward-looking analysis, alongside our baseline scenario which forms the basis of our report.

In the first of these synchronous analyses ("simultaneous"), we used as the dependent variable financial data averaged over the period 2017 to 2022, as the independent variable leadership team representation data averaged over 2017, 2019, and 2022. In the "midpoint" analysis, we used an average of the 2017 and 2019 representation data. In a third, "level" analysis, we tested our most recent 2022 representation data against financial data averaged over 2018 to 2022. Finally, we conducted a "forward-looking" analysis of financial data from 2017 to 2022 with 2017 diversity data as the independent variable. We conducted all these analyses for gender representation, however for ethnicity, we limited them to analyses with years that had shown a statistical significance in our baseline scenario.[16] In each instance we continue to average out financial data over five years, given its significantly higher year-on-year variability versus the representation data.

In each of these four additional analyses we have continued to find a strong correlation between diverse leadership teams and financial outperformance, a further confirmation of our baseline business case for diversity across both executive and board teams. As with all our analyses, we do not attempt to imply causation, for example, determining whether diverse leadership teams cause financial outperformance or financial outperformance causes diverse leadership teams. However, not only did we see a positive correlation for executive teams and gender diversity on boards across all permutations of these synchronous analysis, each remained statistically significant.

16. As our analysis of the business case for ethnicity on boards became statistically significant starting in 2023 (with a p-value of 0.005), any analyses involving years prior to 2023 for boards ethnicity data were excluded.

## Emerging economies projected to benefit the most from increased diversity

To better understand contextual nuances, we examined diversity in emerging and advanced economies (see box). Even at this basic level of segmentation, we can expect companies to face local business and cultural contexts resulting in differing extents to which diverse representation in leadership and DEI in general are a priority.

Most emerging economies in our sample have a high degree of gender imbalance in the workforce.[17] However, emerging economies have shown meaningful progress in recent years. While gender representation in advanced economies rose five percentage points from 2020 to 2023, with women's executive representation now standing at 21 percent, emerging economies saw an almost equivalent increase —with representation rising four percentage points within the same timespan (Exhibit 5).

17. McKinsey Global Institute's gender parity score reflects on the link between gender inequality at work, in society, and in attitudes around the world.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 99 of 227    MCKINSEY-EEOC-PROD-000063



### Considerations for analysis of the business case in emerging economies

For this analysis, we've used World Bank economic classifications. "Advanced" economies include Australia, Canada, Denmark, France, Germany, Israel, Italy, Japan, New Zealand, Norway, Singapore, Spain, Sweden, United Kingdom, and United States. "Emerging" economies include Brazil, Colombia, Egypt, India, Malaysia, Mexico, Nigeria, and South Africa. However, we recognize that this is only one system, and that there are multiple local, nuanced cultural norms within each economy that likely impact gender and ethnic representation.

Because we can only compare data from economies with a consistent definition of ethnic diversity, our dataset for this is greatly limited in comparison to our gender data. Data reliability is also relevant: in some emerging economies, Brazil and South Africa, there is sufficient data for our analysis, but in others the available data is limited, including Colombia, Egypt, India, Malaysia, Mexico, and Nigeria.

CONFIDENTIAL    MCKINLEY-EEOC-PROD-000064

Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 100 of 227    Document 3-3

Exhibit 5

## Women representation in executive teams by economy type.



Emerging economies[1]                    Advanced economies[1]                    All economies

1. Advanced economies include Australia, Canada, Denmark, France, Germany, Israel, Japan, Norway, Singapore, Sweden, United Kingdom, United States; emerging economies include Brazil, Columbia, India, Mexico, Nigeria, South Africa. All economies include companies with available gender data in both 2019 and 2022.

Source: *Diversity Matters* Even More dataset

At present, and consistent with our findings in *Diversity Wins*, advanced economies in our dataset see a much higher likelihood of outperformance for executive gender diversity (at 51 percent) than do emerging economies (11 percent). This difference is even starker at board level, where the business case is more than sevenfold.

Transformational change in emerging economies require large scale interventions: long-term, skill-based interventions, sustained investments in education, and cross-industry collaborations. At the same time, these emerging economies may have the most to gain, with more opportunity to strengthen their business case as representation grows. The best-performing companies in emerging economies often face fierce domestic competition, and struggle to maintain their position at the top.[18] In this context, creating differentiation through increasingly diverse representation, with its associated better returns, may be especially impactful.

The business case for gender and ethnic diversity on executive teams grows ever stronger, reinforced by the significant impact of board diversity. Our findings show that companies in all economies and industries (especially emerging economies) with more diverse teams are positively correlated to financial outperformance. To ensure diverse leaders are well supported, companies can pursue intentional, purposeful diversity strategies backed by an inclusive culture. In Chapter 2, we see how this is much more than an idealistic vision: equitable representation is a realizable goal that is already in our reach.

18. Pre-COVID-19 McKinsey research shows only 45 percent of emerging-economy companies reaching the top quintile of profit generation hold their place there for a decade, compared to 62 percent in advanced economies.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 101 of 227    Document 13    MCNULTY-EEOC-PROD-000065

## Case Study 1
# IHG Hotels & Resorts: Centering inclusion, from local to global

**Hit hard by the COVID-19 pandemic, the hospitality industry has endured a challenging few years. But even through tough times, forward-looking companies such as IHG Hotels & Resorts have maintained their commitment to DEI. Their global-local approach respects regional conditions, fosters independent innovation, and encourages information flow.**

IHG gives maximum flexibility and support to local and regional leadership to pilot appropriate DEI strategies. As Global DEI Director Georgina Warren puts it, the strategy is "locally owned and driven, because the local nuances are so critical."

There's a firm-wide circulation of ideas, ensuring that the best concepts permeate the organization. If local pilots show promise, they can be adapted and implemented more broadly, with resources provided by leadership. Open, two-way conversations are key to connecting local leaders with overall DEI strategy.

IHG convenes regular DEI councils where hotel managers around the world can give feedback to global executives, including CEO Elie Maalouf, about what works and what doesn't. The approach is designed to allow input from managers with local knowledge: "It's not just global saying, 'Here's what you need to do,'" Warren explains. "It's sharing better practices and insights, researching what we can be doing better."

"Local leaders want to tap into the energy of the top executives," adds Louise Byrne, vice president of Global Talent. "They're really connected with the DEI agenda and want to translate it to business outcomes. There's always that nice tension and pushback, with local leaders free to say, 'This doesn't make that much sense within our market, let's modify this.'"

IHG tracks diversity and inclusion throughout the organization, always keeping local contexts in mind. Byrne says, "We have a global approach with a huge focus on gender and ethnicity, but that looks different across the world and includes some stretching targets that we're on a journey toward achieving." To this end, the company has developed an inclusion index which allows it to identify "hotspots" that may need extra assistance. "Hotspots are where we need to overinvest," explains Byrne. "That's when we decide where to double down—making sure not to spread the jam too thin."

With these interlinked strategies, IHG empowers employees at every level—corporate, regional, and individual hotel structures—to pursue DEI initiatives that create positive change. This connectivity and openness, Byrne says, allows the company to "keep inclusion at the heart while driving diversity," even amid economic shifts and challenges.



## Chapter 2

# Equitable representation at the top is within reach

The world of diverse representation in leadership is changing. Top performing companies in our research have delivered on ground-breaking diversity at a rapid pace, setting new aspirational standards. Some that have prioritized executive and board diversity are on the brink of reaching parity in gender and ethnicity, while even companies with average representation have shown progress over time. Growth in women's representation on executive teams has sped up significantly over the past decade, particularly in advanced economies, although ethnic diversity has increased at a slower pace.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 103 of 227    MCNULTY-EEOC-PROD-000067

## Gender diversity picks up steam, but ethnic diversity lags

Since McKinsey first started tracking data on representation in 2015, women have made substantial gains in the workplace and in leadership. The current global dataset shows that one-fifth of executive-team members are women, a third higher than reported in 2020. Eight in ten surveyed companies now have at least one woman on their executive team (up from fewer than two-thirds), while seven in ten have more than 10 percent. Since 2020's *Diversity Wins* (and with an expanded dataset), we have now seen the highest increase in diversity in a decade and more representation at the highest levels than ever before (Exhibit 6,7).

In contrast, ethnic diversity representation has made slower gains in recent years. For companies in both our 2020 and 2023 reports, only 16 percent of executive-team members belong to a historically underrepresented ethnic group.[19] While this is a 14 percent improvement since 2020, larger gains were observed in previous years. There has also been a small shift upwards (to 68 percent) since *Diversity Wins* in the number of companies with at least one person in executive leadership from a historically underrepresented ethnic group.

When considering ethnic diversity in leadership versus the general population, US companies are currently the closest to representing the population at 20 percent ethnic representation on leadership teams in our dataset. However, this still falls behind the equitable ethnic demographic representation at 41 percent. Other countries in our dataset have higher

rates of traditionally underrepresented populations in their executive leadership teams, but also have further to go to reach equitable representation. Across our sample, the weighted average rate of ethnic diversity representation for historically underrepresented groups is 35 percent[20]; however, the equivalent weighted rate of representation is 15 percent on executive teams and 18 percent on boards.

## Women still face higher barriers to representation

Despite strong progress, women are still underrepresented on executive teams in all regions analyzed. Reasons for this are familiar, though in recent years further issues have come to the fore, including increasing indications that women leaders are not satisfied in their roles at work. Our *2023 Women in the Workplace* report found that women continue to face more headwinds in the workplace than men, and this is especially true for women of color. As nearly half of women continue to experience microaggressions at work that call their competence and abilities into question, these women are most likely to think about quitting their jobs and struggle with burnout.

Achieving gender parity is a complex aspiration that requires societal, economic, and policy dynamics to be addressed. Companies that have been tackling this issue purposefully and strategically, aligning their internal efforts with government policies where applicable and wider societal interventions, are starting to reap the rewards of a more diverse workforce.

---

19. As locally defined, recognizing that each region's ethnic makeup and cultural norms impact progress towards greater representation.
20. We calculate weighted average representation by the number of companies in our sample across each country where there is data on ethnic representation.

Exhibit 6

**Average women and ethnic diversity representation on executive teams.**



**Women representation[1]**

**Ethnic diversity representation[2]**



| | Women representation | Ethnic diversity representation |
|---|---|---|
| 2018 | 14% | 12% |
| 2020 | 15% | 14% |
| 2023 | 20% | 15% |

1. Companies with gender data available for 2017 (n = 985), 2019 (n = 1,039), and 2022 (n = 1,265).
2. Companies with ethnicity data available for 2017 (n = 586), 2019 (n = 533), and 2022 (n = 590).
Source: *Diversity Matters* Even More dataset

Exhibit 7

**Rate of change for executive team representation.**

Executive team representation, %

xx   Average annual change, % points

+xx%   Cumulative change 2015–23, %



**Women representation**

**Ethnic diversity representation**



Executive teams from 2020 dataset[1]

Women: +1.6 → 15, 20 → +33%
Ethnic: +0.9 → 14, 16 → +14%

Executive teams from 2018 dataset[2]

Women: +0.4, +1.6 → 14, 15, 20 → +43%
Ethnic: +1.0, +0.9 → 12, 14, 17 → +42%

Executive teams from 2015 dataset[3]

Women: +1.3, +0.8, +1.8 → 15, 19, 20, 26 → +73%  (2015, 2018, 2020, 2023)
Ethnic: +1.7, +0.2, +1.5 → 8, 12, 13, 17 → +113%  (2015, 2018, 2020, 2023)

1. Gender: n = 1,265 (executive team); ethnicity: n = 590 (executive team); subset of companies from *Diversity Matters* 2020 dataset for which gender/ethnicity data available for 2019 and 2022.
2. Gender: n = 867 (executive team); ethnicity: n = 957 (executive team); subset of companies from *Diversity Matters* 2018 dataset for which gender/ethnicity data available for 2017, 2019, and 2022.
3. Gender: n = 365 (executive team); ethnicity: n = 241 (executive team); subset of companies from *Diversity Matters* 2015 dataset for which gender/ethnicity data available for 2014, 2017, 2019, and 2022.
Source: *Diversity Matters* Even More dataset

CONFIDENTIAL   Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 105 of 227   Document 13   MCNULTY-EEOC-PROD-000069

## Good news as leading cohorts show rapid progress

Over the past eight years, we have tracked over 330 companies' progress on representation and diversity in leadership, and segmented these companies into 5 cohorts based on both 2015 levels of executive-team diversity and progress since then: Diversity Leaders, Fast Movers, Moderate Movers, Resting on Laurels, and Laggards (Exhibit 8).

It has been particularly inspiring to find that **Diversity Leaders** have attained gender parity

and equitable ethnic representation, showing that equitable representation at the top is not just a lofty dream but a realistic goal. Further, our **Fast Movers** demonstrate that change can happen at speed and scale, with gender representation reaching 32 percent—the first time we've seen such a promising outcome in this cohort. These companies have raised the bar to keep pace with the changing landscape of diversity representation in leadership (Exhibit 9). Their strong performance prompted us to raise the improvement thresholds for companies from our 2020 *Diversity Wins* report to reflect

Exhibit 8

**Cohort matrix and threshold values for 2015–23 comparison.**


% of total number of companies

Given higher diversity on executive teams, we raised the threshold for 2023 cohorts[1]



### Women representation



### Ethnic diversity representation





1. For this analysis, we used subsets of UK and US companies with available data for 2014 and 2022 (gender = 331 companies; ethnicity = 227 companies).
2. Thresholds for improvement were updated from *Diversity Wins* (DM3) to reflect increases seen in top-performing quartiles; gender thresholds were increased by 5 percentage points and ethnicity thresholds were increased by 10 percentage points.
3. Equitable representation refers to the level at which a leadership team's diverse representation matches the level of representation of historically under represented ethnicities within a given region's population.

Source: *Diversity Matters Even More* dataset

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 106 of 227    MCNUL-DOC-EEOC-PROD-000070

Exhibit 9

**Executive team representation by cohort using 2015–23 dataset.[1]**


% of total number of companies



Women representation

Ethnic diversity representation[2]

Diversity Leaders — Women: 26% (2015), 50% (2023), 6%; Ethnic: 16% (2015), 35% (2023), 12%

Fast Movers — Women: 7% (2015), 32% (2023), 30%; Ethnic: 2% (2015), 23% (2023), 34%

Resting on Laurels — Women: 28% (2015), 26% (2023), 30%; Ethnic: 19% (2015), 15% (2023), 23%

Moderate Movers — Women: 8% (2015), 20% (2023), 10%; Ethnic: 3% (2015), 12% (2023), 15%

Laggards — Women: 11% (2015), 14% (2023), 24%; Ethnic: 1% (2015), 1% (2023), 16%

1. For this analysis, we used subsets of UK and US companies with available data for 2014 and 2022 (gender = 331 companies; ethnicity = 227 companies).
2. Absolute representation, not relative to country-levels of equitable representation.

Source: *Diversity Matters* Even More dataset

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 107 of 227    MCNULTY-EEOC-PROD-000071

the gains seen in top-performing quartiles (five percentage points for gender and ten percentage points for ethnicity). While there is still much work to be done in other cohorts, our Diversity Leaders and Fast Movers point to what is possible.

**Diversity Leaders**
In the span of eight years, our Diversity Leaders have moved from representation levels similar to current global average, to gender parity in their leadership teams—a ground-breaking achievement.

This is a relatively small cohort, as it represents 6 percent of the gender-cohort dataset and 12 percent of the ethnicity-cohort dataset. Of the Diversity Leaders in our last report *Diversity Wins*, slightly under half have remained as gender Diversity Leaders, and similarly, just over half of ethnicity Diversity Leaders have held their status. These shifts highlight that maintaining status as a Diversity Leader requires sustained commitments and actions towards gender and ethnic parity.

In our 2015 report, the Diversity Leaders cohort were at 26 percent gender representation and 16 percent ethnicity representation, only slightly better than current average global representation numbers. Fast forward to the present day, Diversity Leaders in the United Kingdom have reached an ethnic-representation average that in fact exceeds the respective equitable ethnic representation rates. Diversity-leading companies in the United States are also nearing equitable ethnic representation. They have on average 39 percent of executives from historically underrepresented ethnicities.

Moreover, as we mention above, Diversity Leaders in these two markets are also rapidly approaching gender parity, a profound change in representation (Exhibit 10). US Diversity Leaders have now reached 50 percent representation of women on executive teams, while the United Kingdom stands at 40 percent.

Exhibit 10

**Diversity Leaders average women/ethnic representation on executive teams in the US and UK.**



### United States[1]



50%

38%

Women representation

Ethnic diversity representation

**50%**
US gender parity
**41%**
US ethnic equitable representation[3]



### United Kingdom[2]



40%

28%

Women representation

Ethnic diversity representation

**50%**
UK gender parity

**18%**
UK ethnic equitable representation[3]

1. Gender: n = 245, ethnicity, n = 156.
2. Gender: n = 86, ethnicity, n = 64.
3. Equitable representation refers to the level at which a leadership team's diverse representation matches the level of representation of historically under represented ethnicities within a given region's population.

Source: *Diversity Matters* Even More dataset; Office of National Statistics (UK) and the United States Census

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 108 of 227    MCNULTY-EEOC-PROD-000072




## Fast Movers

A third of both our gender and ethnicity cohorts across all industries are Fast Movers, the largest proportion of companies. They testify that when prioritized, rapid increases in diverse representation are possible and sustainable—and not just for a small subset of firms.

The gender Fast Movers cohort has seen women's representation grow at an average three percentage points a year, reaching 32 percent off 2014's low base of 7 percent. Similarly, ethnic representation jumped to 24 percent in 2022 from 2 percent in 2014.[21] In the United Kingdom, we also see the Fast Movers cohort approaching equitable representation for ethnicity at around 16 percent.

Considering the Fast Movers and Diversity Leaders cohort together, we observe that nearly half of the UK companies in our dataset have either crossed or are approaching ethnic equitable representation, which feels like promising progress. However, for gender, slightly over a third of our cohort companies are up to 20 percentage points off from gender parity on executive teams—showing that there is still a long way to go.

## Resting on Laurels

Representing a third of the gender cohort and a fifth of the ethnic cohort, Resting on Laurels is the second-largest cohort in our dataset. These companies are often located in industries with high representation of women, such as retail and healthcare, and many had better initial gender representation at the start than they have now. Once considered front-runners, these now have current average representation similar to that displayed by Diversity Leaders in 2014.

While there is some good news on progress in the area of equitable representation, across most geographies, significantly more work is needed. Diversity Leaders are beacons for other companies, demonstrating that scaling and institutionalizing policies that promote multiple forms of diversity can move the needle on representation. And what of the growing expectation of companies to take a wider perspective, positively impacting their community and environment?—we explore this dynamic in more detail in Chapter 3.

21. While *Diversity Matters* was published in 2015, the report used data collected in 2014.

CONFIDENTIAL Case 2:25-mc-00053-BHL Filed 11/21/25 Page 109 of 227 Document 3-3 MCNULTY-EEOC-PROD-000073

## Case Study 2
# DHL Group: Cultivating belonging and embracing broad diversity

**DHL Group goes above and beyond DEI statistics, aiming to be a great company to work for, where employee belonging is prioritized in the spirit of "All different, together successful."**

Diversity is multifaceted, especially for global companies. DHL Group wanted to ensure its strategy embraced all forms of diversity—not just age, gender, sexual orientation, and ethnicity, but also harder-to-quantify aspects like gender identity, cultural heritage, abilities, and religion.

But taking a broad approach to diversity could result in rigidity rather than inclusivity, says Thomas Ogilvie, CHRO of DHL Group. "We cannot structure every facet, as that feels more rigid than inclusive," he says.

DHL Group goes beyond DEI to encourage a culture rooted in DEIB, where the B stands for belonging. Do employees feel they can bring their whole selves to work? Or as Ogilvie puts it, "If I am the person that I am, will I belong?" And so, while still tracking static diversity metrics, the company now focuses on these experience-based aspects.

This kind of transition requires alignment across the organization. DHL Group deliberately links DEIB principles and actions to its broader strategic approach to be an employer of choice and a great company to work for, for all. And while company-wide values must be set, they recognize the importance of space for regional and cultural particularities to flourish, especially at such a large company with a presence across the world.

A focus on belonging is key to having a workforce that feels truly included. When this is aligned with the company's values and mission, it in turn strengthens that sense of belonging—a virtuous cycle. As Thomas Ogilvie says, "If a person can agree with the statement: *No matter who I am, no matter what experiences I have, I belong to this company*—in other words, if there's an emotional bond—then we have achieved the correct state."



CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 110 of 227    MCNULTY-EEOC-PROD-000074

## Special feature on boards
# Opening the aperture

**Boards play a critical role in steering and overseeing executive teams, and diversity at board level can shape a company's trajectory. While we continue to see a relationship between board diversity and financial performance, historically underrepresented leaders, both in terms of gender and ethnicity, are still underrepresented in our sample.[22] When they are present, they typically have shorter tenures. However, trends towards a broader range of age and experience, and a more inclusive candidate pipeline, hold promise for improved diversity.**

### Boards are much more diverse than before

Since our last report, gender representation has accelerated, and about 15 percent of women on boards are still in their first year of serving. As in previous analyses, boards tend to be more diverse than executive teams (29 percent women and 19 percent underrepresented ethnic groups versus 20 and 15 percent respectively) (Exhibits 7, 11).[23] Just 5 percent of companies have no women on their boards—a substantial improvement since 2019. However, there are significant regional differences. Women are least likely to hold board positions in Latin America, followed by Asia–Pacific, whilst in continental Europe, 98 percent of companies have at least one woman on the board.

While ethnic diversity had a slow start, significant progress has also been made here in recent years. Globally, a fifth of board positions belong to historically underrepresented groups or ethnicities, a small rise since 2019. Of these, nearly a third are within their first two years of tenure. Just under a quarter of companies have no historically underrepresented ethnic representation, down from 37 percent in 2019.

### Opening the aperture of candidates

In recent years, a series of events and global trends have heightened awareness in North America and select regions in Europe; for example, the Me Too movement, Black Lives Matter movement , an increased focus on social impact goals, and more. As one company executive we interviewed noted, "After [the murder of] George Floyd, there was a 'meet the moment' feeling, and the sense of urgency and drive to action increased. We all want to make a positive corporate contribution to society." We continue to see executives globally prioritizing representation as a business imperative.

Despite this enthusiasm, there is often a perception of a lack of sufficiently qualified candidates from diverse backgrounds. While it is factually true that there are sufficient candidates, this myth does plague many efforts. Further, a candidate may also hesitate to join boards where they would be the only diverse member, leading them to question the company's commitment. Truly advocating for diverse representation requires companies to be creative and forward-thinking, not only in how they identify board talent but also in how they increase diversity in the boardroom and convey their core beliefs. It is probable that there are sufficient diverse candidates—but identifying and cultivating them likely takes purposeful and creative effort.

---

22. Our dataset for boards analysis spans 1,200+ companies across 23 countries in Africa and the Middle East, APAC, Continental Europe, Latin America, North America, and the United Kingdom.
23. When we stress-test this result by removing countries not included in the 2019 dataset, we see the same jump.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 111 of 227    MCNULTY EEOC-PROD-000075

Exhibit 11

## Rate of change for board representation.

Board representation, %

| xx | Average annual change, % points |

**+xx%** Cumulative change 2015–23, %



### Women representation



### Ethnic diversity representation



**Boards from 2020 dataset[1]**

**Boards from 2018 dataset[2]**

**Boards from 2015 dataset[3]**

1. Gender: n = 1,265 (board); ethnicity: n = 590 (board); subset of companies from *Diversity Matters* 2020 dataset for which gender/ethnicity data available for 2019 and 2022.
2. Gender: n = 872 (board); ethnicity: n = 957 (board); subset of companies from *Diversity Matters* 2018 dataset for which gender/ethnicity data available for 2017, 2019, and 2022.
3. Gender: n = 115 (board); ethnicity: n = 241 (board); subset of companies from *Diversity Matters* 2015 dataset for which gender/ethnicity data available for 2014, 2017, 2019, and 2022.

Source: *Diversity Matters* Even More dataset

### Considering diverse skillsets and professional backgrounds

Diversity of background has risen in importance throughout organizations, and boards are no exception. In some geographies, the roles of board members have also shifted in recent years, with an increasing number of active executives (such as large business unit leaders, CFOs, CIOs, and CTOs) joining boards.[24] This is a positive shift toward more holistic diversity (see Chapter 3 for additional detail) and diversity of thought, with the perspectives of experienced, working executives enriching conversations and strengthening decision making across the company.

Most companies' board members have previous C-suite experience. However, one of our interviews revealed that intentionally nominating directors who had instead excelled in non-business careers (for example, government, research) brought an unprecedented level of decision-making prowess, benefitting the board as a whole. As a leader in the natural-resources industry noted, "We had to say we're not looking for a senior executive—we actually wanted people who think differently. For example, we had people from government, and they understood where we were going structurally; we also had a lot of social science people, not just people who ran companies." These directors brought unique

24. Board Monitor US, Heidrick & Struggles, 2021.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 112 of 227    Document 13    MCNUDOCAEEOC-PROD-000076



perspectives on social change, a core value of the organization. Approaches such as these continue to open the aperture for diverse board leadership.

### Cultivating diverse candidate pipelines over time

As we mention above, company leaders often express concerns about sourcing diverse board talent. Relying on existing networks to develop candidate pipelines can limit representation and diversity of background, especially if the established leadership has similar profiles. What's needed instead is a broadening of the candidate pipeline, and this requires innovative solutions. Our interviews with companies in the top quartile for gender and/

or ethnic diversity found that effective organizations started reaching out to talent pipelines and networks early on to identify top candidates, and actively maintained these relationships to fill upcoming board seats.

Companies can feed this process by preparing their own diverse talent for future board participation at other organizations. This includes placing high-potential, diverse individuals in roles with profit-and-loss responsibility, ensuring they have committed mentors and sponsors, and equipping them with the knowledge and skills needed to confront the governance and strategy issues that boards typically face.

## Case Study 3

# Air New Zealand: Doing more, hand in hand with the community

**Air New Zealand (Air NZ) has many DEI initiatives in place, including gender- and ethnicity-based employee networks.**

"It is important that our employees have opportunities to connect across the organization, and that our leadership is representative of the population of Air New Zealand, our customers, and Aotearoa," says Nikki Dines, Chief People Officer. Even so, the company continues to challenge itself: "Is this really making an impact on the ground?" asks Dines. "Are we doing the right things to make a positive difference to our staff? Achieving accreditations can help, but it's the actions we take—or don't take—that matter most."

To this end, Air NZ has committed to engaging the community in their DEI efforts. The airline has partnered with key stakeholders, from schools to nonprofits to educational institutes, to broaden its talent pipeline and increase employee DEI awareness, and enhance their social impact.

For example, a mission-critical resource for Air NZ is its pilots, yet this profession remains heavily male dominated. In their search for creative solutions, Air NZ pilots visit local schools, educating students, teachers, and careers advisors about careers in aviation and breaking down gendered stereotypes. "For example, female students are sometimes told that if they became pilots they'd never see their

kids," says Dines. "And that is a misconception: our pilots probably get to see their kids more than many office-based roles!"

Beyond gender, ethnic inclusion remains a challenge, particularly in upper and middle management. "What we've found is that our Māori and Pasifika employees less frequently put their hands up for promotions," says Dines. Conventional emerging-leader programs did not seem to draw the best out of candidates from all cultural contexts. To counteract this, Air NZ chose to partner with a community organization on a program designed to build leadership capability, stressing cultural confidence and providing space to discuss identity. In addition, it changed how employees are selected for leadership roles. "We rewrote the promotion process and added a list of different criteria and asked candidates' peers to score them. As soon as we put this into place, we had employees from much more diverse backgrounds being selected into leadership roles."

"Programs like this are growing empathy and understanding, and are helping to shift our culture," said Dines.



## Chapter 3

# Diversity and inclusive growth

While year over year financial performance remains critical, businesses are increasingly aspiring to have positive, long-term impact on all stakeholders—the core tenet of stakeholder capitalism. This emphasizes the interests and needs of a wider set of stakeholders, including employees, customers, and investors, prioritizes social and environmental goals, and drives towards sustainable, inclusive growth—in short, what we refer to as holistic impact.

In many parts of the world there is a growing call for organizations to consider their holistic impact, not only within their own business environment, but on a wider scale, both locally and globally. Our research points to five main areas of holistic impact: financial and operational, capabilities, health and workforce, and environmental and social. In this report, we broaden the lens of our research, placing particular focus on environmental and social-impact elements. (See box "Finding the link between diversity and holistic impact measures").

Our findings are striking. Across all industries surveyed, more diversity in boards and executive teams is correlated to higher social and environmental impact scores. Social and environmental impacts are also closely linked. For example, over 80 percent of companies that perform well on social-impact metrics do similarly well for environmental metrics. These relationships are robust and statistically significant across executive teams and boards, for both gender and ethnic diversity.

## Companies are responding to calls for positive impact

Stakeholders across companies' impact landscape—investors, customers, employees, regulators—continue to expect them to embrace DEI and deliver on holistic impact commitments. In recent years, nine in ten CEOs indicated that caring about sustainability is increasingly important to the future success of their business, and that they are personally committed to a sustainable agenda.[25] Furthermore, 77 percent of consumers said they are motivated to purchase from companies committed to making the world a better place.[26] This is not to say that there is unanimous support for a holistic approach, as it is not universally a priority. However, it is important to note that many stakeholders are interested in an aspiration for companies to create wins for shareholders, employees, and a wider society. Our research aims to provide a fact base for this discussion.

Previous McKinsey research shows that progress on these holistic goals tends to be linked to strong financial performance, higher equity returns, and reduced downside risk. Companies that pursue sustainable, inclusive growth while continuing to perform on the fundamentals have stronger financial performance than peers who only excel on financial metrics, as measured by total shareholder returns.

## A clear connection between leadership diversity and social and environmental impact

Over half of the companies in our sample are performing well in reported community involvement metrics, defined as scoring above 75 on the community measure.[27] Diverse leadership teams could go a long way toward closing this gap though, for companies who are not yet performing well in this dimension, leading to a positive impact on the ethical disposition, community orientation, and general image of a company.

We examined how leadership diversity could be linked to three components of holistic impact—community, workforce, and environment—which all have particularly close connections with employee and community well-being. The results were pronounced: across all three components, we found positive correlations with gender and ethnic leadership diversity (Exhibit 12).

Higher levels of ethnic representation in leadership teams are clearly correlated with higher metrics across the board. For instance, at the executive-team level, ethnic diversity is particularly strongly correlated with environmental and workforce scores and metrics: a 10 percent increase in ethnic representation is associated with a rise of nearly 4 points in climate-strategy scores. When we look at what could be the driver of this relationship, one answer might be that diverse leadership helps widen and broaden the perspectives and experiences of a team and in an inclusive environment that creates more innovative solutions to environmental challenges. Or, put more simply, companies that value diversity and inclusive growth are also more likely to prioritize combatting inequity in their strategic decisions.

---

25. The Decade to Deliver: A call to business action, UN Global Compact and Accenture Strategy, CEO Study, 2019.
26. "Consumers, investors hold corporations' feet to the fire," Aflac CSR Survey Report Results and Analysis, Aflac, July 2019.
27. A company is considered to be underperforming if it scores below 75 on the Community measure.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 116 of 227    MCNULTY-EEOC-PROD-000080

## Finding the link between diversity and holistic impact measures

For each of the more than 1,250 major companies that were included in this study, we took the ethnic and gender diversity of their executive teams and boards and ran a regression analysis against other holistic-impact metrics.

Assessing holistic impact is complicated by the need for measures that are objective, consistent, and for which data can be gathered at scale. For this analysis, we have chosen to use environmental, social, and governance (ESG) scores as a lens for observing the link between leadership diversity and broader impact. We focus on the social (S) and environmental (E) pillars, using subscores which do not overlap with diverse leadership metrics. The governance (G) pillar already involved measures of executive and board diversity, and as such was excluded from our direct analyses.

E scores measure how a company performs as a steward of the physical environment. This considers a company's utilization of natural resources and the effect of its operations on the environment, including across supply chains.[28] Here we chose to look at operational ecoefficiency and climate-strategy metrics. S scores measure how a company manages its relationships with its workforce, the societies in which it operates, and the political environment.[29] These included talent attraction and retention, labor-practice indicators, corporate citizenship and philanthropy, and business ethics.

We also recognize that companies can make a positive impact in ways not measured by ESG scores. Deciding on appropriate actions is not always easy: these must be weighed against operating constraints. Nevertheless, our research aims to inspire change by providing a factual base for debate on these issues.

We calculated correlations between diversity and holistic-impact metrics for gender and ethnicity at both board and executive level. In selecting holistic-impact metrics, we avoided choosing metrics inherent to corporate diversity—such as the number of women on an executive team—to avoid circular logic.

This revealed positive relationships. For every ten-percentage-point increase in women's representation on executive teams, E and S holistic-impact metrics collectively went up by one point.[30] For boards, this relationship was also strong: for every woman added to a company board with ten directors, there was a two-point increase in holistic impact scores. These associations were independent of holistic-impact metrics in the general workforce, ensuring the conclusions were not circular.[31]

28. "Understanding the 'E' in ESG," S&P Global, October 23, 2019.
29. "What is the 'S' in ESG," S&P Global, February 24, 2020.
30. The S&P holistic impact score is calculated out of a total of 100.
31. Given the potential relationship between leadership diversity and employee diversity, we tested for multicollinearity between leadership diversity and any holistic-impact metrics relating to the workforce—including employee gender diversity—and found none. Multicollinearity occurs when independent variables in a regression model are highly correlated. Independent variables that are highly correlated may suggests that they are measuring the same thing. Thus, multicollinearity can cause misleading interpretations of regression outputs.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 117 of 227    MCNUL DOCUMENT-PROD-000081

Exhibit 12

## Correlation of representation on leadership teams with sample of holistic impact metrics.[1]

A 10% increase in diverse representation on leadership teams is positively correlated to additional score point(s), detailed below:



| | Women representation | | Ethnic diversity representation | |
| --- | --- | --- | --- | --- |
| | Board members | Executive team members | Board members | Executive team members |
| Community score | 2.4 | 4.3 | 2.0 | 3.1 |
| — Business ethics | 2.1 | 3.4 | 1.4 | 1.3[2] |
| — Corporate citizenship and philanthropy | 1.3 | 3.3 | 2.5 | 2.4 |
| Workforce score | 1.6 | 3.9 | 2.8 | 2.4 |
| — Talent attraction and retention | 1.6 | 3.3 | 1.9 | Not statistically significant |
| — Labor practice indicators | 1.4 | 3.1 | 1.9 | 1.7 |
| Environmental score | 1.8 | 3.5 | 2.3 | 2.7 |
| — Operational ecoefficiency | 2.2 | 4.8 | 2.2 | 1.9 |
| — Climate strategy | 2.8 | 5.8 | 3.8 | 3.6 |

1. To explore further, we tested a selected set of metrics related to each component: within community, we tested business ethics, corporate citizenship and philanthropy; within workforce, we tested talent attraction, retention, and labor-practice indicators; and within environment, we tested operational ecoefficiency and climate strategy.
2. Significant only at 10% confidence interval.

Source: BoardEx and Equilar 2022; *Diversity Matters Even More* dataset; ESG Rating 2021; Refinitiv ESG Rating 2021; S&P GLobal ESG Rating 2021

Gender diversity, too, is strongly correlated with impact across all components, especially at board level. Considering the "talent attraction and retention" and "labor practice" indicators, a 10 percent increase in women on an executive team is correlated with an around 2.1 point increase in each score. These figures more than double when the same increase is applied to boards.

Given the current business environment, the link between leadership diversity and a motivated workforce is particularly notable. Recent workforce well-being challenges, particularly around burnout

and emotional well-being, have been compounded by external forces following the COVID-19 pandemic and many return-to-office trends across the globe. While resignations have since slowed, higher workforce scores do relate to higher rates of both recruitment and workforce retention, helping to limit future turnover.

These findings also highlight the role of inclusion, which is as important as representation when it comes to building a diverse workforce. As we showed in *Diversity Wins*, even relatively diverse companies can struggle to create work environments with

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 118 of 227    MCNUDDC-EEOC-PROD-000082



inclusive leadership, managerial accountability, equality and fairness of opportunity, and freedom from bias and discrimination. Companies with more diverse leadership at the top and a commitment to inclusive practices have the potential to be a driving force in developing more inclusive work environments and fostering a happier workforce.

Finally, we also found a link between greater diversity in leadership roles and diversity across the organization.[32] For a 10 percent rise in women's executive representation in our 2019 dataset, we see on average a 2.1% increase in the percentage of both women employees and women managers in 2021.

A similar, if somewhat smaller, effect holds with ethnic representation.[33] When there is a path for women and underrepresented leaders to step into the highest roles, it suggests that there are inclusive practices at play, making it possible for all to succeed.

Overall, there is a strong correlation between diversity in influential company leadership roles and multiple indicators of holistic impact across workforce, community, and environmental components. These relationships hold across sectors.

> The case for DEI is clear when it comes to the bottom line. But now we see the benefits extend even further as stakeholders' interest in an organization's holistic impact has expanded. But how do companies tackle this vital and complex task? In Chapter 4, we lay out some suggestions to turn diversity and inclusion goals into a practical action plan.

---

32. Organization-wide and management diversity is a workforce submetric score within the social pillar. These data points were then compared against our dataset for executive teams.
33. We recognize that there is, naturally, a degree of overlap in these scores.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 119 of 227    MCNULTY-EEOC-PROD-000083

## Case Study 4
# Edison International: Advancing DEI in and beyond the organization

**A major energy company's commitment to societal impact extends beyond the organization: Upstream to their supply chain, and downstream to the wider community.**

Edison International's leadership asked: "What does it mean for us to be good citizens?" The answer had to include all stakeholders, from the local community to employees to investors. This clarity allowed the company to navigate a goal-oriented path forward, focused on creating wider positive impact. DEI measures are pursued internally among employees as well as in the California community, where the company provides electricity to over 15 million customers.

Internally, the company strives to create trust with bold transparency around representation. Edison International tracks and analyzes pay data, role diversity, and employee sentiments—and shares this data freely to instill accountability and pride throughout the organization. This is paying off: the organization is approaching gender parity and is close to reaching ethnic fair share at the executive level. As of 2022, women comprised 37 percent of Edison executives, up more than 10 percent in five years. The Edison International Board has achieved gender parity amongst its independent directors, and the company's racial and ethnic representation are above national market availability.

Investment in DEI extends to the supply chain. The company recognizes support for women-, minority-, disabled veteran-, and LGBT-owned enterprises as an economic imperative. To make this a reality, the company has held over 100 workshops focused on attracting diverse suppliers, and in 2022 spent over 35 percent of total procurement with such businesses.

Edison International also engages with industry associations and community groups, expanding recruitment efforts to bring diverse talent on board. For example, it joined the American Association of Blacks in Energy (AABE) Energy Equity campaign to increase representation in the industry, and has committed $1 million in incremental shareholder funding to pilot a scholarship program to expand diversity in the line-worker pipeline.

The company has striven to create an inclusive culture that uplifts all partners in its ecosystem. And with 87 percent of its workforce saying they're proud to work at Edison (exceeding United States, Fortune 500, and Utilities benchmarks), this commitment is paying off.



Chapter 4

# From commitment to action: 5 levers for change

The last decade has been a period of notable progress on equitable representation in leadership. Yet representation alone is an insufficient and unsustainable outcome. Since Why Diversity Matters in 2015, our thinking has evolved with continued engagement in this field. From our initial focus on diverse representation in leadership, we added a perspective on the practical steps companies can take to increase leadership diversity. From there, we broadened our focus to highlight the importance of inclusion and equity.

CONFIDENTIAL      Case 2:25-mc-00053-BHL      Filed 11/21/25      Page 121 of 227      MCNULTY-EEOC-PROD-000085

Now, we are beginning to distill the essence of holistic impact, and the role that leaders play in cultivating visionary workplaces. By building inclusive and supportive workplace cultures where diverse leaders and allies are truly heard, companies can chart a path towards impact beyond financial performance.

Diverse leadership teams know the importance of articulating a clear DEI strategy and values. In our research, the more diverse the leadership team, the more likely it is to have made public, mature aspirations to DEI that flow through company decision making and strategy. The natural but challenging next step is transforming commitment into bold action.

## Doubling down on diversity commitments

The past few years have seen a surge of interest in racial and ethnic diversity in corporate environments, with increasing numbers of companies pledging action. Since 2020, Fortune 1000 companies have publicly pledged over $340 billion to support racial equity, while the proportion of S&P 500 firms discussing DEI in their annual reports has leapt from 14 to 80 percent.[34]

But at the same time, critiques of "DEI-washing"—companies using DEI rhetoric to fashion a positive public image—are on the rise: in a 2020 Edelman Trust Barometer survey, almost two-thirds of American respondents warned that brands proclaiming support for racial equity may come across as "exploitative" or "opportunists" if such statements aren't followed through with appropriate action.[35] Employees, and even leaders, are growing increasingly disillusioned with the pace of action. Our *Women in the Workplace* 2022 report revealed that women leaders were 1.5 times more likely than

their male peers to report having left a previous job in search of a company that was more committed to DEI.[36] In certain geographies, particularly in some parts of the United States, there is now even rising criticism against some DEI initiatives as themselves discriminatory. Despite this, our data tells a clear story: diversity, equity, and inclusion are even more important, and top performers are remaining committed. If companies do not acknowledge the strategic impact and correlation between financial performance outcomes and DEI, they may risk falling behind.

Moving beyond lip service to action can be more difficult than anticipated—a learning journey that diversity leaders reflected on in our interviews. One leader recounted that their firm promoted flexibility to improve representation. However, when women were still hesitant to pursue primarily male-dominated roles, which were perceived to be less flexible, further action was clearly required. Ultimately, the company realized it needed to make flexibility a whole company way of working. The company responded by encouraging greater flexibility in day-to-day operations, regardless of role. Another leader in Asia–Pacific was proud of their LGBTQ+ certification as a public commitment to diversity. But their LGBTQ+ employees did not perceive their workplace culture as sufficiently inclusive. The organization ultimately undertook further initiatives to expand beyond certification, including education on appropriate usage of gender pronouns and initiatives designed to increase both visibility and accountability throughout the organization.

Further insights from our interviews surfaced five strategies that top diversity leaders can pursue to turn words into action:

---

34. Megan Armstrong, Eathyn Edwards, and Duwain Pinder, "Corporate commitments to racial justice: An update," McKinsey, February 21, 2023; Andrew Ramonas, S&P 500 Opens up on diversity after Floyd as investors seek more, Bloomberg Law, February 11, 2023.
35. Edelman Trust Barometer Special Report: Brand trust in 2020, Edelman, June 2020.
36. *Women in the Workplace* 2022, McKinsey and LeanIn.Org, October 18, 2022.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 122 of 227    MCNULTY-EEOC-PROD-000086



### 1. Commit to a systematic, purpose-led approach to benefit all stakeholders

While a strong social corporate culture used to be thought of as a "nice to have," our research suggests it is now a "must-have", central to any corporation's mission and values. Embracing purpose-led capitalism and a mission-driven culture is now a core part of a compelling business strategy.

Our research shows that a focus on societal good is firmly tied to both workplace satisfaction and community health. Progress on inclusive and sustainable growth goals, as indicated by ESG scores, are correlated to positive financial performance, and investors, customers, employees, and regulators increasingly expect companies to set strong DEI commitments.

For example, we interviewed a nonexecutive chairman of a large conglomerate who observed that the growing presence of women on the board created a more holistic approach to workforce wellness. This has led to better workforce relationships and more satisfied and productive employees overall.

Another company we interviewed has showcased this correlation through their support of the local community beyond their workforce through several initiatives. They partner with universities to reduce stereotypes for women entering STEM fields by providing scholarships and mentorship programs. They also have programs to finance women entrepreneurs and new mothers.

In both of these examples, these diversity leaders use their DEI advantage as a strategic unlock, both to tangibly articulate the value of DEI to the organization and to extend their strategic performance to positively impact their broader community.





## 2. Embed your strategy in company-wide business initiatives while tailoring to local context

DEI aspiration is a company-wide goal, owned and led by top leadership. The critical "and" here is that local teams across the organization also get the needed support and license to tailor this strategy to local contexts. This builds ownership and local impact, and it ensures that the strategy and initiatives used resonate within their unique market and geographic context. As one leader we interview highlighted, "The conversation that Black leaders need to have in the US are different than in the UK."

To accomplish real DEI action with a "global-local" approach, effective leaders should build open lines of communication to develop a deep understanding of their workforce, community, and customers. These clearly articulated values ensure DEI moves from abstract ideals to concrete actions, and help to avoid "one-size-fits-all" approaches, grey areas, misconceptions, and a lack of follow-through.[37]

A global insurance company, like many other companies, established five global employee networks dedicated to championing DEI from the ground up. Reflecting the dimensions of gender, disability status, nationality and ethnicity, age group, and LGBTQ+ identity, these networks represent the global workforce and expresses employees' needs and preferences. From there, local DEI groups are responsible for implementing global strategies.

Other companies first agilely test DEI initiatives in specific localities before enacting them as part of a corporate-wide strategy. These firms understand that local managers often understand the nuances of local DEI best and should be given freedom, agency, and support to foster a culture of diversity and inclusion.

---

37. Ella Washington, "The five stages of DEI maturity," *Harvard Business Review*, November 1, 2022.

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 124 of 227    MCNULTY-EEOC-PROD-000088

## 3. Prioritize belonging and inclusive practices to unlock performance

While representation is important, it is insufficient for achieving the performance outcomes we believe serve as the drivers of the DEI business case. Our previous report highlighted the importance of inclusion in an organization. We found that sentiments surrounding diversity and inclusion differed, with employees reporting more negative experiences with inclusion than with diversity in the workplace. A recent US study found that 94 percent of employees see belonging as very or somewhat important in a workplace—but one in five workers reported that they do not feel they belong at work. For Black and Hispanic employees, the rates of belonging are even lower.[38]

Belonging at work comes from being seen, supported, connected, and aligned to the company's purpose and values.[39] This is true for all forms of diversity, visible and measurable or not, and key for several reasons: the impact of diverse representation is muted if individuals, regardless of identity, do not feel emboldened to bring their full selves to work;[40] some forms of diversity are difficult to quantify and can only be fostered if individuals feel empowered to be authentic; and without inclusion, retaining talent is more challenging .

Companies can create spaces where diverse experiences are celebrated. One multinational organization we interviewed has taken action to increase inclusion and openness. They work with a nonprofit to host facilitated team meetings which encourage discussion and sharing of backgrounds. This exercise has helped bring to light forms of diversity that are not easily segmented. Employees felt empowered to share experiences with physical ability, religion, socioeconomic class, caretaking

for elderly relatives, financial obligations, and past abuse. These experiences brought unique perspectives, and feeling empowered to share them increased feelings of belonging and job satisfaction—and ultimately aided retention levels.

In another example, one company we interviewed wanted to push toward a more holistic view of diversity. To ensure they were recruiting and retaining talent from a variety of backgrounds, they implemented a system that aimed for proportional representation of diverse profiles. However, they soon realized that elements of diversity such as neurodiversity and disability are difficult to quantify and measure; in many parts of the world, employers are not legally allowed to ask people about (and thus track) gender, sexual orientation, religion, and physical ability. Employees found that a stringent quota model led to awkward situations and convoluted hiring procedures.

The organization took this opportunity to rethink its approach, from focusing on specific recruitment metrics to fostering an inclusive culture that encouraged employees to bring their whole selves to work. This ultimately led to more trust and better team results due to how people "showed up" to work.

There may also be a link between belonging and the bottom line. A recent McKinsey study showed companies that focused on employee belonging, while maintaining a performance-driven outlook, were more likely to outperform their peers and be more resilient.

Further support can include management training that fosters belonging, as well as creating and maintaining affinity and employee resources groups (ERGs). Interviewees said ERGs helped employees feel more satisfied at work.

---

38. *2023 Work in America Survey: Workplaces as engines of psychological health and well-being,* American Psychological Association, July 13, 2023.
39. *The Power of Belonging: What it is and why it matters in today's workplace,* Coqual, 2020.
40. https://www.mckinsey.com/featured-insights/mckinsey-explainers/what-is-psychological-safety

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 125 of 227    MCNULTY-EEOC-PROD-000089



The case for diversity and holistic impact    43

Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 126 of 227    MCNULTY-EEOC-PROD-000090



## 4. Embolden and activate champions and allies by providing adequate resources and support

Our research on _Women in the Workplace_ has shown that while women leaders are as likely as men at their level to want to be promoted and aspire to senior-level roles, they are more likely to experience microaggressions that undermine them and their authority and signal that it will be difficult to advance. This is especially true for women of color. Women leaders also do more to support DEI efforts, effective people management, allyship, and employee well-being. They are leading the transition to more inclusive and supportive workspaces, which is crucial for employee retention and satisfaction, particularly for younger employees.

However, this labor is often invisible and seldom officially rewarded through performance reviews or bonuses, which can make it harder for women to advance. This also means that women leaders are stretched thinner than their male counterparts—and have higher burnout rates.[41]

To ensure diverse leaders are supported and their efforts are recognized, companies can mentor and sponsor diversity champions, as well as encourage and celebrate allyship. Support can also include debiasing training for leadership, as well as measurable aspirations for leaders on contributions to DEI and employee wellness, bolstered by frequent qualitative feedback sessions. DEI and employee well-being work can also be folded into performance evaluations.

Efforts to increase representation can fall short if diverse perspectives are maligned or ignored, rather than appreciated. Increasing allyship action and embedding support for DEI work into company culture and performance reviews can activate the potential of diverse voices.

---

41. _Women in the Workplace_ 2022, McKinsey and LeanIn.Org, October 18, 2022.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 127 of 227    Document 33    MCNULTY-EEOC-PROD-000091

## 5. Act on feedback, including dissenting voices

There is no single correct approach to creating a diverse and inclusive company, and interviewees emphasized that a DEI strategy is complicated and challenging to get right on the first try. With that in mind, establishing a culture of feedback on DEI strategy from the workforce and wider stakeholders can provide valuable insights, identifying both strengths and opportunities for change. Including dissenting voices and silent majorities can further strengthen the approach and help find connections that are critical to shape an inclusive culture for everyone. Leaders can use routine company pulse surveys to collect feedback internally, and social listening externally.

For instance, an organizational leader of a transportation firm we interviewed received backlash to their DEI practices, such as using inclusive language. Rather than ignoring the criticism, they took the opportunity to better understand the foundations of the dissent, how to address concerns, and improved education and communication on why DEI initiatives mattered to the company. Educating stakeholders on the business and cultural benefits of DEI, as well as the downsides of bias and groupthink, proved to be an effective way of addressing misconceptions and securing support.[42] In regions and contexts where dissenting views have risen on the benefits of DEI for historically underrepresented ethnic groups, companies may leverage a similar approach. An agile and open mindset may be crucial to shifting strategies in response to feedback. A multinational organization we interviewed proactively shifts strategy to maintain momentum in their pursuit of social good. They provide local teams with the flexibility to test out policies, and hold routine "culture congresses" to share ideas, results, and feedback. For them, the creation of inclusive spaces with psychological safety is key to engendering a robust debate on diverse policies—with both assenters and dissenters.

> Our research shows that internal commitments to DEI initiatives have slowed compared to previous years.[43] Yet diversity leaders are doubling down rather than retreating on DEI goals. As we have shown, a focus on diversity delivers benefits in employee retention and satisfaction, consumer sentiment, stakeholder engagement, and license to operate. Now is the time to hold the line and increase investments in DEI initiatives, and commit to the conviction that diversity matters.

---

42. Ruchika Tulshyan, "Do your employees know why you believe in diversity?," Harvard Business Review, June 30, 2020.
43. Megan Armstrong, Eathyn Edwards, and Duwain Pinder, "Corporate commitments to racial justice: An update," McKinsey, February 21, 2023.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 128 of 227    MCNULTY-EEOC-PROD-000092



# Conclusion

**Over nearly a decade of research, and despite a challenging business environment, we continue to see a compelling and growing case for diversity in the leadership of companies worldwide.**

Our previous years' research showed the importance of building DEI initiatives into company strategy, so that employees of all identities feel included and welcomed in their workplaces. In this report, our findings show an even stronger business case for executive teams, and a statistically significant link between diverse boards and financial outperformance. In addition, companies with greater diversity on their leadership teams are linked to higher holistic-impact scores, including on environmental and social measures.

Companies wishing to achieve lasting impact along these dimensions can move beyond increasing diverse representation to integrating DEI in a purpose-driven approach. This enables diverse leaders to sit in key decision-making roles, builds belonging across the organization, and broadens the company's positive impact across stakeholders, employees, the external community, and the environment.

These findings highlight key imperatives for businesses:

1. Commit to a systematic, purpose-led approach to benefit all stakeholders.

2. Embed your DEI strategy in company-wide business initiatives while tailoring to local context.

3. Prioritize belonging and inclusive practices to unlock performance.

4. Embolden and activate champions and allies by providing adequate resources and support.

5. Act on feedback, including dissenting voices.

These moves are not easy, but our case studies show that they are possible and increasingly worthwhile. In today's ever-changing landscape—with economic turbulence, political uncertainty, and individual company dynamics—diversity matters even more.

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 129 of 227   MCNULTY-EEOC-PROD-000093

# Methodology

Our assessment of gender and ethnic/cultural diversity is based on publicly available data from 1,265 companies across 23 countries. We reviewed corporate and other industry websites to gather statistics on the proportion of women and the split of ethnic/cultural groups for the whole company, the executive team, and the board of directors. Our data was collected in September and October of 2022.

Demographic data was not uniformly available for each company in our dataset. For this reason, the final tally of companies analyzed for a given correlation may be less than the full sample of companies available. The exact sample size for each correlation is provided in the exhibits.

Financial data came from the Corporate Performance Analytics database by McKinsey and S&P Global. We measured profitability using average earnings before interest and taxes (EBIT) margins for non-financial companies and average return on equity (ROE) for financial companies over the five-year period from 2017 to 2021. To ensure fair comparisons for EBIT and ROE measures across financial and non-financial companies, we standardized each metric using its mean and standard deviation.

We limited our dataset to those companies for which we could obtain complete financial data (EBIT or ROE) and gender data for the executive team. For some of these companies, board and/or ethnicity data was also available. For the purposes of this analysis we analyzed companies' proportion of "men" or "women" employees due to data limitations, but recognize that gender is not binary. Our observations on other forms of diversity (such as LGBTQ+ or age) were limited by a lack of access to publicly available data.

## Definition of company levels

"Executive team" is defined according to each company's own definition of its executive management team or committee. Typically, this refers to C-2, which encompasses the CEO and up to two levels below, typically the executives on C-suite level who report directly to the CEO (for example, CFO, COO, and presidents). In some cases, we also include C-3 (for example, vice presidents) where these executives are listed on a company's website or annual report as being part of the executive management team.

"Board of directors" refers to the official directors of the corporate board, including both independent and executive directors, responsible for governance and oversight. The composition of boards varies considerably across the sample, and the degree of regional diversity observed may be influenced by government diversity aspirations.

## Determination of diversity quartiles

Companies in our global dataset were grouped into quartiles based on the diversity of their organizations at each level. For gender diversity, quartiles were based on the percentage of women at a given level, relative to the total ("global" sample) of 23 countries: Australia, Brazil, Canada, Colombia, Denmark, Egypt, France, Germany, India, Israel, Italy, Japan, Malaysia, Mexico, New Zealand, Nigeria, Norway, Singapore, South Africa, Spain, Sweden, the United Kingdom, and the United States.

For ethnic diversity, we reprised a metric used in our original *Why Diversity Matters* publication: the normalized Herfindahl-Hirschman Index (NHHI), used by economists to measure market concentration and competition within an industry. We adapted the NHHI to differentiate diversity in companies that had the same number of non-majority executives overall, but where one executive team included a greater range of ethnic backgrounds. Since the publication of the original research, we have inverted the ratio such that an NHHI measure of 0 indicates a team where everyone has the same race or gender. Increases in NHHI indicate an increase in ethnic/cultural diversity.

CONFIDENTIAL     Case 2:25-mc-00053-BHL     Filed 11/21/25     Page 130 of 227     Document 1-3     MCNULTY-EEOC-PROD-000094

HHI=∑N(si 2)
NHHI=(HHI-1⁄N)/(1-1⁄N)
NHHInew = 1—NHHIold

*where N is the number of ethnic groups in the specific geography*

Ethnic diversity quartiles were also set globally. However, given the limited availability of ethnic/cultural demographic data, the sample was much smaller—only eight countries out of 23: Brazil, Canada, Mexico, New Zealand, Singapore, South Africa, the United Kingdom, and the United States.

While our correlations are based on companies' NHHI ratios, we also aggregated ethnic/cultural representation by industry and by geography. We define ethnic group identity as it is understood in each geography:

— Brazil: Branco/Branca, Black, Asian, multiracial, other

— Canada: Aboriginal peoples, White, Black, Asian, other

— Mexico: White, Mestizo, Indigenous, Black, other

— New Zealand: European, Māori, Pacific (Pasifika), Asian (including South Asian), Middle Eastern/Latin American/African, other

— Singapore: Chinese, Malay, Indian, other

— South Africa: Black, White, Colored, Indian/Asian ancestry, other

— United Kingdom: White, Black, Asian (including South Asian), multiracial, other

— United States: White/European ancestry, Black/African ancestry, Latino of any race, Asian/Asian ancestry (including South Asian), other (including mixed race)

## Methodology for financial performance

We grouped companies into peer groups based on industry and region (headquarters location). Within each industry-region pair, we then determined what the median EBIT was. If a company's EBIT was above their industry-region's median EBIT, then it was classified as "outperforming". This is consistent with previous *Diversity Matters* publications. We fit all the financial data to normal distribution curves and determined that differentiating the bar for financial performance using industry-region pairs was a necessary step to ensure that we were truly capturing those companies that were outperforming.

## Regression analyses

We considered any correlations with a p-value of <0.05 as statistically significant. We also noted p-values <0.1 given past social science research suggests this is low enough to suggest potential relationships between variables.

## Cohort analysis

For gender-cohort analysis, a subset of US and UK companies with available gender data in 2014 and 2022 was used (331 companies). These were segmented into cohorts based on diversity baseline in 2014 and rate of change to the 2022 diversity landscape.

For ethnic-cohort analysis, a subset of US and UK companies with available ethnicity data in 2014 and 2022 was used (227 companies). They were segmented into cohorts based on diversity baseline in 2014 and rate of change to the 2022 diversity landscape relative to the respective equitable representation of ethnic and cultural diversity locally. Equitable representation is defined as how closely leadership mirrors regional demographics.

In both cases, we established matrix cutoffs based on the companies' distribution in each of the baseline and rate-of-change axes.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 131 of 227    MCNULTY-EEOC-PROD-000095

## Societal business case

For the societal business case, the gender and ethnicity representation data are used alongside environmental and social data sourced from S&P Global and Refinitiv. Companies with available data for holistic-impact metrics from S&P Global (1,153 companies) and community and workforce social scores as calculated by Refinitiv (1,265 companies) were included in the analysis.

We ran multivariable regressions with each of these metrics, considering industry-region pairs to standardize for performance across these pairs. As with financial performance data, these metrics were not available uniformly for each company in our dataset, and the exact sample size for each observed correlation is detailed in the corresponding exhibits.

In the analyses involving ethnic representation, the raw average was used over NHHI measures to capture a clear relationship between an additional historically underrepresented ethnic team member and social impact metrics.

## Deep-dive company profiles

We conducted research on leading companies in our dataset using publicly available information from their websites. We supplemented our findings with senior executive interviews, including the companies profiled. From these deep dives, we selected frontrunners with lessons for other companies and developed case studies which outline four distinct examples of DEI best practices. To learn more about our case studies, or if your company would like to participate in our research in the future, please contact the authors.

## Limitations of this work

This work adds to a growing body of research on the business case for DEI, and sheds light on how companies can use diversity as an enabler of business impact. Several caveats and limitations are worth highlighting.

Correlation is not causation, and we are not asserting causal links. As with many levers of business performance, particularly at such a high level, causation would be challenging to demonstrate, likely requiring detailed longitudinal studies. Yet, while not necessarily causal, the relationship is real. We have found statistically significant correlations between higher levels of diversity and above-industry-average financial performance in our original 2015 report, our 2018 and 2020 updates, and this report. Other research gives us good insight into what might underpin this relationship, and our interviews tell us how companies can make material differences in their DEI outcomes. Taking all this into account, we think companies on the hunt for growth can be much more tactical in how they think about DEI as a lever to pull.

Also, we cannot definitively say what drives the correlations we find. It is theoretically possible that financial outperformance enables companies to achieve greater levels of diversity. For example, companies that perform well financially may choose to deploy more of their resources toward advanced talent strategies, allowing them to attract more diverse talent. However, in practice this seems unlikely. We have observed that most companies only embark on a major transformation when they have a burning platform to do so.

Measures of holistic impact, particularly the ESG data we have utilized in this report, are still nascent. Scores across rating agencies correlate by roughly 55 percent due to variation in metrics and definitions. Currently, available data is also primarily a measure of harm reduction rather than positive societal or environmental impact. We leveraged them for this report as they are currently one of the only globally available standardized indicators of non-financial impact. As these rating systems mature or new measures for rating holistic impact are created, it may be possible to identify a more direct link between diverse leadership and holistic impact. For example, measuring a wider range of societal impact and sustainability, including measures such as equality of opportunity and sense of belonging, as they relate to diverse leadership may be the next logical step of this analysis.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 132 of 227    Document 33    MCNULTY-EEOC-PROD-000096

# Acknowledgements

**Sundiatu Dixon-Fyle** is a senior fellow in the London office; **Vivian Hunt**, DBE is the Chief Innovation Officer at UnitedHealth Group; **Celia Huber** is a senior partner in the Bay Area office; **Maria del Mar Martinez Márquez** is a senior partner in the Madrid office; and **Sara Prince** is a senior partner in McKinsey's Atlanta office, where **Ashley Thomas** is a senior expert.

The authors thank the executives and DEI leaders at Air New Zealand, DHL Group, Edison International, and IHG Hotels & Resorts who are featured in the case studies in this report, as well as the many other executives who agreed to speak with us, for contributing their time and sharing their companies' experiences with DEI. The authors would also like to thank the following senior colleagues for their commitment to this topic: Diana Ellsworth, Pablo Illanes, JP Julien, Lucy Pérez, Nina Spielmann, and Kandis Wood-Jackson. In addition, the authors would like to thank these leaders for their advice and guidance: Mitch Kornman, Matthews Mmopi, Mukani Moyo, Leah Mukoro, and Ali Potia.

Further, we thank the contributors to the report, drawn from across McKinsey's global offices. They include: Arianna Beetz, Victoria Bennett, Golden Daka, Jessie Felde, Luz Flores, Cheyenne Galitski, Allan Kiambuthi, Lukasz Kozanowski, Tatenda Mabikacheche, Hope Manninen, Grace Ngapo, Roxie Pugh, Yuan Qu, Catie Rudzinskas, and Kadija Yilla. Additionally, we would like to thank these colleagues for their support: Ifeoma Arowolo, Sandra Hu, Aiyla Khan, Ann Wen, Ziqi Yan, and Jo Yee Yap. We also thank Derin Adebulehin, Crystal Ball, Kayla Beare, Colin Douglas, Jackie Fermo, Henrietta Rose Innes, Lizanda Lucas, Jocelyn Newmarch, Edmund Rodseth, Alice Sholto-Douglas, and Carin Smith of the Editorial Team; Hana Katen, Nicola Montenegri, and Margret-Ann Natsis of the External Relations Team; Jerzy Petral of Visual Graphics & Media; and Dana Sand of McKinsey Global Publishing for their collaboration and support. Finally, the authors appreciate the support of colleagues from McKinsey's Capabilities & Insights team in compiling holistic impact metrics for the companies in our sample, as well as Data2Impact.



CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 134 of 227    MCNULTY-EEOC-PROD-000098



Diversity Matters Even More by McKinsey
November 2023
Copyright © McKinsey & Company
Designed by United States Design Center

www.mckinsey.com

@McKinsey
@McKinsey

# EXHIBIT 10

**From:** █████████

**Sent:** Friday, December 8, 2023 2:14 PM

**To:** Conmey, Michael

**Subject:** RE: Feedback Request: Mark McNulty

Mark █████████████, and we work together on many of the day to day AML-related topics. Specifically in 2023, we spent considerable time on the sanctions screening space and a project that engaged the NM Law department and outside counsel. Additionally, and out of pattern, was the "market scan" for the AML system to ensure NM was paying a reasonable rate and to compare AML system functionality. Mark has always been a direct communicator and says what is on his mind. I have found him to be very logical in his assessment of situations and consistently consistent in his demeanor. Given his style and approach, I implicitly trust Mark and truly value his input and perspective in all matters. He is diligent about keeping our regularly schedule 1:1s, and I value that time to update him and seek his input. The Northwestern Mutual AML program is a better program through his leadership.

The only improvement opportunity that I can think of would fall under the heading of "political savvy". My perspective is that Mark is exceptional at managing the logical problems and issues that require escalation across a broad spectrum of topics: AML, investments… I think that the organizational changes that occurred in 2023 (moving the AML Officer role one level further down the reporting chain of command) may negatively impact the AML program. I believe that these changes stem from Mark's ability to successfully manage the senior level relationships within Enterprise Compliance and around the company.

I hope my comments and perspective make sense. Please let me know if you have any questions or require any additional information.



**From:** Conmey, Michael <michaelconmey@northwesternmutual.com>

**Sent:** Friday, December 1, 2023 4:14 PM

**To:** ████████████████████████

**Subject:** Feedback Request: Mark McNulty

Hi ████ would you mind providing me with feedback on Mark for year-end reviews? If possible, I would appreciate your feedback by Monday, 12/11.

1. How have you worked with Mark in 2023 and what does Mark do well?
2. What suggestions for improvement, if any, do you have for Mark?
3. Please provide any other feedback on Mark based on your working relationship in 2023.

CONFIDENTIAL

MCNULTY-EEOC-PROD-000100

Thanks, and have a good weekend.

Mike

Michael J. Conmey, JD | Chief Compliance Officer
Mason Street Advisors, LLC & Northwestern Mutual Series Fund, Inc.
Northwestern Mutual Investment Management Company, LLC
720 East Wisconsin Avenue
Milwaukee, WI 53202-4797
(414) 665-3487 (phone)
(414) 625-3487 (fax)
michaelconmey@northwesternmutual.com

# EXHIBIT 11

BIZEXPO IS MAY 13 - Early
Registration Ends May 1

LEARN
MORE



Real Estate

By **Hunter Turpin**
Oct 11, 2024 12:57 pm



Learn more about:   CG Schmidt     Gilbane Building Co.     Northwestern Mutual     Tracy Lutterman

Nearly one year into construction, the total makeover of **Northwestern Mutual's** North Office Building at its downtown Milwaukee corporate headquarters campus is beginning to take shape.

The company is overhauling the 18-story building at 818 E. Mason St. into a miniature version of its 32-story Tower and Commons building next door as part of a $500 million project.

- Advertisement -





"This whole project is about doubling down in Milwaukee," said Tracy Lutterman, assistant director of construction management at Northwestern Mutual. "This is our home headquarters. We want to invest here, invest in our employees and the community."

*1 of 3*  ‹  ›



*Construction workers installs a stee*

Renovations of the 1990 building began last November with crews working top-down to remove the building's exterior, diverting 1.3 million pounds of waste in the process, according to Lutterman.

A "weather wall" was installed to protect the core of the building from the elements while crews expand each of the floor plates, adding 40,000 square feet in new space (creating a

- Advertisement -



Once that work is complete, a glass curtain will be added to the exterior next year.

Having seen no delays in construction so far, the building is still set to open in 2027, Lutterman said.

The project prepares the insurance giant to move about 2,000 workers to downtown Milwaukee from its campus in Franklin.

- Advertisement -



Upon completion of the North Office Building, Northwestern Mutual's downtown campus will be able to house up to 9,000 employees. The company has a current roster of 8,000 employees mostly spanning Milwaukee, Franklin and New York City.



*A welder on the building's west facade.*

A multi-story western addition of the building has been removed to make way for a new community-facing structure that spans North Cass Street. The space will house a conservatory and event space, which will connect the parking garage to the west with the North Office Building. The space could also include retail space like a restaurant.

Construction work is being led by Rhode Island–based **Gilbane Building Co.** in partnership with Milwaukee's **CG Schmidt Inc.** These two, **like many on the project team**, also worked together on the Tower and Commons project.

*1 of 4*



# EXHIBIT 12



# Why Leadership and Management Skills are Essential For People With Technical Backgrounds

By **Megan Johnson**  ·  October 22, 2024



Search Harvard Chan

Environmental health and safety (EHS) and occupational health professionals are known for their impeccable technical skills, but often have little formal training in management and leadership. In most science, engineering, and public health programs, coursework is already overflowing with important topics that need to be covered, and management and leadership training tend to fall by the wayside.

However, that doesn't mean those topics aren't important. Management and leadership skills are essential for both technical people who have been out in the working world for a while, and for those who are transitioning or would like to transition into higher-level roles.

"Leadership and management skills are critical to being successful," says Lou DiBerardinis, co-Program Director of Harvard T.H. Chan School of Public Health Executive Education's _Management and Leadership Skills for EHS Professionals_. "These are the so-called 'soft' or 'human' skills such as communication, active listening, time management, strategic planning, performance measurement, and managing programs."

As emerging issues, including artificial intelligence and sustainability, play a increasingly big role for major organizations, leaders need to be consistently educated on these topics to provide successful leadership. By learning how to bridge the gap between environmental health and safety technical skills and leadership skills, participants can successfully lead their institution.

Search Harvard Chan

# The Lessons of the Pandemic

Often, environmental health and safety professionals assume greater leadership roles within their organizations during unprecedented periods of crisis. This was particularly demonstrated during the beginning of the pandemic. As a result, many environmental health and safety professionals now have greater leadership roles within their organizations.

"That was the first time that a lot of people who are not environmental health and safety professionals learned that PPE, wearing masks, and ventilation was important, and needed to be able to understand that to lead and manage to develop those programs," DiBerardinis shared.

Since then, leaders who have both technical backgrounds and leadership skills have become increasingly in demand. Whether it's testing how to best disinfect disposable masks using radiation or organizing the collection of PPE from labs for distribution at hospitals, EHS professionals are consistently called upon to demonstrate adept leadership skills.

Through lessons of both functional leadership, a form that's focused on effectiveness and cohesion, and transformational leadership, which is focused on creating and sustaining change, participants possess the ability to develop clear strategies and measures for the successful integration of health, safety, and the environment into the culture of an organization.

# Who Needs to Further Their Knowledge?

Environmental health and safety (EHS) and occupational health professionals

and leadership skills. Whether it's managing and motivating employees or conflict resolution and negotiation, the principles instilled in *Management and Leadership Skills for EHS Professionals* are looked upon favorably by hiring institutions.

DiBerardinis shares that the course, which uses lectures, small group discussions, and case studies, teaches participants "to be able to sell themselves and their program, and to be able to demonstrate that they provide value to the organization, which in turn, should help them advance their career."

The program frequently draws health, safety, medical, and environmental professionals in the following roles:

- Industrial Hygienists

- Safety Professionals

- Radiation Health and Safety

- Biological Safety

- Environmental Management

- Occupational Medicine and Health

---

*Harvard T.H. Chan School of Public Health offers* Management and Leadership Skills for EHS Professionals. *This program provides participants with the skills needed to improve environmental health and safety performance within their organization.*

**Last Updated**  April 17, 2025

Search Harvard Chan

# EXHIBIT 13

| **From:** | Valters, Laila |
| **Sent:** | Friday, November 1, 2024 9:03 AM |
| **To:** | EC-ALLEMPL |
| **Cc:** | Villegas, Rebecca; Manista, Ray; Eull, Bradley; LaFore, Steve; Heinemann, Ryan; Breese-Jaeck, Joanne; Tomczak, Bonnie; McDowell, Matt |
| **Subject:** | WMC CCO and NMIS CCO Announcements |

Enterprise Compliance:

I'm excited to start in my new role as VP-Enterprise Compliance and Chief Compliance Officer(CCO) for the life company today.

As I will be continuing in my role as President & CEO of Northwestern Mutual Investment Services, LLC (NMIS), changes to the CCO role for NMIS and the Wealth Management Company (WMC) are needed.

Please join me in congratulating **Nicole Lund** who has been promoted to Vice President and will be the CCO for NMIS effective today. Nicole will continue to report to Mike Conmey from an EC functional perspective.

**Jeff Schloemer**, VP- Compliance will be appointed CCO of WMC at their December board meeting. Please join me in congratulating Jeff on this expanded accountability and role. Until the December board meeting, Rebecca Villegas will continue to serve as CCO for WMC.

These new and expanded accountabilities for Jeff and Nicole show our commitment to talent and leader development in EC and elevating our talent from within when possible. There will be details to finalize and share in the coming days as Nicole and Jeff assume these roles. If you have any questions, please reach out to your leader or to me.

I'm looking forward to the exciting work we have ahead in EC!

**Laila M. Valters**
Vice President-Enterprise Compliance and Chief Compliance Officer
President & CEO, Northwesterm Mutual Investment Servics, LLC
(she/her)

720 E. Wisconsin Ave
Milwaukee, WI 53202
P: 414-665-7495

Assistant: Jill Haupt, 414-665-5368



**CONFIDENTIAL**   Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 150 of 227   Document 33   NMNULDCAEEOC-PROD-000110

# EXHIBIT 14

| From: | ██████████ |
|---|---|
| **Sent:** | Thursday, December 12, 2024 2:37 PM |
| **To:** | Conmey, Michael |
| **Subject:** | RE: Performance Feedback Request: Mark McNulty |

See below.  Happy to discuss further.

**From:** Conmey, Michael <michaelconmey@northwesternmutual.com>
**Sent:** Monday, December 9, 2024 10:05 AM
**To:** ██████████████████████████████████
**Subject:** Performance Feedback Request: Mark McNulty

Good morning, ████.  Would you mind providing me with feedback on Mark for year-end reviews?  If possible, I would appreciate your feedback by next Monday, 12/16.

1. How have you worked with Mark in 2024 and what does Mark do well?  <span style="color:red">Very limited capacity; primarily with respect to the de novo review of the foreign sanctions policy (along with Law and outside counsel).  Mark did a good job of coordinating discussions when we had them.</span>
2. What suggestions for improvement, if any, do you have for Mark?  <span style="color:red">Driving timelines and execution (e.g. foreign sanctions project); pro-active ownership and communication with stakeholders (e.g. new AML rule); direct engagement with business.</span>
3. Please provide any other feedback on Mark based on your working relationship in 2024.  <span style="color:red">N/A</span>

Thank you.  I hope you have a great week!

Mike

Michael J. Conmey, JD
Vice President – Enterprise Compliance
Northwestern Mutual
720 East Wisconsin Avenue
Milwaukee, WI 53202-4797
(414) 665-3487 (phone)
(414) 625-3487 (fax)
michaelconmey@northwesternmutual.com
(he/him)

# EXHIBIT 15

Hi Mike,
Please see below.

| | |
|---|---|
| 1. How have you worked with Mark in 2024 and what does Mark do well? | Mark is good to work with because:<br><br>- He listens to the issue and provides clear responses based on his experience and knowledge.<br>- He is open to thoughts and recommendations.<br>- Provides clear explanation and next step action items. |
| 2. What suggestions for improvement, if any, do you have for Mark? | My observation is there often seems to be a lack of proactive engagement from Mark or his team's end when issues arise.<br><br>A suggestion would be to proactively reaching out to the teams who are impacted by regulatory change or alerts that come through after performing a review of the impact.<br><br>Actively reaching out to team members or leads when you encounter issues and suggesting possible solutions can greatly benefit our collaborative efforts. Regularly checking in on the state of tasks and openly communicating challenges early can go a long way to establishing and solidifying relationships. |
| 3. Please provide any other feedback on Mark based on your working relationship in 2024. | Mark is knowledgeable and has good intentions and good ideas around application. It has been mostly a one-way approach of me sending items I see related to sanctions or AML instead of notices from Mark and team. The MIFC team would benefit from the expert advice and implementation help with the appropriate groups.<br><br>Mark's work with sanctions policy is important. The enterprise level policy will help with building a framework of expectations and ownership of procedures by the front-line.<br><br>Overall, Mark is enjoyable to work with and makes the time to meet and discuss items as they come up. |

CONFIDENTIAL   Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 154 of 227   Document 33   MCNULTY-EEOC-PROD-000112

████████████████████████

**From:** Conmey, Michael <michaelconmey@northwesternmutual.com>
**Sent:** Monday, December 9, 2024 10:05 AM
**To:** ████████████████████
**Subject:** Performance Feedback Request: Mark McNulty

Good morning, ████. Would you mind providing me with feedback on Mark for year-end reviews? If possible, I would appreciate your feedback by next Monday, 12/16.

1. How have you worked with Mark in 2024 and what does Mark do well?
2. What suggestions for improvement, if any, do you have for Mark?
3. Please provide any other feedback on Mark based on your working relationship in 2024.

Thank you. I hope you have a great week!

Mike


Michael J. Conmey, JD
Vice President – Enterprise Compliance
Northwestern Mutual
720 East Wisconsin Avenue
Milwaukee, WI 53202-4797
(414) 665-3487 (phone)
(414) 625-3487 (fax)
michaelconmey@northwesternmutual.com
(he/him)

CONFIDENTIAL Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 155 of 227 MCNULTY-EEOC-PROD-000113

# EXHIBIT 16

Learn more about **LSEG**

# Brand Watch: Why investing in 'soft' skills makes hard-headed business sense

By **Oliver Balch**

February 24, 2025 6:02 AM CST · Updated 2 months ago

  

Industry Insight from Ethical Corporation Magazine, a part of Thomson Reuters.



Big Brothers Big Sisters of America links young people in one-to-one 'matches' with employers from its network of over 350 corporate partners, including Starbucks. REUTERS/Mike Blake Purchase Licensing Rights

## Summary

Mentored youth earn 15% more than non-mentored peers

UK survey found 37% of young adults lack communication skills

27% of young people struggle with problem-solving

Brands with mentoring see rise in worker satisfaction and productivity

February 17 - How might disadvantaged young people increase their likelihood of career success in today's ever more technology-driven economy? The answer is not, as you might think, to learn to write code or master search-engine optimisation (valuable as these may be): instead, it's to find yourself a

mentor.

According to new longitudinal research ⧉ carried out by economist Alex Bell while at Harvard University, mentored young people between the ages of 20 and 25 typically take home 15% more than their non-mentored peers.

The study, which points to the greater confidence, teamworking capabilities and general workplace readiness that the beneficiaries of mentoring have, comes at a time of growing employer frustration with the poor "soft skills" of young recruits.

In the UK, for example, 37% of 18- to 25-year-olds are judged to have deficient communication skills, and 27% are seen as being substandard at problem solving, according to a recent survey ⧉ .

One problem is that it's not only soft skills that are in short supply. Research suggests ⧉ that companies globally could miss out on $5.5 trillion in lost productivity and missed opportunities by 2026 if today's IT skills deficit isn't fixed.

Rather than pitch soft and hard skills against one another, brands would do better to consider how the two support one another, says Ginneh Baugh, chief impact officer at Big Brothers Big Sisters of America (BBBSA), the U.S.'s largest youth mentoring provider and sponsor of the Harvard research.

The issue is one of order, not hierarchy. It's comparatively easy to improve the technical competencies of a young person entering the workforce with strong soft skills, she notes; far less so the opposite.

A Big Brothers Big Sisters workplace mentoring programme at the University of West Florida, U.S. Handout via REUTERS Purchase Licensing Rights ⧉

"(Employers) tell us, 'Hey, we can teach coding. We can teach our business strategy, our approach, even our product line. What we don't have the time for is to teach interpersonal-skills, say, or how to work as a team.'"

Focusing unduly on technical skills can also unintentionally shrink a brand's talent pool. The lack of diversity in sectors with a heavy reliance on STEM subjects (science, technology, engineering and maths) is reflected in the U.S. high-tech industry ⧉ , where Black and Hispanic workers (who are under-represented in STEM education ⧉ ) make up a mere 7.4% and 9.9% of the total workforce, respectively.

A hard-skills bias can also be a poor indicator of long-term talent. Technical expertise does "not necessarily guarantee success in a role", says Mike Smith, chief executive of Randstad Enterprise. Counter to general perceptions, in fact, soft skills often serve as "better predictors of long-term success in a role".

The consensus among recent literature ⧉ adds strength to that view, finding that stronger soft skills correlate with sharper wage progression. The same positive correlation exists at an organisational level, with soft skills linked to increases in brands' competitive advantage, cross-disciplinary efficiencies, and greater entrepreneurship, evidence from firms in Slovakia ⧉ reveals.

So, how best should brands go about boosting soft skills?

Emma Egging has given considerable thought to that question from over 13 years of running youth charity, the Jon Egging Trust ⧉ (JET). To date, JET has taken more than 45,000 young people from marginalised backgrounds through its three-year "Blue Skies" programme, which places a special emphasis on "workplace competencies" such as teamwork, leadership and employability skills.

Egging's advice is three-fold. First, start early. "If you want young people to be work-ready at the point of hiring, you need to start investing in them five years before you need them." Second, escape the classroom. In JET's case, it splits its instruction 50:50 between in-school and out-of-class settings.

The advantage of the latter is the accelerating effect of "learning by doing", not just "learning by listening", says Egging. Finally, expose young people to real working environments wherever possible. Stepping into an office space or modern industrial setting can open their eyes to new career possibilities, while also demonstrating the relevance that soft skills play.



UK air traffic control services provider runs a three-year youth skills programme in cooperation with the Jon Egging Trust. REUTERS/Matthew Childs Purchase Licensing Rights ⧉

At its leading edge, brand engagement on the soft skills agenda aligns with her advice. Over the last five years, for instance, big brands linked to the business-backed Global Alliance for Youth ⧉ network have helped over 30 million young people into work. The alliance, which is just one of multiple such industry-led efforts, counts global employers such as Nestle, Microsoft, Accenture, SAP and Meta among its 25 members.

Brands are also changing how they pitch such activities, shifting away from talk of nice-to-do community projects to pragmatic language about business needs and economic growth. Swiss food giant Nestle's Nestle needs YOUth programme ⧉ has already reached more than 5 million young people since its launch in 2013. It describes its target youth audience as the "entrepreneurs and innovators of tomorrow" and key to "transforming our talent pool ⧉".

Brenda Jefcoate, STEM and aviation consultant at the UK Civil Aviation Authority, which runs on-site learning initiatives with JET, is even more explicit. When young recruits lack soft skills such as communication and problem-solving, she states, it negatively impacts "productivity, workplace culture and, ultimately, organisational success". In contrast, recruits with strong soft skills are more likely to thrive and help their employers do the same.

Investing in young people's workplace competencies brings an important secondary benefit: namely, the positive effects on morale and engagement for existing employees involved in helping young people.

Martin Rolfe, chief executive of the UK air traffic control services provider, NATS, which runs a three-year youth skills programme in cooperation with JET, says he "can't overstate the importance" of the initiative in "delivering employee satisfaction".

Feedback

It is a view echoed by Baugh at BBBSA, which links young people in one-to-one "matches" with employers from its network of over 350 corporate partners, including international brands such as UPS, The Starbucks Foundation and KPMG Foundation.

Mentoring provides a "multi-layered solution" to employees' growing desire for purpose and connection at work, she notes. "When people mentor, they feel more connected to society and other people. In fact, about 90% of our volunteers say the young people they mentor changed their life more than he or she changed theirs."

Clearly, companies need workers with a combination of high-calibre hard and soft skills, not one or the other.

Corporate talent strategies must adapt accordingly. Brands investing in soft skills do so in many forms, from mentoring and apprenticeships to work experience and tailored training. Yet, the overriding message behind all is the same: it's time to stop seeing soft skills as "soft" and treat them with the hard-headed, non-nonsense seriousness that they deserve.

*For more insights into diversity and inclusion issues, download the latest issue of Ethical Corporation magazine by* clicking here.

Suggested Topics:

Boards, Policy & Regulation     Diversity and Inclusion     Boards

Opinions expressed are those of the author. They do not reflect the views of Reuters News, which, under the Trust Principles, is committed to integrity, independence, and freedom from bias. Ethical Corporation Magazine, a part of Reuters Professional, is owned by Thomson Reuters and operates independently of Reuters News.

Purchase Licensing Rights



**Oliver Balch**

Oliver Balch is an independent journalist and writer, specialising on business's role in society. He has been a regular contributor to The Ethical Corporation since 2004. He also writes for a range of UK and international media. Oliver holds a PhD in Anthropology / Latin American Studies from Cambridge University.



## Read Next

Future of Money
**UK sets out new proposed laws to regulate crypto industry**
ago

Sustainable Finance & Reporting
**Unions, cities, nonprofits sue to block Trump workforce cuts**
ago

Climate & Energy
**India's market regulator issues norms for withdrawing an ESG rating**
1:42 PM UTC

Sustainable Finance & Reporting
**Engine Capital pushes Lyft to explore strategic options, possible sale**
1:33 PM UTC

# EXHIBIT 17

| | |
|---|---|
| **From:** | Valters, Laila |
| **Sent:** | Monday, March 3, 2025 4:29 PM |
| **To:** | McNulty, Mark |
| **Subject:** | FW: Open Audit Item - Risk Accepted |
| **Attachments:** | risk-acceptance-form.docx |

Mark, can you share anything more about the work systems teams and / or ▉▉▉▉▉▉▉ to prioritize this work and any expected timeline for completion?

The documentation says that the AML team felt that includes these rules in the implementation ensured we would have the resources dedicated to the ongoing work necessary … do I read it that it has been 4 years and we haven't make any progress?

**From:** Heise, Jesse <jesseheise@northwesternmutual.com>
**Sent:** Monday, March 3, 2025 3:00 PM
**To:** McNulty, Mark <markmcnulty@northwesternmutual.com>; Schroeder, Brian <brianschroeder@northwesternmutual.com>; Valters, Laila <lailavalters@northwesternmutual.com>
**Subject:** RE: Open Audit Item - Risk Accepted

Thank you Mark. The last step is to get Laila's approval in an email for continuing to accept the risk for another year. We need the department head to approve risk acceptance.

Laila: Do you approve continuing to accept the risk associated with this issue for another year?



CONFIDENTIAL    MCNULTY-EEOC-PROD-000118

# EXHIBIT 18



# McNulty, Mark

Sr Dir Enterprise AML Officer
Manager: Rebecca Villegas
Evaluated By: Rebecca Villegas

# 2022 Year End Performance Review

Organization: Underwriting (Rebecca Villegas)
Location: Milwaukee, WI Corporate
01/01/2022 - 12/31/2022

## Overall Summary

### Manager Overall Evaluation

**Rating:** Successful

**Comment:** During 2022, Mark's role evolved to include his existing AML Officer responsibilities and expanded to include the program lead responsibilities for the retail investment compliances covering broker dealer and investment advisory services of NMIS and WMC. In addition, Mark joined the department Steering team alongside several other leadership changes in the department. From an AML program perspective, Mark's summary does a nice job of covering the high points of accomplishments, and I'd highlight the positive internal audit results and OCC regulatory exam results. Mark has developed a stable and mature AML program for the enterprise and has leveraged proprietary information to increase coverage and quality of various AML alerts, in addition to the credibility and expertise he brings to his role. An area of focus for Mark in 2023 is to continue to build proprietary information proprietary information . Further, Mark should continue to focus on building his AML succession bench, ideally considering a diverse slate of potential successors.

In June 2022, Mark took on new responsibilities for the retail investment teams. During the balance of the year, Mark focused on getting to know his new team and their work, and providing guidance and escalation as needed. In 2023, I'd like to see Mark build a proactive model of compliance program support for the retail investment programs that considers risks proactively to set or change policy, provides effective challenge for business processes and decisions, and involves creating ongoing dialogue and influence with Wealth leaders.

In his role as a department leader, Mark adds valuable experience and perspective to the team. Mark's insights were particularly helpful during the 2023 strategy planning sessions, and I'd encourage him to find more opportunities and venues to share his expertise and perspective in steering meetings and other department-facing venues.

### Employee Overall Evaluation

**Comment:** 2022 was a challenging year with departmental realignments, additional reporting relationships, and increased responsibilities in both the leadership/direction-setting of the department and delegated project work on behalf of the CCO. With all these changes, I was able to manage/prioritize my workload to ensure that responsibilities were met while having the time necessary to address the needs of my growing reporting structure. The listed goals were met with the attention to detail which has become expected from the AML Officer role. When engaging in project areas, I have been purposeful in expanding my view to include the broader Enterprise Compliance perspective. proprietary information proprietary information

With the expanded role, I have made a purposeful effort to delegate more responsibility to my very capable team. This has led to additional advancement of their skills and comfort level while expanding cross-training opportunities. My team has a wealth of different perspectives and backgrounds, and we foster an environment where everyone is free to share different

approaches to the work at hand. Challenging the "way it has always been done" mentality and finding new ways to meet our obligations. I am very proud of the work my team has accomplished in 2022 and am looking forward to continued growth 2023.

## Goals

### AML Committees and Reporting Responsibilities

Serve as Chair of both the AML Committee and the AML Executive Committee -
Schedule meetings, create agendas, present materials, ensure leadership is updated on the status of the AML program.
Create and deliver AML program reports to enterprise leadership in 2022 -
NMWMC Meeting of the Audit Committee and Board of Directors, NMIS Board Meeting, NM Series Fund Board Meeting, IPS Compliance Committee, Enterprise Compliance and Operations Committee
Gather statistical information for, prepare and submit the annual WMC MLR report to the OCC.
Measures:
Quarterly AML Committee meetings are held timely and appropriate information is shared
2022 AML Program reports are completed and presented to the above noted leadership meetings
2022 WMC MLR report submitted on or before the due date.

Organization Alignment:

### D&I Goal

See below under "Supports"

Organization Alignment: Mirror or exceed enterprise EX engagement scores for your team on "My manager values diverse perspectives and an inclusive environment." (Archived)

### Maintenance of Enterprise AML Program

Continue to develop and cross train AML Team members. Daily execution of AML Program processes through efficient use of AML Team resources.
Ensure the timely review and resolution of all AML alerts.
Review and comment on enterprise SAR filings.
Lead weekly triage meetings with SIU partners to review and assess current AML issues/alerts/cases.
Perform program oversight duties (low priced securities, OFAC scans, PEP, etc.)
Complete the necessary annual certifications: DTCC, 314b, etc.
Foster an environment of creative problem solving and personal ownership among AML Team members and our partners in Law and the SIU.
Measures:
Alerts and cases are reviewed and closed within documented timelines.
SAR filings are completed timely and in appropriate circumstances.
Monthly and Quarterly oversight reviews are completed within deadlines.
Annual certifications are made by appropriate deadlines.

Organization Alignment:

### Projects and Company Initiatives

Enterprise Compliance Steering Membership -

Participate in EC Steering meetings helping to define and drive EC initiatives in 2022.

Company Policy and Procedures -

Participate in Enterprise Compliance Policy Committee proprietary information Cross train AML Team members to take on direct inquiries from the field with the most current legal/regulatory guidance.

2022 Regulatory Examinations and Inquiries (As needed) -

Act as the primary contact point for all AML related inquiries and data production. Meet directly with examiners as needed to describe the company AML program and answer any/all questions they have about the program.

Participate in Enterprise Fraud Risk Council -

Assist in the prevention, review and response to company fraud incidents. Provide the AML perspective necessary when assessing the impact of fraud incidents, including any AML reporting obligations.

Measures:

Provide value to help drive company and departmental initiatives.

Creation of policy updates as needed.

Sharing of latest information with AML Team and Law.

Adequate and Timely responses and data provided to regulators.

Enhanced fraud processes/policies as a result of information learned/discussed at the Enterprise Fraud Risk Council meetings.

Organization Alignment:

# EXHIBIT 19



# McNulty, Mark

Sr Dir Enterprise AML Officer

Manager: Michael Conmey
Evaluated By: Michael Conmey

# 2023 Year-End Performance Review

Organization: Enterprise Compliance (Michael Conmey)

Location: Milwaukee, WI Corporate

01/01/2023 - 12/31/2023

## Overall Summary

### Manager Overall Evaluation

**Rating:**   Successful

**Comment:**   Mark continued to lead a successful AML program in 2023 and chair the AML operating and executive committees, managing the agendas and running the meetings.  He focused on building depth and expertise on his team to support the AML program work, which progressed during the year as highlighted in his summary. I encourage Mark to continue to build bench strength on the AML team in the coming year. Mark also continued to serve as the subject matter expert proprietary information proprietary information regularly educating colleagues in the home office and field about the policy and related regulatory risks.  He also supported colleagues considering other AML adjacent policies proprietary information proprietary information . The AML program continued to have positive outcomes and audit results for the year. I received positive feedback on Mark regarding his responsiveness to various AML related inquiries during the year and his ability to explain these policies and how they apply in the context of various scenarios.  In his role leading retail investments compliance, Mark notably served as a point of escalation supporting his team with a challenging business partner proprietary proprietary information proprietary information  I received positive feedback on Mark's knowledge, responsiveness, and ability to connect stakeholders for the initiative.

Mark's role evolved during the year to include primary responsibility for the company's economic sanctions compliance, proprietary information proprietary information . At year-end, Mark was in the process of leading an evaluation of proprietary information proprietary information  This work will continue in 2024.  In the coming year, I would like to see Mark learn more about NM's institutional investments business and proactively seek opportunities to build relationships with the business, operations, and compliance teams. With respect to the proprietary information , this will give Mark the opportunity to execute on project management skills and effectively present findings and program enhancements in formal governance settings to various stakeholders. With Mark's expanded responsibilities for sanctions compliance, his role leading retail investments compliance was moved to a peer in EC.

As Mark highlighted in his self-evaluation, he is willing to challenge the status quo. I appreciate Mark's candor and his willingness to share his viewpoints.  During the year, Mark and I held regular one-on-one meetings where we discussed his concerns and viewpoints on certain topics.  His concerns were shared with other leaders as appropriate and additional meetings were held in some cases, including with HR, to further address certain topics.

### Employee Overall Evaluation

**Comment:**   I feel 2023 was another successful year. 2023 continued the pattern of increased responsibilities for my role within Enterprise Compliance as I continued to make a case for being elevated to a Vice-President job level. Whether those responsibilities were participation in the EC Steering team providing

leadership and direction on the department, taking on additional responsibilities for overseeing the NMIS and WMC program teams, representing the department in corporate committees and projects, I approached all responsibilities with the same level of engagement and competence to ensure all areas of responsibility were appropriately addressed. My new direct reports shared a true appreciation for my management style and appreciated my ability to provide support where needed (managing Risk and Controls issues being the best example). My existing AML team made continued advancements in their competencies and efficiencies propelling the AML Program into its strongest position to date (alert turnaround, process backups, and regulatory risk management). And I never lost sight of my personal performance goals. I am a go-to resource for field and home office personnel for issues that go beyond my core AML responsibilities and the feedback is consistently very positive. I am one who will challenge the status quo and question why. I provided important direction and feedback for our proprietary information with respect to pushing back on partner responsibilities being delegated to NMIS. I challenged a proprietary information proprietary information . And I have raised concerns to my leaders with potential legal issues with certain employment practices with the intent of protecting the company and our people leaders. I don't shy away from difficult conversations and will do everything in my power to improve my team, department and company. I maintain an open and welcoming environment for my direct reports allowing for free exchange of ideas and information. It has been a consistent piece of feedback to hear that my direct reports appreciated the honest and open dialogue within my team. I treat my people as I would want to be treated, am an unflinching advocate for them and they continue to flourish under the approach.

## Goals

### AML Committees and Reporting Responsibilities

Serve as Chair of both the AML Committee and the AML Executive Committee -
Schedule meetings, create agendas, present materials, ensure leadership is updated on the status of the AML program.
Create and deliver AML program reports to enterprise leadership in 2023 -
NMWMC Meeting of the Audit Committee and Board of Directors, NMIS Board Meeting, NM Series Fund Board Meeting, IPS Compliance Committee, Enterprise Compliance and Operations Committee
Gather statistical information for, prepare and submit the annual WMC proprietary information
Measures:
Quarterly AML Committee meetings are held timely and appropriate information is shared
2023 AML Program reports are completed and presented to the above noted leadership meetings
2023 WMC MLR report submitted on or before the due date.

Organization Alignment:

### Maintenance of Enterprise AML and Retail Investment Compliance Support Programs

Continue to develop and cross train program team members. Daily execution of AML Program processes and Retail Investment Compliance Support consultation through efficient use of program resources.
Ensure the timely review and resolution of all AML alerts.
Review and comment on enterprise SAR filings.
Lead weekly triage meetings with SIU partners to review and assess current AML issues/alerts/cases.
Perform program oversight duties (low priced securities, OFAC scans, PEP, etc.)
Complete the necessary annual certifications: DTCC, 314b, etc.
Foster an environment of creative problem solving and personal ownership among program members and our business partners.
Measures:
Alerts and cases are reviewed and closed within documented timelines.

SAR filings are completed timely and in appropriate circumstances.
Monthly and Quarterly oversight reviews are completed within deadlines.
Annual certifications are made by appropriate deadlines.
Business partners feedback on adequacy of support received.

Organization Alignment:

## People Leader D&I Goal: Mirror or exceed enterprise EX engagement scores for your team on "My manager values diverse perspectives and an inclusive environment." (Public)

Continue to foster an environment that promotes and supports the participation of all team members. Facilitate open dialogue that allows for all employees to share their ideas and perspectives. Respect and consider "out-of-the-box" solutions and encourage new approaches to historic challenges.
Measures:
Feedback from direct reports.
Divisional and enterprise surveys.

Organization Alignment: Mirror or exceed enterprise EX engagement scores for your team on "My manager values diverse perspectives and an inclusive environment." (Archived)

## People Leader Engagement Goal: "Build trust and rapport with your team as assessed through the employee pulse survey"

Provide a team environment that allows for open and honest dialogue. Come to the aide of employees who are having difficulty navigating through challenges. Provide clear direction and feedback to assist in the career development of my direct reports.
Measures:
Feedback from direct reports.
Employee pulse survey results.

Organization Alignment: Establish an engaging work environment. (Archived)

## Projects and Company Initiatives

Enterprise Compliance Steering Membership -
Participate in EC Steering meetings helping to define and drive EC initiatives in 2023.
Company Policy and Procedures -
Participate in Enterprise Compliance Policy Committee
Completion of AML Risk Assessment
Completion of a full review of the company sanctions processes and implementation of identified enhancements.
2023 Regulatory Examinations and Inquiries (As needed) -
Act as the primary contact point for all AML related inquiries and data production. Meet directly with examiners as needed to describe the company AML program and answer any/all questions they have about the program.
Participate in Enterprise Fraud Risk Council -
 Assist in the prevention, review and response to company fraud incidents. Provide the AML perspective necessary when assessing the impact of fraud incidents, including any AML reporting obligations.
Measures:
Completed AML Risk assessment.
Completed sanctions review and enhancements implemented.
Creation of policy updates as needed.

Adequate and Timely responses/data provided to regulators.
Enhanced fraud processes/policies as a result of information learned/discussed at the Enterprise Fraud Risk Council meetings.

Organization Alignment:

# EXHIBIT 20

| Job History | | | | | |
|---|---|---|---|---|---|
| **Job Title** | **Company** | **Start Date** | **End Date** | **Location** | **Responsibilities and Achievements** |
| Enterprise Anti-Money Laundering Officer | Northwestern Mutual | 11/30/2017 | | Milwaukee, WI | •Responsible for the overall management of the BSA/AML program for four entities: NM, NMIS, NMWMC, NMSF. Duties include: Reviewing transactional activity, overseeing suspicious activity reporting, presenting annual reports to the respective Board of Directors, creating and updating policies as needed, overseeing regulatory audits of the AML/BSA program, acting as Chair of both the AML Executive Committee and the AML Committee. |
| Vice President - Compliance | SII Investments, Inc. & Investment Centers of America, Inc. | 11/30/2015 | 11/30/2016 | Appleton, WI | •Under direction of the CCO, was responsible for the overall management and operations of SII and ICA compliance functions, including: Managed regulatory inquiries, examinations, and investigations including issuing response letters. Overseeing teams responsible for the handling of customer complaints, litigations and arbitrations, the processing of registrations, performing ongoing surveillance and the review of advertising and sales literature. Named the delegate to the AML Officer, with the responsibility for revising the firm's AML program, managing the AML Specialists, handling of escalations, and the filing of reports to the proper authorities. Oversaw the team responsible for the creation and implementation of SII and ICA continuing education programs. Managed a team of 15 employees with 2 direct reports. |
| Director - NMIS Field Administration | Northwestern Mutual | 11/30/2010 | 11/30/2015 | Milwaukee, WI | •Was responsible for the centralized management and oversight of a broad range of NMIS Administration activities including; leading the enterprise "Succession Planning Initiative" for field representatives, oversight of NMIS operations, design and implementation of NMIS policies/procedures, shape distribution policies by anticipating and responding to regulatory changes, maintenance of required books and records, reporting findings/results of regulatory issues to the NMIS Board and managing third-party referral relationships. Managed a team of 10 employees with 4 direct reports. |
| Assistant Director - Compliance Assurance | Northwestern Mutual | 11/30/2007 | 11/30/2010 | Milwaukee, WI | •Was responsible for the management and oversight of centralized NMIS surveillance systems covering the following; suitability at the trade and account level, trending of patterns of behavior by financial representatives, review of the personal trading activity of financial representatives and the certification of the annual Code of Ethics. In addition, was responsible for oversight of internal compliance testing program working directly with CCO to address findings and mitigate risks. Managed a team of 15 employees with 3 direct reports. |
| Compliance Oversight and Review Manager | Northwestern Mutual | 11/30/2005 | 11/30/2007 | Milwaukee, WI | •Was responsible for the management and oversight of compliance and field inspection team covering the following; On-site inspection of field offices and financial representatives, review and approval of outside business activities, creation of continuing education content, ensuring proper registration of field representatives, consulting with field supervisors on application of policy and delivery of disciplinary actions. Managed 5 direct reports. |
| NMIS Project Management Consultant | Northwestern Mutual | 11/30/2003 | 11/30/2005 | Milwaukee, WI | •Was responsible for leading complex, regulatory initiatives for the enterprise. Examples include; the build-out of a "Regulatory Response Team" to manage all inquiries and on-site examinations by industry regulatory bodies (SEC, FINRA, etc.), leading the "Shell Account Reconciliation Project" to ensure the capture of suitability information for direct-to-fund positions, managing the FINRA mandated mutual fund breakpoint client notification and review project. Managed various numbers of temporary employees as projects dictated. |
| Broker Dealer Compliance Specialist | Northwestern Mutual | 11/30/2002 | 11/30/2003 | Milwaukee, WI | •Was responsible for managing complex regulatory projects impacting the enterprise. Examples included; FINRA mutual fund breakpoint self-assessment to determine if clients received the proper sales charge discounts (managed 23 temporary employees), implemented process/procedural changes related to internal audit findings and assisted with compliance functions when needed (OBA approvals, onsite compliance inspections of financial representatives, etc.) |
| Compliance Examiner | FINRA | 11/30/1998 | 11/30/2002 | Chicago, IL | •Completed on-site examinations of broker/dealer member firms reviewing for compliance with FINRA and SEC rules and regulations including: qualification/registration, financial recordkeeping, supervisory system, sales practices, customer complaints, filing requirements, transaction reporting, continuing education requirements and any other applicable rules relating to the specific business activities of the firm being examined. •Completed in-depth examinations of customer complaints and terminations of registered representatives for potential FINRA and/or SEC rule violations. •Monitored and analyzed the financial and operational condition of member firms on a monthly and quarterly basis. •Designated Trading and Market Making examiner for one of the five examination sections in the Chicago District Office. •Designated Mentor for assisting in the training of newly hired examiners. |

# EXHIBIT 21

## Job History

### Enterprise Anti-Money Laundering Officer

Northwestern Mutual | November 2017 - Present | 7 years 4 months |
Milwaukee, WI

· Responsible for the overall management of the BSA/AML
program for four entities: NM, NMIS, NMWMC, NMSF. Duties include:
Reviewing transactional activity, overseeing suspicious activity
reporting, presenting annual reports to the respective Board of
Directors, creating and updating policies as needed, overseeing
regulatory audits of the AML/BSA program, acting as Chair of both
the AML Executive Committee and the AML Committee.

### Vice President - Compliance

SII Investments, Inc. & Investment Centers of America, Inc. | November
2015 - November 2016 | 1 year | Appleton, WI

· Under direction of the CCO, was responsible for the overall
management and operations of SII and ICA compliance functions,
including:
Managed regulatory inquiries, examinations, and investigations
including issuing response letters. Overseeing teams responsible for
the handling of customer complaints, litigations and arbitrations, the
processing of registrations, performing ongoing surveillance and the
review of advertising and sales literature. Named the delegate to the
AML Officer, with the responsibility for revising the firm's AML
program, managing the AML Specialists, handling of escalations, and
the filing of reports to the proper authorities. Oversaw the team
responsible for the creation and implementation of SII and ICA
continuing education programs. Managed a team of 15 employees
with 2 direct reports.

### Director - NMIS Field Administration

Northwestern Mutual | November 2010 - November 2015 | 5 years | Milwaukee, WI

- Was responsible for the centralized management and oversight of a broad range of NMIS Administration activities including; leading the enterprise "Succession Planning Initiative" for field representatives, oversight of NMIS operations, design and implementation of NMIS policies/procedures, shape distribution policies by anticipating and responding to regulatory changes, maintenance of required books and records, reporting findings/results of regulatory issues to the NMIS Board and managing third-party referral relationships. Managed a team of 10 employees with 4 direct reports.

### Assistant Director - Compliance Assurance

Northwestern Mutual | November 2007 - November 2010 | 3 years | Milwaukee, WI

- Was responsible for the management and oversight of centralized NMIS surveillance systems covering the following; suitability at the trade and account level, trending of patterns of behavior by financial representatives, review of the personal trading activity of financial representatives and the certification of the annual Code of Ethics. In addition, was responsible for oversight of internal compliance testing program working directly with CCO to address findings and mitigate risks. Managed a team of 15 employees with 3 direct reports.

### Compliance Oversight and Review Manager

Northwestern Mutual | November 2005 - November 2007 | 2 years | Milwaukee, WI

· Was responsible for the management and oversight of compliance and field inspection team covering the following; On-site inspection of field offices and financial representatives, review and approval of outside business activities, creation of continuing education content, ensuring proper registration of field representatives, consulting with field supervisors on application of policy and delivery of disciplinary actions. Managed 5 direct reports.

### NMIS Project Management Consultant

Northwestern Mutual | November 2003 - November 2005 | 2 years | Milwaukee, WI

· Was responsible for leading complex, regulatory initiatives for the enterprise. Examples include; the build-out of a "Regulatory Response Team" to manage all inquiries and on-site examinations by industry regulatory bodies (SEC, FINRA, etc.), leading the "Shell Account Reconciliation Project" to ensure the capture of suitability information for direct-to-fund positions, managing the FINRA mandated mutual fund breakpoint client notification and review project. Managed various numbers of temporary employees as projects dictated.

### Broker Dealer Compliance Specialist

Northwestern Mutual | November 2002 - November 2003 | 1 year | Milwaukee, WI

· Was responsible for managing complex regulatory projects impacting the enterprise. Examples included; FINRA mutual fund breakpoint self-assessment to determine if clients received the proper sales charge discounts (managed 23 temporary employees), implemented process/procedural changes related to internal audit findings and assisted with compliance functions when needed (OBA approvals, onsite compliance inspections of financial representatives, etc.)

### Compliance Examiner

FINRA | November 1998 - November 2002 | 4 years | Chicago, IL

- Completed on-site examinations of broker/dealer member firms reviewing for compliance with FINRA and SEC rules and regulations including:
qualification/registration, financial recordkeeping, supervisory system, sales practices, customer complaints, filing requirements, transaction reporting, continuing education requirements and any other applicable rules relating to the specific business activities of the firm being examined.
- Completed in-depth examinations of customer complaints and terminations of registered representatives for potential FINRA and/or SEC rule violations.
- Monitored and analyzed the financial and operational condition of member firms on a monthly and quarterly basis.
- Designated Trading and Market Making examiner for one of the five examination sections in the Chicago District Office.
- Designated Mentor for assisting in the training of newly hired examiners.

# EXHIBIT 22



# McNulty, Mark

Sr Dir Enterprise AML Officer

Manager: Michael Conmey

# 2024 Year-End Performance Review

Organization: Enterprise Compliance (Michael Conmey)

Location: Milwaukee, WI Corporate

01/01/2024 - 12/31/2024

## Overall Summary

### Manager Overall Evaluation

**Rating:** Successful

**Comment:** Mark continued to lead and administer an effective AML program with positive outcomes during the year. Mark's self-evaluation does a nice job of summarizing the highlights and measures of success. I would like to acknowledge in particular Mark's leadership and contributions to the AML focused regulatory examinations in 2024, proprietary information. In both cases, Mark's colleagues provided positive feedback on his command of the program and related rules and concepts, and his ability to effectively communicate both verbally and in writing proprietary information. proprietary information. Mark also continued to serve as the subject matter expert on the company's AML related policies, proprietary information proprietary information

Mark also continued to regularly interact with his counterparts proprietary information and effectively challenge them when they sought to terminate client accounts proprietary information proprietary information. As a team leader, Mark has built a positive team dynamic of development and support. He received positive feedback from his direct reports on his availability and the time he spent during the year educating them and providing context for assignments to aid in their growth and development.

Beyond his AML duties, Mark continued his ownership and oversight of the company's economic sanctions compliance processes, which is an expanded area of responsibility since 2023. This has challenged Mark to learn new areas of the business and work with new contacts, including in EC. proprietary information . As Mark indicated in his self-evaluation, progress on the project slowed during the year and did not meet original targets for completion. To further enhance Mark's effectiveness, I recommend that he focus on building relationships with business, operations and risk partners supporting the institutional investments business so that he is in a stronger position to escalate and resolve issues like project delays. I also encourage Mark to proactively engage with the institutional investments compliance team to optimize communication between the compliance teams and explore how they may help him grow his knowledge of the business and product lines.

I appreciate Mark's efforts managing within an active regulatory space like AML and sanctions compliance. Mark received consistent positive feedback from peers and colleagues on his knowledge of the AML space, his availability and responsiveness to others, and his logical and practical approach to problem solving. I look forward to Mark continuing a strong AML program and growing and developing the sanctions program further in 2025.

### Employee Overall Evaluation

**Comment:** 2024 was another successful year for the AML program and for my performance in general. We successfully met all of the annual goals for the year; proprietary information

[proprietary information] successful internal audits of the AML program (all satisfactory results); successfully created and communicated Board presentation materials; enhanced program procedure documents during annual [proprietary information] certification process; actively participated in the enterprise Fraud Risk Counsel; updated applicable enterprise stakeholders during AML committee and AML Executive Committee meetings; [proprietary information]

[proprietary information] [enhanced enterprise procedures] [proprietary info]

[proprietary information] ; and completed all required annual program certifications and reports (MLR, 314b, DTCC, etc.). More importantly than the 'checklist' work items that we completed in 2024, I am very proud of the continued cross training and developmental activities that we have continued to support in 2024. Whether that was pushing additional responsibilities down and across the team in support of a wide breadth of knowledge and responsibility or simply by giving team members a voice on 'how' we would be meeting our obligations, I continue to provide opportunity for the team to grow and expand their knowledge base. And finally, an assessment of 2024 would not be complete without commentary on the work we achieved in the area of sanctions compliance. A lot of time, energy and resources were spent in reviewing and revising the sanctions procedures [proprietary information]

[proprietary information]

A frustratingly slow process for which my consistent contact points failed to drive quicker response time. However, I still believe my recommendations for how to improve the procedure, [proprietary information]

[proprietary information] was a much-needed revision to help drive the '3 lines of defense' approach to compliance. Although these delays pushed our completion of this work into 2025, I expect the finished product will be much more valuable to the enterprise in the long run.

[proprietary information]

In addition to the procedure work, I was always looking to find ways to improve our sanctions program. The best example was when we were implementing an update to the NICE-

[proprietary information]

, we will be able to improve our sanctions screening program with more efficient list utilization [proprietary information] [proprietary information] and the additional enhancement of a 'sanctioned securities' list by unique identifier [proprietary information] These additions will further enhance our program while reducing the direct cost to NM. I am proud of the work that the AML team has accomplished in 2024 and look forward to more successes in 2025.

# Goals

## AML Committees and Reporting Responsibilities

Serve as Chair of both the AML Committee and the AML Executive Committee -Schedule meetings, create agendas, present materials, ensure leadership is updated on the status of the AML program.
Create and deliver AML program reports to enterprise leadership in 2024 -NMWMC Meeting of the Audit Committee and Board of Directors, NMIS Board Meeting, NM Series Fund Board Meeting, IPS Compliance Committee, Enterprise Compliance and Operations Committee
Gather statistical information for, prepare and submit the annual WMC MLR report to the OCC.
<u>Measures:</u>
Quarterly AML Committee meetings are held timely and appropriate information is shared.
2024 AML Program reports are completed and presented as noted above.
2024 WMC MLR report submitted on or before the due date.

Status:

Organization Alignment:     Annual Performance Goal (Archived)

## Maintenance of Enterprise AML Programs

Work with Law and Managed Investments to refine the sanctions processes and procedures to account for the heightened regulatory scrutiny. Meet with impacted business areas to educate on any policy/procedure changes.
Revisit Low Priced Securities policy with business partners to gauge appetite for revisions to align with investment philosophy.
Continue to develop and cross train AML Team members.
Daily execution of AML Program processes through efficient use of AML Team resources.
Ensure the timely review and resolution of all AML alerts.
Review and comment on enterprise SAR filings.
Lead weekly triage meetings with SIU partners to review and assess current AML issues/alerts/cases.
Ensure completion of program oversight duties █████ proprietary information █████
Complete the necessary annual certifications: RECAP, DTCC, 314b, etc.
Foster an environment of creative problem solving and personal ownership among AML Team members and our partners in Law and the SIU.
<u>Measures:</u>
Revised sanctions policies and procedures are published with impacted business units educated on the changes.
Low Priced Securities policy amended as determined.
Alerts and cases are reviewed and closed within documented timelines.
SAR filings are completed timely and in appropriate circumstances.
Monthly and Quarterly oversight reviews are completed within deadlines.
Annual certifications are made by appropriate deadlines.
AML team engagement scores and feedback.

Status:

Organization Alignment:     Annual Performance Goal (Archived)

## Mirror or exceed enterprise EX engagement scores for your team on "My manager values diverse perspectives and an inclusive environment."

Continue to foster an environment that promotes and supports the participation of all team members. Facilitate open dialogue that allows for all employees to share their ideas and perspectives. Respect and consider "out-of-the-box" solutions and encourage new approaches to historic challenges.
<u>Measures:</u>
Feedback from direct reports.
Divisional and enterprise surveys.

Status:

Organization Alignment:     People Leader - Leader Commitments - Diversity & Inclusion (Archived)

## Projects and Company Initiatives

Company Policy and Procedures -Participate in Enterprise Compliance Policy Committee
Completion of a full review of the company sanctions processes and implementation of identified enhancements.

Support 2024 Regulatory Examinations and Inquiries proprietary information -Act as the primary contact point for all AML related inquiries and data production. Meet directly with examiners as needed to describe the company AML program and answer any/all questions they have about the program.

Participate in Enterprise Fraud Risk Council - Assist in the prevention, review and response to company fraud incidents. Provide the AML perspective necessary when assessing the impact of fraud incidents, including any AML reporting obligations.

Provide necessary AML support for proprietary information . Work with partner bank to ensure appropriate AML processes in place.

proprietary information

<u>Measures:</u>

Updated sanctions policies and procedures completed. Communicate changes to impacted business partners.

Creation of policy updates as needed.

Adequate and Timely responses/data provided to regulators.

Enhanced fraud processes/policies as a result of information learned/discussed at the Enterprise Fraud Risk Council meetings.

Positive feedback from proprietary information with respect to AML responses and resources being provided in a timely manner.

proprietary information

Status:

Organization Alignment:     Annual Performance Goal (Archived)

# EXHIBIT 23



**BrokerCheck Report**

# MARK EDWARD MCNULTY

CRD# 2723609

| <u>Section Title</u> | <u>Page(s)</u> |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 5 - 6 |

 When communicating online or investing with any professional, make sure you know who you're dealing with. <u>Imposters</u> might link to sites like BrokerCheck from <u>phishing</u> or similar scam websites, or through <u>social media</u>, trying to steal your personal information or your money.

Please contact FINRA with any concerns.

**About BrokerCheck®**



BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
- BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
- Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- **Where did this information come from?**
- The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - ○ information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - ○ information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- **How current is this information?**
- Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
- To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
- **Are there other resources I can use to check the background of investment professionals?**
- FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.
- 

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

**CONFIDENTIAL**

MCNULTY-EEOC-PROD-000136

## MARK E. MCNULTY
CRD# 2723609

**Currently employed by and registered with the following Firm(s):**

 **NORTHWESTERN MUTUAL INVESTMENT SERVICES,LLC**
720 E Wisconsin Ave
Milwaukee, WI 53202
CRD# 2881
Registered with this firm since: 10/03/2017

**B** **NORTHWESTERN MUTUAL INVESTMENT SERVICES, LLC**
720 E Wisconsin Ave
Milwaukee, WI 53202
CRD# 2881
Registered with this firm since: 10/04/2017

# Report Summary for this Broker



This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

**This broker is registered with:**
- 1 Self-Regulatory Organization
- 1 U.S. state or territory

**This broker has passed:**
- 1 Principal/Supervisory Exam
- 2 General Industry/Product Exams
- 2 State Securities Law Exams

## Registration History

**This broker was previously registered with the following securities firm(s):**

**IA** **INVESTMENT CENTERS OF AMERICA, INC.**
CRD# 16443
APPLETON, WI
11/2016 - 04/2017

**IA** **SII INVESTMENTS, INC.**
CRD# 2225
APPLETON, WI
11/2016 - 04/2017

**B** **INVESTMENT CENTERS OF AMERICA, INC.**
CRD# 16443
APPLETON, WI
09/2016 - 04/2017

## Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker? **No**

◆2025 FINRA. All rights reserved. Report about MARK E. MCNULTY.

## Broker Qualifications



### Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 1 SRO and is licensed in 1 U.S. state or territory through his or her employer.**

### Employment 1 of 1

| | |
|---|---|
| Firm Name: | **NORTHWESTERN MUTUAL INVESTMENT SERVICES, LLC** |
| Main Office Address: | **720 EAST WISCONSIN AVENUE**<br>**MILWAUKEE, WI  53202-4797** |
| Firm CRD#: | **2881** |

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | FINRA | General Securities Principal | Approved | 10/04/2017 |
| B | FINRA | General Securities Representative | Approved | 10/04/2017 |

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| IA | Wisconsin | Investment Adviser Representative | Approved | 10/03/2017 |
| B | Wisconsin | Agent | Approved | 10/04/2017 |

### Branch Office Locations

**NORTHWESTERN MUTUAL INVESTMENT SERVICES, LLC**
720 E Wisconsin Ave
Milwaukee, WI  53202

◆2025 FINRA. All rights reserved. Report about MARK E. MCNULTY.

**CONFIDENTIAL**

# Broker Qualifications



## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below. A passed exam or exam waiver does not permit a broker to do business without an active SRO or state registration.

**This individual has passed 1 principal/supervisory exam, 2 general industry/product exams, and 2 state securities law exams.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|---|---|---|
| B General Securities Principal Examination | Series 24 | 05/14/2003 |

### General Industry/Product Exams

| Exam | Category | Date |
|---|---|---|
| B Securities Industry Essentials Examination | SIE | 10/01/2018 |
| B Investment Company Products/Variable Contracts Representative Examination | Series 6 | 04/12/1996 |

### State Securities Law Exams

| Exam | Category | Date |
|---|---|---|
| B IA Uniform Combined State Law Examination | Series 66 | 11/14/2016 |
| B Uniform Securities Agent State Law Examination | Series 63 | 04/19/1996 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

❖2025 FINRA. All rights reserved. Report about MARK E. MCNULTY.

# Broker Qualifications



## Professional Designations

This section details that the representative has reported **0** professional designation(s).

No information reported.

◆2025 FINRA. All rights reserved. Report about MARK E. MCNULTY.

# Registration and Employment History



## Registration History

The broker previously was registered with the following firms:

| | Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|---|
| IA | 11/2016 - 04/2017 | INVESTMENT CENTERS OF AMERICA, INC. | 16443 | APPLETON, WI |
| IA | 11/2016 - 04/2017 | SII INVESTMENTS, INC. | 2225 | APPLETON, WI |
| B | 09/2016 - 04/2017 | INVESTMENT CENTERS OF AMERICA, INC. | 16443 | APPLETON, WI |
| B | 09/2016 - 04/2017 | SII INVESTMENTS, INC. | 2225 | APPLETON, WI |
| B | 03/2003 - 09/2016 | NORTHWESTERN MUTUAL INVESTMENT SERVICES, LLC | 2881 | MILWAUKEE, WI |
| B | 12/1996 - 07/1999 | LIBERTY SECURITIES CORPORATION | 14416 | PURCHASE, NY |
| B | 04/1996 - 08/1996 | WADDELL & REED, INC. | 866 | OVERLAND PARK, KS |

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 10/2017 - Present | Northwestern Mutual Investment Services LLC | Registered Representative | Y | Milwaukee, WI, United States |
| 09/2017 - Present | Northwestern Mutual Life Insurance Company | AML Compliance Officer | Y | Milwaukee, WI, United States |
| 04/2017 - 09/2017 | UNEMPLOYED | UNEMPLOYED | N | Neenah, WI, United States |
| 09/2016 - 04/2017 | SII INVESMENTS, INC. | compliance vp | Y | APPLETON, WI, United States |
| 02/2003 - 09/2016 | NORTHWESTERN MUTUAL INVESTMENT SERVICES, LLC | REGISTERED REPRESENTATIVE | Y | MILWAUKEE, WI, United States |
| 01/2003 - 09/2016 | NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY | COMPLIANCE SPECIALIST | Y | MILWAUKEE, WI, United States |

## Registration and Employment History



### Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

1) 50% OWNER, HSC HOLDINGS LLC, 1608 FALLS ROAD, GRAFTON, , WISCONSIN, 53024, UNITED STATES OF AMERICA, INVESTMENT PROPERTY, START DATE: 7/12/2018, HOURS PER MONTH: 0-5, HOURS DURING SECURITIES TRADING HOURS: 0-5, PARTNER IN THE PURCHASE OF RENTAL REAL ESTATE, INVESTMENT RELATED.
2) 50% OWNER, HELLFISH HOLDINGS, LLC, 1608 FALLS RD, GRAFTON, , WISCONSIN, 53024, UNITED STATES OF AMERICA, INVESTMENT PROPERTY, START DATE: 6/25/2020, HOURS PER MONTH: 0-5, HOURS DURING SECURITIES TRADING HOURS: 0-5, PROPERTY OWNERSHIP, LANDLORD OF RENTAL PROPERTIES, INVESTMENT RELATED

**End of Report**



**This page is intentionally left blank.**

❖2025 FINRA. All rights reserved. Report about MARK E. MCNULTY.

**CONFIDENTIAL**

# EXHIBIT 24




**IAPD Report**

# MARK EDWARD MCNULTY

CRD# 2723609

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Qualifications | 2 - 3 |
| Registration and Employment History | 4 - 5 |

 When communicating online or investing with any professional, make sure you know who you're dealing with. Imposters might link to sites like BrokerCheck from phishing or similar scam websites, or through social media, trying to steal your personal information or your money.

Please contact FINRA with any concerns.


# IAPD Information About Representatives

IAPD offers information on all current-and many former representatives. Investors are strongly encouraged to use IAPD to check the background of representatives before deciding to conduct, or continue to conduct, business with them.

### What is included in a IAPD report?

IAPD reports for individual representatives include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards.

It is important to note that the information contained in an IAPD report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the representative, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

### Where did this information come from?

The information contained in IAPD comes from the Investment Adviser Registration Depository (IARD) and FINRA's Central Registration Depository, or CRD, (see more on CRD below) and is a combination of:

- information the states require representatives and firms to submit as part of the registration and licensing process, and

- information that state regulators report regarding disciplinary actions or allegations against representatives.

### How current is this information?

Generally, representatives are required to update their professional and disciplinary information in IARD within 30 days.

### Need help interpreting this report?

For help understanding how to read this report, please consult NASAA's IAPD Tips page http://www.nasaa.org/IAPD/IARReports.cfm

### What if I want to check the background of an Individual Broker or Brokerage Firm?

To check the background of an Individual Broker or Brokerage firm, you can search for the firm or individual in IAPD. If your search is successful, click on the link provided to view the available licensing and registration information in FINRA's BrokerCheck website.

### Are there other resources I can use to check the background of investment professionals?

It is recommended that you learn as much as possible about an individual representative or Investment Adviser firm before deciding to work with them. Your state securities regulator can help you research individuals and certain firms doing business in your state. The contact information for state securities regulators can be found on the website of the North American Securities Administrators Association http://www.nasaa.org



# Report Summary

## 📄 MARK EDWARD MCNULTY (CRD# 2723609)

The report summary provides an overview of the representative's professional background and conduct. The information contained in this report has been provided by the representative, investment adviser and/or securities firms, and/or securities regulators as part of the states' investment adviser registration and licensing process. The information contained in this report was last updated by the representative, a previous employing firm, or a securities regulator on **05/22/2023**.

## 🏢 CURRENT EMPLOYERS

| | Firm | CRD# | Registered Since |
|---|---|---|---|
| IA | NORTHWESTERN MUTUAL INVESTMENT SERVICES,LLC | CRD# 2881 | 10/03/2017 |
| B | NORTHWESTERN MUTUAL INVESTMENT SERVICES, LLC | CRD# 2881 | 10/04/2017 |

## 📄 QUALIFICATIONS

This representative is currently registered in **1** SRO(s) and 1 jurisdiction(s).

Is this representative currently Inactive or Suspended with any regulator? **No**

**Note:** Not all jurisdictions require IAR registration or may have an exemption from registration.
Additional information including this individual's qualification examinations and professional designations is available in the Detailed Report.

## 📄 REGISTRATION HISTORY

This representative was previously registered with the following firm(s):

| | FIRM | CRD# | LOCATION | REGISTRATION DATES |
|---|---|---|---|---|
| IA | INVESTMENT CENTERS OF AMERICA, INC. | 16443 | APPLETON, WI | 11/16/2016 - 04/07/2017 |
| IA | SII INVESTMENTS, INC. | 2225 | APPLETON, WI | 11/16/2016 - 04/07/2017 |
| B | INVESTMENT CENTERS OF AMERICA, INC. | 16443 | APPLETON, WI | 09/21/2016 - 04/07/2017 |

For additional registration and employment history details as reported by the individual, refer to the Registration and Employment History section of the Detailed Report.

## 📄 DISCLOSURE INFORMATION

Disclosure events include certain criminal charges and convictions, formal investigations and disciplinary actions initiated by regulators, customer disputes and arbitrations, and financial disclosures such as bankruptcies and unpaid judgments or liens.

Are there events disclosed about this representative? **No**

CONFIDENTIAL  Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 197 of 227    MCNULTY-EEOC-PROD-000146



# Qualifications

## REGISTRATIONS

This section provides the SRO, states and U.S. territories in which the representative is currently registered and licensed, the category of each registration, and the date on which the registration becomes effective. This section also provides, for each firm with which the representative is currently employed, the address of each location where the representative works.
This individual is currently registered with **1** jurisdiction(s) and 1 SRO(s) through his or her employer(s).

## Employment 1 of 1

| Firm Name: | **NORTHWESTERN MUTUAL INVESTMENT SERVICES,LLC** |
| Main Address: | 720 EAST WISCONSIN AVENUE<br>MILWAUKEE, WI 53202-4797 |
| Firm ID#: | 2881 |

| | Regulator | Registration | Status | Date |
|---|---|---|---|---|
| **B** | FINRA | General Securities Principal | Approved | 10/04/2017 |
| **B** | FINRA | General Securities Representative | Approved | 10/04/2017 |
| **IA** | Wisconsin | Investment Adviser Representative | Approved | 10/03/2017 |
| **B** | Wisconsin | Agent | Approved | 10/04/2017 |

## Branch Office Locations

**NORTHWESTERN MUTUAL INVESTMENT SERVICES,LLC**
720 E Wisconsin Ave
Milwaukee, WI 53202


# Qualifications

## ✓ PASSED INDUSTRY EXAMS

This section includes all industry exams that the representative has passed. Under limited circumstances, a representative may attain registration after receiving an exam waiver based on a combination of exams the representative has passed and qualifying work experience. Likewise a new exam requirement may be grandfathered based on a representative's specific qualifying work experience. Exam waivers and grandfathering are not included below.

**This individual has passed 1 principal/supervisory exam, 2 general industry/product exams, and 2 state securities law exams.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|---|---|---|
| General Securities Principal Examination (S24) | Series 24 | 05/14/2003 |

### General Industry/Product Exams

| Exam | Category | Date |
|---|---|---|
| Securities Industry Essentials Examination (SIE) | SIE | 10/01/2018 |
| Investment Company Products/Variable Contracts Representative Examination (S6) | Series 6 | 04/12/1996 |

### State Securities Law Exams

| Exam | Category | Date |
|---|---|---|
| Uniform Combined State Law Examination (S66) | Series 66 | 11/14/2016 |
| Uniform Securities Agent State Law Examination (S63) | Series 63 | 04/19/1996 |

## ✓ PROFESSIONAL DESIGNATIONS

This section details that the representative has reported **0** professional designation(s).

No information reported.

CONFIDENTIAL     Case 2:25-mc-00053-BHL     Filed 11/21/25     Page 199 of 227     MCNULTY-EEOC-PROD-000148


# Registration & Employment History

## 📖 PREVIOUSLY REGISTERED WITH THE FOLLOWING FIRMS

This representative held registrations with the following firms:

| | Registration Dates | Firm Name | ID# | Branch Location |
|---|---|---|---|---|
| IA | 11/16/2016 - 04/07/2017 | INVESTMENT CENTERS OF AMERICA, INC. | CRD# 16443 | APPLETON, WI |
| IA | 11/16/2016 - 04/07/2017 | SII INVESTMENTS, INC. | CRD# 2225 | APPLETON, WI |
| B | 09/21/2016 - 04/07/2017 | INVESTMENT CENTERS OF AMERICA, INC. | CRD# 16443 | APPLETON, WI |
| B | 09/21/2016 - 04/07/2017 | SII INVESTMENTS, INC. | CRD# 2225 | APPLETON, WI |
| B | 03/31/2003 - 09/15/2016 | NORTHWESTERN MUTUAL INVESTMENT SERVICES, LLC | CRD# 2881 | MILWAUKEE, WI |
| B | 12/23/1996 - 07/26/1999 | LIBERTY SECURITIES CORPORATION | CRD# 14416 | PURCHASE, NY |
| B | 04/15/1996 - 08/28/1996 | WADDELL & REED, INC. | CRD# 866 | OVERLAND PARK, KS |

## 📖 EMPLOYMENT HISTORY

Below is the representative's employment history for up to the last 10 years.

| Employment Dates | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 10/2017 - Present | Northwestern Mutual Investment Services LLC | Registered Representative | Y | Milwaukee, WI, United States |
| 09/2017 - Present | Northwestern Mutual Life Insurance Company | AML Compliance Officer | Y | Milwaukee, WI, United States |
| 04/2017 - 09/2017 | UNEMPLOYED | UNEMPLOYED | N | Neenah, WI, United States |
| 09/2016 - 04/2017 | SII INVESMENTS, INC. | compliance vp | Y | APPLETON, WI, United States |
| 02/2003 - 09/2016 | NORTHWESTERN MUTUAL INVESTMENT SERVICES, LLC | REGISTERED REPRESENTATIVE | Y | MILWAUKEE, WI, United States |
| 01/2003 - 09/2016 | NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY | COMPLIANCE SPECIALIST | Y | MILWAUKEE, WI, United States |

©2025 FINRA. All rights reserved. Report about MARK EDWARD MCNULTY.



# Registration & Employment History

## 🏢 OTHER BUSINESS ACTIVITIES

This section includes information, if any, as provided by the representative regarding other business activities the representative is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent, or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious, or fraternal and is recognized as tax exempt.

1) 50% OWNER, HSC HOLDINGS LLC, 1608 FALLS ROAD, GRAFTON, , WISCONSIN, 53024, UNITED STATES OF AMERICA, INVESTMENT PROPERTY, START DATE: 7/12/2018, HOURS PER MONTH: 0-5, HOURS DURING SECURITIES TRADING HOURS: 0-5, PARTNER IN THE PURCHASE OF RENTAL REAL ESTATE; INVESTMENT RELATED.
2) 50% OWNER, HELLFISH HOLDINGS, LLC, 1608 FALLS RD, GRAFTON, , WISCONSIN, 53024, UNITED STATES OF AMERICA, INVESTMENT PROPERTY, START DATE: 6/25/2020, HOURS PER MONTH: 0-5, HOURS DURING SECURITIES TRADING HOURS: 0-5, PROPERTY OWNERSHIP, LANDLORD OF RENTAL PROPERTIES, INVESTMENT RELATED


# End of Report

This page is intentionally left blank.

# EXHIBIT 25

https://www.northwesternmutual.com/equal-employment-opportunity-policy/

1. Home

2. Equal Employment Opportunity Policy

Equal Employment Opportunity Policy

Northwestern Mutual is an equal opportunity employer who welcomes and encourages diversity in the workforce. We are committed to creating and maintaining an environment in which each employee can contribute creative ideas, seek challenges, assume leadership and continue to focus on meeting and exceeding business and personal objectives.

The company prohibits discrimination based upon an individual's race, color, religion, creed, age, sex, disability, national origin, ancestry, ethnicity, sexual orientation, gender identity/expression, marital status, citizenship status or veteran status or any other characteristics protected by law.

Overview:

Northwestern Mutual appreciates the uniqueness of each individual and supports diversity within the communities in which our employees reside and our company does business. As such, Northwestern Mutual is an equal opportunity employer that welcomes and encourages diversity in the workforce.

We know that a culturally sensitive, diverse workforce is better able to serve our customers' needs and can produce better business results. We are committed to creating and maintaining an environment in which each employee can contribute creative ideas, seek challenges, assume leadership and continue to focus on meeting and exceeding business and personal objectives. This commitment to diversity will be reflected in company policies, procedures, activities and communications.

This policy applies to hiring, promoting, transferring, and other personnel transactions and conditions of employment at Northwestern Mutual.

Find What You're Looking for at Northwestern Mutual

Northwestern Mutual General Disclaimer

Northwestern Mutual is the marketing name for The Northwestern Mutual Life Insurance Company and its subsidiaries. Life and disability insurance, annuities, and life insurance with long-term care benefits are issued by The Northwestern Mutual Life Insurance Company, Milwaukee, WI (NM). Long-term care insurance is issued by Northwestern Long Term Care Insurance Company, Milwaukee, WI, (NLTC) a subsidiary of NM. Investment brokerage services are offered through **Northwestern Mutual Investment Services, LLC (NMIS)** a subsidiary of NM, broker-dealer, registered investment advisor, and member FINRA and SIPC. Investment advisory and trust services are offered through Northwestern Mutual Wealth Management Company® (NMWMC), Milwaukee, WI, a subsidiary of NM and a federal savings bank. Products and services referenced

are offered and sold only by appropriately appointed and licensed entities and financial advisors and professionals. **Not all products and services are available in all states. Not all Northwestern Mutual representatives are advisors. Only those representatives with "Advisor" in their title or who otherwise disclose their status as an advisor of NMWMC are credentialed as NMWMC representatives to provide investment advisory services.**

Northwestern Mutual

# Culture of Respect Policy

Promoting Diversity & Inclusion by Preventing Discrimination, Harassment, and Retaliation

## Key Points

- Northwestern Mutual is an equal opportunity employer that welcomes and encourages diversity in the workforce.

- We are committed to creating and maintaining an environment in which each employee can contribute creative ideas, seek challenges, assume leadership and continue to focus on meeting and exceeding business and personal objectives.

- The Company prohibits discrimination based upon an individual's race, color, religion, creed, age, sex, disability, national origin, ancestry, ethnicity, sexual orientation, gender identity/expression, marital status, citizenship status or veteran status or any other characteristics protected by law.

- Northwestern Mutual is committed to providing a safe, healthy work environment that is free from harassment, intimidation, and retaliation. In support of this, please refer to the Northwestern Mutual Sexual Harassment Prevention Policy. • All employees are responsible for acting in a respectful manner at all times.

- The Company will reasonably accommodate qualified employees and candidates for employment whose disabilities or religions require such accommodation.

## Overview

Northwestern Mutual appreciates the uniqueness of each individual and supports diversity within the communities in which our employees reside and our Company does business. The Company knows that a culturally sensitive, diverse workforce is better able to serve our customers' needs and can produce better business results. We are committed to creating and maintaining an environment in which each employee can contribute creative ideas, seek challenges, assume leadership and continue to focus on meeting and exceeding business and personal objectives.

Northwestern Mutual is an equal opportunity employer that welcomes and encourages diversity in the workforce. The Company prohibits discrimination based upon an individual's race, color, religion, creed, age, sex, disability, national origin, ancestry, ethnicity, sexual orientation, gender identity/expression, marital status, citizenship status, veteran status, or any other characteristics protected by law. If an employee or candidate for employment require reasonable accommodation due to a disability or their religion, the Company will reasonably accommodate that disability or religion as required by law.

Northwestern Mutual strives for a professional and safe work environment that is free from all forms of harassment, intimidation, and retaliation. Everyone in the Company is accountable for upholding a Culture of Respect. To maintain a harassment-and discrimination-free work environment, employees have a responsibility not only to manage their own behaviors, but also to bring concerns and complaints to the attention of management so that appropriate action can be taken. Any employee who believes discrimination, harassment, intimidation, or retaliation is occurring should report the matter immediately to their manager or to Human Resources (Human Resources Consultant, Employee Relations, or the Company's Equal Employment Opportunity (EEO) Officer).

## Manager's Role

- Model the behavior and maintain a culture that respects each employee and that recognizes, accepts, develops, and uses the talents of all employees.

- Prevent and correct acts of discrimination, harassment, or retaliation, and immediately report all employee complaints to your Human Resources Consultant, Employee Relations, or the Company's EEO Officer.

- If an employee requests an accommodation because of their disability or religion, or if you believe such an accommodation might help an employee function better at work, refer them to Human Resources or direct them to Health Services.

# Definitions

- **Discrimination:** Discrimination in the workplace occurs when someone is treated differently or is not given the same work opportunities as another similarly situated person because of their protected class.

- **Protected Class**: Protected Class refers to race, color, religion, age, sex, disability, national origin, ancestry, ethnicity, sexual orientation, gender identity/expression, citizenship status, veteran status, or any other characteristic protected by law.

- **Harassment:** Harassment is a form of discrimination. Harassment consists of unwelcome conduct – whether verbal, physical or visual – based upon a person's protected class that unreasonably interferes with a person's work performance or creates an intimidating, hostile, or offensive work environment.

- **Retaliation:** Retaliation refers to negative treatment of an individual because they complained about discrimination or have otherwise exercised their legal rights.

- **Disability:** A disability is a physical or mental impairment which substantially limits one or more major life activities.

- **Accommodation:** Accommodation refers to affirmative steps an employer takes to accommodate employee disabilities, or religious beliefs or practices, to allow the employee to perform their job. Reasonable accommodation may involve technology, tools or adjustments to the physical work environment, or adjustments to work schedule or certain work duties. The Company will not offer an accommodation that creates an undue burden on the business and may not offer an employee's preferred accommodation if other options are available.

# Details and Procedures

- The Company will not discriminate against or subject any employee or candidate for employment to harassment because of their protected class. Furthermore, the Company will not tolerate intimidation, threats, or retaliation for participating in activities related to the administration of laws requiring equal employment opportunity, for opposing any actions made unlawful by those laws, or for exercising any other rights protected by those laws.

- This policy applies to conduct by any employee, financial representative, vendor, client, customer, contractor, consultant, visitor, or any other business associate.

- Any applicant or employee who feels that they have been discriminated against, harassed, intimidated, or retaliated against in violation of the law or this policy should immediately contact their manager, their HR Consultant, Employee Relations, or the Ethics Resource Center (1-866-663-8427). Complaints will be investigated and resolved in an appropriate, private, and timely manner. If the employee does not feel that their concerns have been handled satisfactorily, they can communicate their concern to the EEO Officer.

- If the investigation finds that inappropriate conduct has occurred, action will be taken to correct the situation and ensure the conduct does not happen again. Any employee found to have engaged in discrimination, harassment, intimidation, or retaliation as outlined in this policy may be subject to discipline up to and including termination of employment, depending on the circumstances.

- An employee who believes they require an accommodation to successfully perform their job should notify their manager, HR Generalist, or the HR Contact Center, or make an accommodation request by contacting Health Services.

- Nothing in this policy should be interpreted as prohibiting an employee's protected rights under Section 7 of the National Labor Relations Act or other applicable federal or state laws.

# Examples of Prohibited Harassment

Examples of prohibited harassment include, but are not limited to:

- racial or ethnic jokes;
- offensive pictures;
- threats and bullying;
- deliberately harming another employee's personal or professional reputation; or
- other unwelcome conduct that makes someone uncomfortable.

Examples of sexual harassment may include, but is not limited to:

- explicit sexual propositions;
- sexual innuendo;
- suggestive comments or questions;
- sexually oriented teasing;
- obscene or other inappropriate language, gestures, printed or electronic material; or
- any unwelcome physical contact such as grabbing, patting, pinching, or pressing against another's body.

Note that additional information on Northwestern Mutual's commitment to maintaining a workplace free from sexual harassment is provided in its Sexual Harassment Prevention Policy.

# EXHIBIT 26

Skip to content



Close

Search
close search    search

News & Events

Company

Total Rewards

Career

Support

mobile menu toggle button MENU

circle logo for mobile devices

search    close search    notification button    notification button    notification icon    notification button

Profile image for Jen Dunning

1. Home
2. Human Resources Department Overview

# NM EEO Officer

- Human Resources Department Overview
- Employee Relations
- NM EEO Officer

Person writing.

## Role and responsibilities

Northwestern Mutual�s EEO officer ensures the company�s compliance with the Equal Employment Opportunity Commission, including required reporting and enforcement of federal law that makes it illegal to discriminate against a job applicant or an employee because of their race, color, religion, sex (including sexual orientation, pregnancy and gender identity), national origin, age (40 or older), disability or genetic information. Additional responsibilities include:

CONFIDENTIAL

MCNULTY-EEOC-PROD-000157

- Preventing and correcting employment harassment and discrimination by the Home Office against any and all in its workforce.
- Defending employees� rights to speak up against harassment and discrimination.
- Protecting employees against retaliation.
- Evaluating and monitoring enterprise compliance to EEO practices.
- Investigating employment practices or alleged violations of policies and/or laws.
- Implementing proactive employment policies.
- Ensuring diversity and legal compliance related to hiring and employment.

**When should I contact the EEO officer?**

Any applicant or member of the workforce who feels that they have been discriminated against, harassed, intimidated, or retaliated against in violation of the law or employee policies should immediately contact their people leader, their HR Consultant, Employee Relations, or the Ethics Resource Center.

Complaints will be investigated and resolved in an appropriate, private and timely manner. If you are not satisfied with how your concern was handled, escalate it to the EEO officer.

**What is �employment discrimination"?**

�Employment discrimination� involves action that negatively impacts someone in their job or their job opportunities when that action is based on that person�s �protected class.�

**What is �protected class"?**

�Protected class� includes any personal characteristics protected by federal, state, and/or local anti-discrimination laws. Although there are differences among jurisdictions, most protected classes are generally immutable, personal characteristics such as gender, race, age, sexual orientation and disability.

Some protected classes, such as religion or physical appearance, may not be completely immutable, but they are still personal characteristics that generally should not be the basis of employment decisions.

**What is �harassment"?**

�Harassment� is a form of discrimination that does not necessarily involve a tangible job action (such as hiring, promotion, discipline, or discharge), but it creates subjectively offensive or unwelcome conduct that creates an objectively hostile work environment or condition of employment because of the offended individual�s protected class.

**What is �retaliation"?**

�Retaliation� refers to negative treatment of an individual because he or she has complained about discrimination or has otherwise exercised his or her legal rights. Retaliation can include tangible employment action, such as discipline or failure to promote, or intangible actions, such as �shunning.�

Retaliation is strictly prohibited; we want employees to feel safe bringing forward concerns so we can address them appropriately.



**Contact the EEO officer**

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 211 of 227    MCNULTY-EEOC-PROD-000158

If you followed escalation procedures, but you are not satisfied with how your concern was handled, contact the NM EEO officer.

Email the EEO officer

# Resources

-  resource icon

   Culture of Respect

-  resource icon

   Organizational chart

 northwestern mutual logo

Copyright 2025 Northwestern Mutual Life

Insurance Company | Milwaukee, WI

Digital Commons Help & Feedback

# EXHIBIT 27

# Diversity & Inclusion

People Leader Goal Toolkit



## CONTENTS

D&I and our business case     2

Your role as a leader     4

What is a D&I people
leader goal?     5

Sample list of goals
to consider     7

FAQs     11

Support and resources     13

# DIVERSITY & INCLUSION AT NORTHWESTERN MUTUAL

We've been focused on diversity at Northwestern Mutual for quite some time; this is not new. In fact, several years ago our senior leadership team committed to our 15-year Diversity & Inclusion (D&I) roadmap because they knew that this work would be a marathon, not a sprint, and that it would be an ongoing and evolving journey.

Today we're nearly midway through our roadmap. We've built a strong foundation (see our inaugural Northwestern Mutual D&I Impact Report) that is ready to move forward, and that's where all-in leadership becomes critically important.

We've committed to developing leaders as role models – as many of you already are – and now we're in the phase of maximizing employee engagement and performance through D&I to take us to the next level. Why? Because we know that diverse and inclusive teams are simply better, and we want our company to thrive for another 160+ years.

> "To be truly effective, diversity, equity and inclusion efforts can't be seen as solely a Human Resources or Diversity & Inclusion team responsibility. This is about our culture, and we all play a role in shaping it. These efforts need to be woven throughout every department and every field office and championed by all of us. And the more we elevate our collective efforts, the more they build off and strengthen each other."

— John Schlifske

Disclaimer: Northwestern Mutual does not necessarily support or endorse external resources that may be referenced in this document or control their content.

**CONFIDENTIAL**    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 215 of 227    McNULTY-EEOC-PROD-000161

# DID YOU KNOW?

Companies that focus on diversity are linked to 45% higher market share growth and 70% new market capture year over year.

Inclusive companies are 1.8x more likely to be change-ready, and 1.7x more likely to be innovation leaders.

Organizations with diverse leaders are 35% more likely to outperform their competitors.

Sources: Harvard, McKinsey, University of Chicago

## Commit to the Mix

**1–5 Years**

Focus on developing leaders as role models, achieving organizational awareness and education, understanding new markets and broadening candidate sources to drive toward an inclusive culture.

2012–2016

## Improve the Mix

**5–10 Years**

Focus on leaders as mentors, maximizing employee engagement and expanding our brand into new markets to attract and retain the best; achieve an inclusive culture and balanced workforce; and accelerate company growth.

2017–2021

## Optimize the Mix

**10–15 Years**

Be a recognized leader in diversity and inclusion to positively impact our communities, influence the marketplace, be a world-class employer and achieve brand distinction.

2022–2026

## Maximize the Mix

Be a progressive, world-class business in the marketplace because diversity and inclusion is intrinsic to every decision we make and every outcome we influence for our policyholders, employees, field representatives and communities.

2027–Ongoing

DRIVE INCLUSIVE CULTURE

## Diversity and Inclusion drive higher-performing teams.

Our success as a company is 100% dependent on the success of our people. That's you, me and our teams. So if the stats in the gray box above are true (and there's a whole lot more where they came from), then focusing on building diverse and inclusive teams is key to our ability to innovate, change and perform.

**Diverse teams are stronger because differences bring out ideas and innovation.** We know we need a diversity of people at Northwestern Mutual to drive creativity through constructive, challenge-the-status-quo behaviors that bring out the best solutions for our customers.

**But having diverse teams isn't enough if our culture is not inclusive.** We want our teams to be as diverse as possible to represent as many perspectives and ways of solving a problem as possible. Yet if our team culture is not inclusive and welcoming of a heterogeneous mix of people and their ideas, innovation doesn't happen. Diversity for diversity's sake isn't enough.

**So, we need both: diversity and inclusion. Diversity is being invited to the game. Inclusion is being asked to play.** And that's where real leadership comes in. We need you to understand how diversity and inclusion are linked, how we need both to be successful, and how to put them to work on your teams.

CONFIDENTIAL

MCNULTY-EEOC-PROD-000162

# YOUR ROLE AS A LEADER

## Model the way

Just as our company has done, lead from a place of constant learning and evolution. Acknowledge that this is not easy and that it requires humility, compassion and being comfortable not having all the answers. Communicate to your teams that we're all on a journey to being the best we can be as a company, as a team and as individuals; and that requires us to learn and grow with one another every day, being as inclusive of difference as possible.

## Lean on our Northwestern Mutual Behaviors.

Our Northwestern Mutual Behaviors ground us in where to focus. Diversity and inclusion support each of our behaviors as enablers. Think about it: When we're solving for the client, having a diversity of perspectives to inform our decisions enables us to bring the best solution forward. When we're being talent multipliers, our ability to be inclusive and consider all people for opportunities helps us avoid overlooking great potential in others. And since we play to win, having a high-performing team fueled by a culture of belonging is a must-have. Help your team understand the fundamental link between diversity and inclusion, our behaviors and high performance. (If you'd like to learn even more about these links, check out the Accelerating Our Behaviors through D&I education piece on NMYOU.)

## Why does this feel hard?

We're living through an incredible time, plagued by the pandemic and civil and social unrest. The difficulty of coming together is physically limited right now, and people's stress levels are high, whether it be about health, finances, racism, politics or many other concerns based on what's going on in the world. Not only is this our current state, but leading diverse teams inclusively is not easy, period. High performance takes real work.

## What is an inclusive leader?

An inclusive leader is not a perfect leader. An inclusive leader is someone who understands the value that multiple perspectives, ideas, cultural orientations and walks of life bring to their team's ability to innovate. An inclusive leader is someone who works every day to get the best out of each of their people through building a team culture in which respect is core and biases are checked. An inclusive leader is someone who sees diversity and inclusion as core leadership competencies and does not leave them to the SLT, HR or anyone else to drive. And lastly, an inclusive leader is someone who gets that building high-performing teams is a never-ending journey, and they get up every day to try again. (Inclusive leaders also know that they don't know everything and seek out support. For more on inclusive leadership, check out this section on Inclusion in NMYOU.)

## Client First



DELIVER
**EXCEPTIONAL**
EXPERIENCE



SOLVE
FOR THE CLIENT

## Powered by Our People



BE A TALENT
**MULTIPLIER**



LEAD WITH
**ENTERPRISE
VISION**

## Future Focused



**CHALLENGE**
THE STATUS QUO



PLAY
TO
**WIN**

**CONFIDENTIAL** Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 217 of 227    Document 18 MCNULTY-EEOC-PROD-000163

# D&I PEOPLE LEADER GOAL

## What is a D&I People Leader Goal?

Beginning this year, people leaders will be expected to demonstrate how they are supporting and driving a diverse and inclusive culture at Northwestern Mutual as part of their annual performance goals.

Each of us is in a unique and different position to influence and drive diversity and inclusion. Ability to drive D&I will be dependent on elements like the kind of leadership role a people leader is in, the type and/or size of their team or organization, the kind of work that the team does and how this work may directly or indirectly be able to influence D&I.

You, as a people leader, and your manager should decide what your goal is together. Start by thinking about what you can influence. Focus on self-growth as well as the growth of your team.

## How will I be measured for my goal?

Just like any other goal, you'll be assessed on how well you met it. We are a performance-driven culture that views diversity and inclusion as core leadership competencies. This means each year people leaders will be expected to report on how they are leading their teams inclusively and promoting diversity, just as with any other business goal. The most important element of the goal(s) a people leader selects is that they drive impact and outcome, not just activity. Highly Successful or Exceptional ratings should correspond to driving meaningful improvement towards our D&I goals.

## Questions to spark your thinking:

**Self:** "Can I influence myself?" Of course, but it's not as easy as we think it is. Each of us has ways of doing things – ways of looking at the world, set processes, habits, and ways in which we lead, etc. We wouldn't be people leaders if we weren't good at most of these things. Yet, bias toward people, things and processes is how we learn to navigate the world and make decisions. We've developed over millions of years to make quick decisions based on instinct in order to stay alive (think the learned response we developed to the threat of a saber-toothed tiger).

**Do a quick mental exercise.** Close your eyes and picture the following people in your mind: teacher, doctor, baseball player, restaurant server, basketball player, CEO. Did a particular kind of person pop in your head? A particular gender, race or age? Of course it did. Now, is this normal? Yes. But is it also a form of bias that predisposes us to assume that certain types of people typically fill these roles based on our experience and/or stereotypes that exist? Yes. (Try this exercise again, and switch in roles we typically find at work: technologist, lawyer, leader, cafeteria worker, marketing manager, underwriter, security guard.)

**CONFIDENTIAL**   Case 2:25-mc-00053-BHL   Filed 11/21/25   Page 218 of 227   MCNULTY-EEOC-PROD-000164

# WE CAN'T SURVIVE WITHOUT BIAS.

Everyone has biases, and that's not necessarily a bad thing. It's based on how we've evolved as humans in our basic fight-or-flight response system. However, oftentimes biases get in the way of our ability to see the entire picture, or they make us move too fast in decision-making because we think we already know what to do or who should do it. This is where taking a pause before making decisions and critically thinking through our assumptions is key, especially as it relates to people.

So, here are a few questions to ask yourself when thinking about how to become an even better leader: What decisions have I made in the past year about people or processes that didn't go so well? What did go well? What happened? How did my relationships change or not change because of it? What did I learn about myself? About others? Take a moment to really think about how bias influences you and what you should consider learning and doing this year as part of your goal. (Want some more food for thought around inclusive leadership? Take our Inclusive Leadership Inventory.)

Team: "Can I influence my team?" Yes. What are the areas your team should work on when it comes to being high performing, and how does D&I play into that? Does bias sometimes creep into our processes for driving development, opportunity and/or our team culture? What do I need to learn, focus on, educate my team on, etc., this year that will make a difference for us? Consider involving your team in brainstorming your goal and consider making it a joint team goal, to have everyone involved in the growth process.

> " At Northwestern Mutual, we know that elevating the talents we each bring is absolutely essential to success — our own, our company's and our community's."
> — John Schlifske

CONFIDENTIAL  Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 219 of 227  MCNULTY-EEOC-PROD-000165

## Sample list of D&I People Leader goals

As we said, you will determine your goal with your manager. Not prescriptive enough? That's on purpose. There is no one-size-fits-all approach to building a culture of belonging. We need every leader to help us identify their own unique areas of opportunity and go address them because that is the only way we can truly move our company forward. It doesn't matter how many goals, statements or events the enterprise creates if all of its leaders don't take an oar and help row the boat. We're in this together.

The sample list of goals below is not intended to be prescriptive, but rather to provide ideas on how people leaders can drive D&I from their unique positions of influence. **People leaders and their managers are expected to use the list below as a guide to developing their goals.** The one requirement is that your goal produces results and is not just a bunch of nice-to-have activities. Here are goals to consider with suggested metrics:

 **GOAL:** Advance diversity and inclusion on my team/department/function through development and promotion.

Goal met by/Potential metrics:

Promoting and implementing the development and advancement of women and people of color in my organization/department through:

- If I am in a position to **promote/retain employees**:

  – Increasing the number of women/people of color (POC) in my organization who are being promoted, who are considered for a promotion or who are qualified for a promotion.

  – Reducing the attrition of women/POC in my organization.

- **Refreshing the team onboarding process** to ensure a consistent experience for employees so that everyone has an inclusive and supportive experience when joining Northwestern Mutual.

- Making sure my entire team has completed **Career Profile and Individual Development Plans** in Workday and referring to them throughout the year in deliberate ways with my employees.

- Creating **mentor/sponsor** pairings for my employees:

  – A mentor is typically an individual with experience in an area that the mentee wishes to develop; interactions are focused on the mentor sharing advice to help guide the mentee as they take action on development plans. Mentors may be a peer or more senior.

  – A sponsor is a more senior leader focused on supporting a person to achieve their desired next level via promotion or new opportunity/position by creating visibility of the individual and advocating for them when talent decisions are being made.

**CONFIDENTIAL**

 MCNULTY-EEOC-PROD-000166

**2** **GOAL:** Refer and bring in more diverse candidates for positions on our team.

If you are in a position to hire, be a driver of diverse hiring. Follow Talent Acquisition best practices, acknowledge your own potential biases, and work to remove any barriers that impede the hiring of women and people of color.

Goal met by/Potential metrics:

- Increasing the number of qualified referrals of diverse candidates into the pipeline made by the team during the year. Promote the Employee Referral Program and emphasize the importance of a diverse set of referrals.

- Partnering with Talent Acquisition to review your selection process to ensure best practices for an inclusive and informative candidate experience are being followed (e.g., diverse pools, diverse interview panels, consistent and objective selection criteria, etc.).

- Leveraging your network to cast a wider net for diverse talent to increase the diversity of final interview pools (e.g., partner with ERGs, share open jobs on diverse channels, etc.).

- Increasing transparency of open roles, selection processes, and promotion decisions with managers within the function and engaging them more actively in attracting and bringing in talent.

- Personally referring a number of qualified diverse candidates to be considered for positions at Northwestern Mutual.

**3** **GOAL:** Personally sponsor at least one woman and person of color, especially a woman of color.

A sponsor is typically a more senior leader focused on supporting a person to achieve their desired next level via promotion or new opportunity/position by creating visibility of the individual and advocating for them when talent decisions are being made.

Goal met by/Potential metric:

- Sponsor at least one woman and person of color who is not already on your team for promotion/new role/opportunity, or increase their visibility with a special project that is reflected in their performance plan.

CONFIDENTIAL    MCNULTY-EEOC-PROD-000167

**4** **GOAL:** Promote and demonstrate a more inclusive team environment.

This includes new team norms of inclusive practices that may include but are not limited to inclusive language, inclusive meetings (no interrupting, equal air time, etc.), psychological safety, zero tolerance for disrespectful behavior (including understanding and review of our new Professional Conduct Policy), removal of invisible barriers, and acknowledgment of people's cultural norms.

Goal met by/Potential metrics:

- Facilitating/moderating team education modules (see D&I within NMYOU site for modules, discussion guides and more that you or your team can facilitate) in at least four team meetings over the course of the year, along with action plans developed for how to improve team culture.

- Increasing team engagement scores around D&I.

**5** **GOAL:** Increase employee engagement with diversity and inclusion efforts inside the company through active partnership with an ERG or D&I Council.

Goal met by/Potential metrics:

- Employees become active members of an ERG or a D&I Council, participating substantively and bringing back learnings to the team via live reports during at least four team meetings over the course of the year. Note: An active member is someone who serves as an officer, governance board member or committee member or plays an active role in a meaningful way. One cannot fulfill a people leader D&I goal by simply attending an ERG event, although all employees are encouraged to attend D&I events and bring back learnings to the team with suggestions on how the team can use what was learned and apply it to the team.

- Increasing team engagement scores around D&I.

**6** **GOAL:** Enhance my/my team's understanding of diversity and inclusion through education/events and ability to take action to drive a more inclusive culture.

Goal met by/Potential metric:

- Internal engagement: Participating in education and/or events with my team that will broaden our understanding and awareness of diversity and inclusion and drive us toward action plans for improvement. Metric: number (at least four) of education/events facilitated/attended along with action plans developed and results realized (action plans will be unique to the needs of the team); increased team engagement scores around D&I.

- External engagement: Participating in external education and/or events with my team that will broaden our understanding and awareness of diversity and inclusion and drive us toward action plans for improvement. Metric: number (at least four) of education/events attended that support our diverse and inclusive community where I live/work with action plans developed for bringing back what was learned to my Northwestern Mutual team; increased team engagement scores around D&I.

 **GOAL:** Recognize inclusive behavior. Encourage team to watch for inclusive behaviors demonstrated by me or the team and recognize inclusive behavior when they see it.

This includes new team norms of inclusive practices to include but not limited to inclusive language, psychological safety, zero tolerance for disrespectful behavior (including understanding and review of our new Professional Conduct Policy), removal of invisible barriers, and acknowledgment of people's cultural norms. *Note: This goal alone is not sufficient without a second goal that demonstrates measurable impact toward advancing D&I.*

**Goal met by/Potential metrics:** Recognition (Workday, Bravo, email, in-person recognition) that you/team use to give kudos to colleagues who demonstrate inclusive behavior.

Examples of inclusive behaviors could include:

a. Interrupt and address microaggressions, bias and/or discriminatory behavior

b. Visible commitment: articulate genuine commitment to diversity and demonstrate allyship

c. Awareness of bias: recognize personal awareness gaps and unjustified perceptions

d. Cultural intelligence: be attentive to others' cultures and adapt as needed

e. Humility: take ownership/admit mistakes and apologize genuinely

f. Curiosity to learn: be open and listen without judgment

g. Effective collaboration: empower others and embrace diverse thinking

A leader can work with their HR partner to gain an understanding of how employees are feeling about the team environment via various methods.

# FAQs

**Why do we need to set goals around D&I? Shouldn't we be doing this already as leaders?**

We have made progress toward building a diverse and inclusive culture but want to do more. It is imperative that we mirror the diversity of the colleagues, clients and communities we serve, and one way to drive toward this is to set goals around diversity and inclusion the way we set goals around other areas of business performance. Setting goals around people and culture will help us improve, just as setting goals around business performance helps us improve.

**This will incent the wrong behaviors ... leaders might make hiring and promotion decisions for the wrong reasons and won't hire the best person for the job.**

Each of us is expected to make the best decisions on behalf of the company. The best decision for the company is to hire, promote and retain the best talent, regardless of anything else. We must remain a meritocracy, and that means that we choose the best person for the job. However, a "meritocracy" isn't possible when people are often given different paths to opportunity, advancement and success. This is why we must pause to look deeper into how we are operating and break out of our routines to evaluate what we can do better so that we are confident that we are not overlooking anyone or any process that is best for the company. We know that diversity and inclusion drive higher performance, innovation and profitability, so we must also strive to be as diverse and inclusive a company as possible. In order to do this, we set goals to keep us on that path.

**This is about quotas.**

The company does not have quotas. Our goals are aspirational in that we hope to achieve them, and setting them helps us to better understand where we need to focus.

**Measuring diversity without a focus on measuring inclusion won't work.**

You're right. This is why the sample goals include both diversity-focused and inclusion-focused goals. In addition to improving diversity, which provides us the broadest range of ideas, we also strive to build a more inclusive culture because we know that we need both to have a high-performance team. We need a diverse team and a culture that supports it so that our people choose to stay with us. We currently have several index questions that help us understand how inclusive our culture is and are launching an entire Diversity & Inclusion Index this year that will provide even more ways to accurately measure inclusion.

**This is reverse discrimination ... as a man, or as one who is not a person of color, I feel like my job security is being threatened.**

Regardless of race and/or gender, employees who continue to perform at their best will continue to be successful at Northwestern Mutual, full stop. Discrimination due to a person's race and/or gender is illegal, and as a company, we will not tolerate discrimination in any form, against any of our people. Unfortunately, women and people from underrepresented ethnicities have been subjected to generations of discrimination in the workplace and beyond. In order to overcome the setbacks this discrimination caused for these groups in general, we work to make sure that our employee base reflects the diverse workforce available today. Having a diverse workforce allows us to perform at our best for our clients.

As a woman/person of color, I feel like this will make it even harder for me to be taken seriously because people will assume that I am where I am because of my gender/race.

No lasting company hires, promotes or retains people who are not qualified for the job. It's too expensive a mistake to make. Northwestern Mutual would not exist for 160+ years if we did not choose top performance above all else. Our culture is built on integrity and doing the right thing, and that applies to our people. Like any company, we must remain competitive, and to compete we must constantly make talent decisions that are in the best interest of the company. Our people succeed because they are successful performers, not because of anything else. Our focus on diversity and inclusion helps us make sure that we do not overlook any high-performing talent, so we may consider all our options when making hiring/promotion decisions. Every employee of Northwestern Mutual deserves to be here and was hand-picked for their talent.

I'm already maxed out as a leader. How can I take on another goal?

As mentioned earlier, diversity and inclusion drive higher-performing teams. Knowing that you are already working hard to drive performance, adding this as a 'to-do' may feel like more at first. However, as this becomes a habit and your team becomes more inclusive, you'll see your team effectiveness grow as well as your leadership abilities.

CONFIDENTIAL    Case 2:25-mc-00053-BHL    Filed 11/21/25    Page 225 of 227    MCNULTY-EEOC-PROD-000171

# RESOURCES

## You are not alone in this.

This is so important to our collective success that we want to do everything possible to give you the tools and support you need to be successful. Below is a list of resources to support you.

- Invitation to attend the D&I People Leader Goal launch event on March 15. Come learn more from leadership about the new goal, discover how you can lead inclusively and maximize your team's performance culture, and ask questions. Don't worry – if you can't attend live, you can catch the replay.

- Every Friday Office Hours from 9-10am with leaders. Have a specific question, need support or just want to listen to other leaders talk about how they're committing to their goal? Join members of the D&I and Talent Management teams and other special guests for helpful dialogue through April.

- D&I People Leader Goal Coaching Corner. Want to talk 1 x 1 with a leader on the D&I People Leader Goal Working Team for support? Look for more information coming out about Coaching Corner contacts or reach out to the D&I team whenever you need to.

- Ongoing live education throughout the year. Watch the DC for education sessions tailored to support people leaders and their teams with their new goal and on various related topics around driving a diverse and inclusive culture.

- Existing education on NMYOU. The D&I team is always available to talk with you about your team's needs and facilitates many live sessions throughout the year. However, don't wait for a live session when you have many education pieces that you or your team can use today on our D&I NMYOU site. Frankly, teams talking and learning together in a session led by their leader or peer is often more effective than a session facilitated by someone not on the team. Also, note that the pieces on NMYOU are intended to be facilitated by leaders or employees and come with discussion guides. So, take a look at them and plan a session for your team today – that's one way to start working on inclusion immediately!

Here's a look at some of what you'll see on our D&I NMYOU Pathway:

Learning and education: Self-paced, leader-led or facilitated education is available.

- Inclusion/Inclusive Leadership and Our Inclusive Leadership Inventory

- Diversity, Dimensions of Diversity, Accelerating Our NM Behaviors

- Anti-racism and In This Together

- Unconscious Bias

- Identity & Privilege

- The Allyship Journey

- Harvard's Implicit Association Test

Discussion guides on:

- Unlocking the Power of Diversity

- Microaggressions

- Being an Ally

- Hosting a Group Dialogue on Tough Topics

- Calling Out Racism

- Talking With Children About Discrimination and Inequity

- Prevent the Backslide – D&I edition

- Many others

Get actively involved:

- Join our ERGs

Northwestern Mutual is the marketing name for The Northwestern Mutual Life Insurance Company (NM), Milwaukee, WI (life and disability insurance, annuities, and life insurance with long-term care benefits) and its subsidiaries. Northwestern Long Term Care Insurance Company, Milwaukee, WI (long-term care insurance) is a subsidiary of NM.

(REV 0221)

12-1314

