UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN

UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,                    Case No. 2:25-mc-00053

            Applicant,

      v.

NORTHWESTERN MUTUAL INSURANCE
CO.,

            Respondent.

## NORTHWESTERN MUTUAL'S BRIEF IN OPPOSITION TO
## EEOC MOTION TO ENFORCE ADMINISTRATIVE SUBPOENA

### Introduction

On March 1, 2025, former Northwestern Mutual employee Mark McNulty filed a discrimination charge with the EEOC, asserting he had been passed over for promotion by two female colleagues in violation of Title VII.  While unfortunate and unfounded, this element of McNulty's charge against Northwestern Mutual was unremarkable.  However, McNulty also asserted he was the victim of an undefined "Diversity Equity and Inclusion policy" favoring women and persons of color, asserting that unidentified "others" had been harmed by this "policy" as well.

Because Northwestern Mutual's policies expressly prohibit "reverse discrimination" and demand that hiring and promotions be based exclusively on merit, and because Supreme Court precedent in *EEOC v. Shell Oil Co.,* 466 U.S. 54, 62 (1984), requires claimants (in the charge) *and* the EEOC (in the notice) to identify the "allegedly unlawful employment practices" with "as much precision as [they] can muster," Northwestern Mutual submitted a position statement refuting McNulty's allegations of discrimination and requesting disclosure of the particular

employment practices being challenged. Because *Shell Oil* also requires that allegations of purported "class" discrimination identify the specific "methods by which the discrimination may have been effected," as well as the "groups of employees" and "categories of positions" allegedly impacted, "with as much precision as the claimant can muster," Northwestern Mutual requested these details as well.

Rather than complying with its *Shell Oil* obligations – imposed for the specific purpose of protecting employers against bureaucratic overreach and abuse – the EEOC refused to specify any potentially discriminatory policies or the positions or groups of employees allegedly impacted by those policies, instead serving a raft of requests for information searching for evidence of potential "class" discrimination. The Seventh Circuit has specifically admonished the EEOC, however, that the Congressional and Supreme Court constraints on its investigative authority are intended to prevent improper "fishing expeditions," limiting the pursuit of "class" discovery to employment practices potentially impacting "similarly situated employees" in the *same* positions, work units, and locations as the claimant. Accordingly, Northwestern Mutual asked the EEOC to withdraw or modify its requests in conformity with this precedent. Once again, the EEOC refused to do so, issuing a subpoena and instituting these proceedings.

Although the EEOC has claimed in private and published statements that it has identified elements of Northwestern Mutual's written "diversity and inclusion" policies that purportedly violate Title VII, the Commission has put forward no lawful explanation for its refusal to comply with *Shell Oil* by identifying those specific "methods" of alleged discrimination being investigated "with as much precision as they can muster." Section 713 of Title VII bars EEOC proceedings challenging employment practices adopted by an employer in reliance upon prior EEOC pronouncements deeming such practices to be lawful. If the EEOC refuses to disclose the

particular employment practices being challenged as required by *Shell Oil*, the employer is thwarted from invoking the Congressional protections otherwise afforded by Section 713.

Absent a benign explanation for withholding these required details from Northwestern Mutual, it appears the agency is attempting to prevent Northwestern Mutual from invoking Section 713 as a defense or bar to these proceedings, based on the company's good faith reliance on historic EEOC pronouncements and interpretations of Title VII. Because the EEOC quite recently has condemned as *unlawful* the very diversity and inclusion measures the EEOC has long encouraged as *lawful*, Northwestern Mutual is confident the EEOC's compliance with the *Shell Oil* disclosure requirements will give rise to a formidable Section 713 defense.

Contemporaneously with the filing of the instant motion, the EEOC issued a press release claiming it had identified "clear indications" that Northwestern Mutual had adopted a "policy" violating Title VII – despite its refusal to identify the particular practices being challenged, much less with "as much precision as [it] can muster." Despite the company's voluntary production of substantial documents and data in response to EEOC information requests, the press release castigates Northwestern Mutual for purportedly refusing to cooperate in the agency's investigation. The EEOC's incendiary and misleading press release sends a disturbing warning to other employers who might seek to enforce their statutory rights.

Northwestern Mutual understands the winds have changed under the current administration and EEOC leadership, as is every administration's prerogative. However, the standards of basic fairness and candid disclosure mandated by Congress and the Supreme Court remain unaltered. Northwestern Mutual seeks nothing more than enforcement of those standards.

**Standards Governing the Scope of Title VII Investigations**

Consideration of the Congressional and Supreme Court governors imposed upon EEOC investigative authority exposes the impropriety of the EEOC's conduct and attempted discovery in these proceedings.

### Title VII Investigations Require a "Valid" Charge of Discrimination

Congress has created "'an integrated, multistep enforcement procedure'" governing EEOC investigations into potential Title VII violations, contemplating: (1) individual claims asserted by an employee alleging s/he has been harmed by a Title VII violation; and (2) claims of systemic discrimination alleging a "pattern or practice" of unlawful discrimination. Such claims can be asserted either by an aggrieved employee or the EEOC. *EEOC v. Shell Oil Co.,* 466 U.S. 54, 62 (1984). Whether filed by an employee or the EEOC, "[c]harges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires." 42 U.S.C. § 2000e-5(b).

### Charge Must Identify the "Allegedly Unlawful Employment Practices" "With as Much Precision as the Claimant Can Muster"

In *Shell Oil*, the Court also addressed "*how much information must be included in the charge* and provided to the employer *before the Commission may secure judicial enforcement of an administrative subpoena*" *id*. at 56, concluding that substantial specificity in the sworn charge is a prerequisite to a valid investigation and subpoena. Specifically, the Court held that claimants "must state '*the facts ...* constituting the alleged unlawful employment practices,'" describing the "'alleged unlawful employment practices'" with "*as much precision as they can muster.*" *Id.* at 67, 72 (*quoting* 29 CFR § 1601.12(a)(3)). The Court held that permitting mere conclusory allegations of the purported Title VII violation in a charge

> would be inconsistent with the evident purpose of the regulation – to encourage complainants to identify *with as much precision as they can muster* the conduct complained of. And it would *render nugatory the statutory limitation of the Commission's investigative authority* to materials "relevant" to a charge.

4

*Id*. at 72.[1]

Significantly, the Court held that even more details are required when investigating allegations of *class* discrimination in violation of Title VII:

> *Insofar as he is able*, the Commissioner should identify the *groups of persons* that he has reason to believe have been discriminated against, the *categories of employment positions* from which they have been excluded, *the methods* by which the discrimination may have been effected, and *the periods of time* in which he suspects the discrimination to have been practiced.

*Id*. at 72-73.

Importantly, these disclosure requirements apply equally to charges filed by individuals or by the Commissioner. *Id*. at 76 (holding that "Congress wished to place a Commissioner on the same footing as an aggrieved party"). Further, the Court held that the same "precision" is required in the Section 2000e-5(b) *notice* of the charge sent to the employer, "reveal[ing] to the employer *all of the information that must be included in the charge itself* …." *Id*. at 81.

### EEOC Subpoenas Must be Limited to Discovery Relevant to the "Specific Sworn Charge"

Turning to the scope of the EEOC's investigatory authority in Title VII investigations, the *Shell Oil* court held that the EEOC must demonstrate a direct link between the facts asserted in the sworn charge of discrimination and the information demanded in an EEOC subpoena:

> It is apparent from the structure of the statute that two of those steps – the charge and the subpoena – are closely related. As indicated above, the EEOC's investigative authority is tied to charges filed with the Commission; *unlike other federal agencies that possess plenary authority to demand to see records relevant to matters within their jurisdiction*, the EEOC is entitled to access *only to evidence "relevant to the charge under investigation.*"

---

[1] All italicized emphases are supplied by Northwestern Mutual unless otherwise noted.

*Id*. at 64 (quoting 42 U.S.C. § 2000e-8(a)). Emphasizing that the EEOC's investigative authority is more constrained than other agencies, the Court recited Title VII's legislative history:

> "It is important to note that the Commission's power to conduct an investigation can be exercised only after *a specific charge* has been filed in writing. In this respect *the Commission's investigatory power is significantly narrower* than that of the Federal Trade Commission or of the Wage and Hour Administrator, who are authorized to conduct investigations, inspect records, and issue subpoenas [sic], whether or not there has been any complaint of wrongdoing."

*Id*. at 64-65. The *charge's* validity thus is essential to the *subpoena's* validity: "If the EEOC were able to insist that an employer obey a subpoena despite the failure of the complainant to file a valid charge, Congress' desire to prevent the Commission from exercising unconstrained investigative authority would be thwarted." *Id*. at 64. The charge's validity, moreover, presents a question of law. *McLane Co., Inc. v. EEOC,* 581 U.S. 72, 81 n. 3 (2017).

### Congressional and Supreme Court Restraints are Intended to Prevent Abusive and Prolonged Investigations

The disclosure standards imposed upon claimants and the EEOC are intended to protect employers from unwieldy and abusive bureaucratic investigations:

> I agree with the Court that a first purpose of the notice provision is "*to provide employers fair notice that accusations of discrimination have been leveled against them.*" *Ante,* at 1634. … *Experience teaches that government administrative agency investigations can be prone to abuse;* they are likely to be conducted more reasonably, more carefully, and more fairly, *when the concerned parties are adequately notified of the causes of the investigation that are in progress.*

*Id*. at 90 (concurrence). Candid disclosure (rather than coy evasion) also facilitates efficient, cooperative, and speedy resolutions of EEOC Title VII investigations:

> [E]ffective notice may conserve both employer and agency resources by *moderating the confrontational posture of the investigation and allowing the employer to explain or clarify its position to the EEOC*. … Finally, and perhaps most importantly, the notice requirement serves a purpose that is central to the statutory scheme – *encouraging quick, voluntary, and informal resolution of complaints*. …. *The Act's overriding goal is not to promote the employment of lawyers but to correct discriminatory practices quickly and effectively.* To this end, the EEOC is always required to attempt to resolve charges

first through "*informal methods of conference, conciliation, and persuasion*."

*Id.*

While the EEOC may pursue any evidence in Title VII investigations that "might cast light on the allegations against the employer," *id.* at 68-69, the "EEOC's investigative authority *is not plenary*; instead, the EEOC "'is entitled to access only to evidence *relevant to the charge under investigation*.'" *E.E.O.C. v. United Air Lines, Inc.*, 287 F.3d 643, 652-653 (7th Cir. 2002) (*quoting Shell Oil*, 466 U.S. at 64)). Discussing the EEOC's burden to show that its discovery requests are relevant to the specific charge of discrimination, the Seventh Circuit admonished:

> [T]he Supreme Court also has cautioned that the charge and *relevance requirements* should not be interpreted so broadly *as to render the statutory language a "nullity." Id.* at 69, 104 S.Ct. 1621. *The requirement of relevance, like the charge requirement itself, is designed to cabin the EEOC's authority and prevent "fishing expedition[s]."* Indeed, as we have noted previously, although the legitimate scope of the subpoena power includes information that "might throw light upon" the inquiry raised by the complaint, "the might" is "an indication of a realistic expectation rather than an idle hope that something may be discovered." *Harrington,* 388 F.2d at 524. Absent a finding that the material sought is relevant, *a court may not enforce an EEOC subpoena*.

*United Air Lines*, 287 F.3d at 652 (citations omitted). As will be shown, however, the EEOC has not even *attempted* to demonstrate the relevancy of several categories of subpoena demands that the agency nonetheless asks this Court to enforce.

### EEOC Subpoenas Cannot Be Enforced if They Fail Any One of Six Enumerated Standards

Title VII subpoenas issued by the EEOC *cannot be enforced* if: (1) there is no valid discrimination charge justifying the discovery; (2) the EEOC fails to demonstrate the discovery is relevant to the specific charge; (3) the requests are "too indefinite"; (4) the requests are "unduly burdensome" or "unreasonable"; (5) the subpoena has been "issued for an 'illegitimate purpose'"; or (6) the EEOC has "acted in bad faith." *See McLane*, 581 U.S. at 76-77 (*quoting United States v. Morton Salt Co.,* 338 U.S. 632, 652–653 (1950)); *University of Pennsylvania v.*

*EEOC*, 493 U.S. 182, 194 (1990); and *EEOC v. Michael Const. Co.*, 706 F.2d 244, 250 (8th Cir. 1983) (*citing U.S. v. Powell*, 379 U.S. 48, 58 (1964)). Nor must district courts defer to the EEOC's self-serving determination that the discovery is appropriate. *McLane*, 581 U.S. at 84; *United Air Lines,* 287 F.3d at 653.

### Discovery into "Class" Discrimination Must be Limited to Employees in the Same Position, Working Unit, and Location

Even if a claimant has asserted a valid, fact-based, sworn charge of class discrimination (though such is not the case here), the Seventh Circuit has imposed substantial restrictions on the EEOC's pursuit of discovery directed to suspected classwide discrimination. In *United Air Lines*, a flight attendant had filed a charge claiming her employer had discriminated against her and other employees on the basis of national origin and sex. *Id.* at 646, 654. Reversing the district court, the Seventh Circuit refused to enforce the subpoena because it was:

> *not limited* to individuals who may be considered *similarly situated to [the claimant] either by position (flight attendant) or by location (France)*; the subpoena requires extensive information with respect to *all United employees* residing abroad. As the Fifth Circuit wrote in *EEOC v. Packard Electric Division, General Motors Corporation,* 569 F.2d 315, 318 (5th Cir.1978), "[i]n the context of an investigation of an individual complaint, it might well be most natural to focus on that *employing unit or work unit from which came the decision of which the individual complainant complains*; within such a unit the EEOC might well need a wide spectrum of statistical data in order to illuminate the general policies bearing on the complainant's situation." … Allowing the EEOC to conduct such a broad investigation would require us to disregard *the Congressional requirement that the investigation be based on the charge*.

*Id.* at 654-55. *Accord E.E.O.C. v. Konica Minolta Bus. Sols. U.S.A., Inc.,* 639 F.3d 366, 370 (7th Cir. 2011) (confirming the *United Air Lines* limitation of class discovery to practices concerning the same positions, work units, and locations). *See also EEOC v. Quantum Foods, LLC,* 2010 WL 1693054, at *5 (N.D. Ill. Apr. 26, 2010) (refusing discovery beyond individual claimant's "employing unit or work unit" as an unlawful "'fishing expedition'"); *EEOC v. Loyola Univ. Med. Ctr., 8*23 F. Supp. 2d 835, 839 (N.D. Ill. 2011) (subpoena "not sufficiently tailored to the

particular circumstances of the investigation," such as employees managed "by the same supervisor"); *EEOC. v. Americold Logistics, LLC, No. 1:4-mc-00061-JMS-DML,* 2014 WL 4722553, at *4 (S.D. Ind. Sep. 23, 2014) (refusing discovery directed to different work locations); and *EEOC v. Forge Industrial Staffing, Inc.*, Case No. 1:14-mc-00090-SEB-MJD, 2014 WL 6673574, at *3-5 (S.D. Ind. Nov. 24, 2014) (refusing discovery of potential discrimination based on different protected class characteristics).

### Factual and Procedural History

#### McNulty's Employment History at Northwestern Mutual

McNulty is a former Northwestern Mutual employee who performed various compliance functions in the Milwaukee home office between April 2016 through September 2025 (save a one-year hiatus in 2016). Dunning Dec., ¶¶ 4-6. On March 1, 2025, McNulty submitted a discrimination charge to the EEOC asserting he had been twice passed over for promotion by two of his white, female colleagues. *See* Aakre Dec., Att. 1 and 2 (charge and notice); Dunning Dec., ¶ 8. On May 2, 2025, Northwestern Mutual submitted a 24-page position statement disputing the charges. Aakre Dec., Att. 3; Lopez Dec., Ex. 4 (LOPEZ-000017-42).[2]

#### EEOC RFIs Untethered to a Valid Charge of "Class" Discrimination

On May 21, 2025, the EEOC propounded 21 requests for information ("RFIs"), including 7 directed to McNulty's allegation that he had been unlawfully passed over for promotion and subjected to retaliation (RFIs 1-7), and 14 directed to undefined "diversity and inclusion"

---

[2] The EEOC filed this entire position statement with the Court (including the subset of business records among the twenty-seven supporting exhibits containing proprietary information that had been marked as "confidential"), despite Northwestern Mutual's previous request that the company be afforded an opportunity to seek judicial protection for such materials in advance of any such public filing (through sealing or redaction). Lopez Dec., ¶ 16. Since the EEOC also issued a press release that prompted immediate national media scrutiny and multiple published articles immediately after the filing, no purpose is served in seeking "confidentiality" protections for these publicly disclosed materials. *Id*., ¶ 15; and Lopez Ex. 7 (11/20/2025 Press Release); and Lopez Ex. 8 (collection of articles).

initiatives applicable to Northwestern Mutual's employees, as well as multiple initiatives applicable *exclusively* to the company's independent contractor sales force (outside the scope of Title VII) (RFIs 8-21). Aakre Dec., Att. 4; Hanneman Dec., ¶¶ 3-8; Plocher Dec., ¶¶ 5-13.

### Northwestern Mutual Reiterates Demand for Compliance with *Shell Oil*

On June 4, 2025, Northwestern Mutual submitted its written objections to the RFIs, including a threshold challenge to the validity of the March 1, 2025 charge under the *Shell Oil* standards, to the extent the charge challenged an undefined "Diversity Equity and Inclusion policy" and was rooted in McNulty's subjective "belief" that Northwestern Mutual discriminated "against [unidentified] others" through this "[undefined] policy." Lopez Dec., Ex. 10 (LOPEZ-000198-215). Northwestern Mutual also objected to the EEOC's failure (and later, outright *refusal*) to disclose the specific employment practices being questioned, contrary to *Shell Oil*, depriving the company of the ability to evaluate the charges, mount a defense, and assert Section 713 as a potential bar to the proceedings to the extent challenging practices the EEOC had long declared (prior to the new administration) to be lawful. *Id.* at LOPEZ-000201-202.[3]

Northwestern Mutual also objected to RFIs exploring potential discrimination on the basis of color, national origin, and race, because the sworn facts in McNulty's charge identified two instances of being passed over by two *white females*. *Id.* at LOPEZ-000203. *See Forge Industrial, supra*, at *3-5 (prohibiting class discovery into discrimination based on protected

---

[3] Section 713 of Title VII provides that in "*any* action *or proceeding* based on *any* alleged unlawful employment practice," if the employer acted "in good faith, in conformity with, and in reliance on any written interpretation or opinion of the Commission," such reliance not only affords a complete defense "to any liability," but also "*shall be a bar to the ... proceeding*" – even if the EEOC later reverses itself or subsequent case law overrides the EEOC pronouncement. *See* 42 U.S.C. § 2000e-12(b). Obviously, an employer first must be confronted with notice of the specific "employment practice" called into question, as mandated by *Shell Oil,* before it can invoke Section 713 and the corresponding EEOC "written interpretation or opinion" supporting a challenged practice. Section 713 affords formidable protections against precipitous changes in the regulatory winds – so long as the EEOC does not attempt to thwart that defense by refusing to identify the specific "allegedly unlawful employment practices."

characteristics not implicated in the claimant's individual discrimination claim). Northwestern Mutual also objected to the pursuit of information about suspected practices preceding the earliest instance McNulty claims he was unlawfully passed over (June 2024). *Id*. Finally, Northwestern Mutual asserted several individual objections to the form and scope of the RFIs, opening and closing its letter with a request to meet and confer. *Id*. at LOPEZ-000203-215.

**EEOC Contends Northwestern Mutual Must
Assert its *Defenses* Before the EEOC Properly Discloses the *Charge***

In response to the company's objections, the EEOC asserted the Kafkaesque contention that Northwestern Mutual must first identify the premise for its Section 713 *defense* before the EEOC has complied with its *Shell Oil* obligation to disclose the particular practices being challenged in the *charge*. Lopez Dec., Ex. 10 at LOPEZ-000217. Since Section 713 affords a defense only if an employer relied upon an EEOC pronouncement opining that a particular practice is lawful under Title VII, such a defense cannot be invoked until the EEOC *first disclose* the particular "alleged unlawful employment practice" being challenged.[4]

**The EEOC Threatens to Show McNulty the Sensitive and Private Contents of
Personnel Files for Northwestern Mutual's Senior Executives and Company Officers**

The EEOC also refused to assure Northwestern Mutual it would not show McNulty the contents of the raft of personnel files the agency had demanded, reserving its purported "right" to show McNulty the personnel files for multiple senior executives and officers (including Ray Manista, the company's Chief Legal Officer). Lopez Dec., Ex. 10 (LOPEZ-000217-218).

**EEOC Refuses to Comply with *Shell Oil* or to Modify Its Objectionable RFIs**

---

[4] The EEOC repeats this *non sequitur* in its opening brief, arguing that Northwestern Mutual has put the "proverbial cart before the horse" by asking the EEOC to establish "reasonable cause" that the company has violated Title VII before the EEOC has conducted its investigation. ECF 2, p. 2. This assertion ignores the distinction between (**1**) disclosing the "*alleged* unlawful employment practices" in the sworn charge *and* notice "with as much precision as the claimant can muster" – the *sine qua non* for an EEOC Title VII investigation; and (**2**) alleging facts demonstrating "*reasonable cause to believe*" that Title VII has been violated – a showing Northwestern Mutual has *never* expected or demanded from the EEOC. *See* Lopez Dec., ¶ 6 and Ex. 1.

On June 12, 2025, Northwestern Mutual's counsel met with the EEOC's representatives by video conference to discuss the company's objections. Lopez Dec., ¶¶ 2-9. Northwestern Mutual pressed the EEOC to disclose the specific employment practices being challenged and investigated, and to withdraw or modify its RFIs to comport with the *United Air Lines* limitations upon the scope of "class" discovery. *Id.* Northwestern Mutual protested that it was impossible to identify responsive records or defend nebulous charges of an *undefined* "Diversity Equity and Inclusion policy" and *unspecified* "support," "opportunities," "mentorships," "mandatory performance metrics," or other "methods" allegedly violating Title VII. *Id.* Northwestern Mutual also asserted that the EEOC's refusal to provide these requisite details wrongly deprived the company of its right to invoke Section 713 as a defense or bar to proceedings challenging practices the EEOC *itself* had encouraged as lawful best practices until January 20, 2025. *Id.*

Northwestern Mutual explained that RFIs seeking information about undefined "diversity and inclusion" policies were too indefinite to formulate a proper response, noting there are myriad elements of an employer's policies and practices potentially bearing on "diversity" or "inclusion." *See, e.g., Best Practices of Private Sector Employer*, https://www.eeoc.gov/best-practices-private-sector-employers (reflecting a *broad range* of diversity and inclusion practices). Northwestern Mutual reminded the EEOC that because the company periodically reviews its corporate policies to ensure conformity with current judicial and regulatory pronouncements, the EEOC could well be investigating practices that no longer existed or were not in effect when McNulty claims he was first harmed by the suspected practices. *Id.*, ¶ 6.

Although admitting they had reviewed multiple company policy documents giving rise to the agency's "obvious concerns," the EEOC representatives refused to disclose those specific practices or modify any of the RFIs (other than trimming the time period of some requests by

two years).  Lopez Dec., ¶ 7.  In response, Northwestern Mutual noted that the agency and the company have a shared responsibility to ensure compliance with Title VII, protesting that no meaningful discussions could occur if the EEOC refused to divulge the specific practices prompting its concerns. *Id.*, ¶ 5. Unmoved, the EEOC persisted in its refusal to disclose the basis for its "concerns," even though Title VII investigations are not supposed to be "adversarial" until the EEOC issues a "reasonable cause" determination. *Shell Oil*, 466 U.S. at 68.

Northwestern Mutual stated that if the EEOC disclosed the alleged practices giving rise to its concerns; explained the nexus between those practices and McNulty's charge; and tailored its RFIs accordingly, the company would reconsider its response to the RFIs and company officer interview request. Lopez Dec., ¶¶ 3, 10-11, and Ex. 10 (LOPEZ-000198-215). Northwestern Mutual summarized the call in an email. *Id.* at Ex. 10 (LOPEZ-000221-222).[5]

**Northwestern Mutual Produced Multiple Data and Documents to the EEOC –**
**Including Multiple Corporate Policies Specifically Directed to Diversity and Inclusion**

Contrary to the EEOC's sworn statement that respondent provided only "minimal responses" to the RFIs and "refused to produce *any* material related to its DEI policies and programs," Akre Dec., ¶ 6(f), the company has produced substantial information and documents to the EEOC, including policies in furtherance of diversity and inclusion. Lopez Dec., ¶¶ 12(d) and (e). Northwestern Mutual has catalogued this production, and has filed the subset of corporate documents referencing "diversity and inclusion."  *Id.*, Ex. 5; and Exs. 6A-6G.

**The EEOC Issues a Subpoena Mirroring the Objectionable RFIs**

---

[5] Northwestern Mutual sent another follow-up email on June 19, 2025, requesting the opportunity to seek court protection prior to any public filing of company documents that had been labeled "confidential," and seeking assurances that the personnel files for company executives and officers would not be shown to McNulty absent a court order.  Lopez Dec., Ex. 10 (LOPEZ-000228-29). Northwestern Mutual followed up on the latter point on June 23, 2025, prompting a June 27, 2025 email from the EEOC refusing to provide those protections.  *Id.* at 227-28.

On June 27, 2025, the EEOC served an administrative subpoena demanding the same categories of documents and data demanded in the RFIs. Aakre Dec., ¶ 7, Att. 6. On July 3rd, Northwestern Mutual filed a petition to revoke or modify the subpoena, reasserting the objections that had been raised in response to the RFIs. Lopez Ex. 10. On September 4th, the EEOC issued a decision agreeing with itself, declining to modify its requests. Aakre Dec, Att. 8.

On October 6, 2025, Northwestern Mutual sent a letter acknowledging the EEOC's decision, repeating its "prior offer to consider providing additional documents and data in response to reasonable limitations and refinements of the disputed EEOC requests, and "renew[ing] its offer to meet and confer with the EEOC in pursuit of an appropriate resolution of the parties' dispute." Lopez Dec., ¶¶ 11, 12(c). The EEOC did not respond to this request, instead initiating the instant federal court proceedings on November 20, 2025. *Id.*, ¶ 11.

### McNulty is Terminated for Multiple Breaches of Trust and Confidentiality and for Distributing a Raft of Disruptive, Derogatory, and Bigoted E-Communications

Significant additional events unfolded that the EEOC chose to omit from the factual presentation in its motion papers. On September 2, 2025, Northwestern Mutual confronted McNulty with the company's discovery of a substantial volume of electronic communications identified during the course of searching McNulty's files for information relevant to the charge and investigation. *See* Lopez Dec., Ex. 4 (9/8/2025 Termination Letter, LOPEZ-000047-58). McNulty had sent numerous e-communications to a small circle of junior colleagues at the company (1) reflecting egregious breaches of trust and violations of company confidentiality policies; (2) discouraging employees from performing their jobs; and (3) transmitting scores of disruptive, demeaning, and bigoted messages about the company and his colleagues. *Id.*

Confronted with these improper communications, his breaches of trust, and his violations of company policy, McNulty refused to acknowledge any impropriety whatsoever. *Id.* at 48, 56-

57.  Northwestern Mutual terminated McNulty's employment on September 8, 2025, sending a letter to McNulty cataloguing in detail the violations, misconduct, and improper communications, *id*., and sending a copy of the letter to the EEOC that same day.  *Id*. at 44-45.

### McNulty Files an Amended Charge of Discrimination

On September 11, 2025, McNulty filed an amended discrimination charge claiming he had been fired in retaliation for asserting his rights under Title VII.  *See* Lopez Dec., ¶ 12(b), Ex. 3.  On September 25th, Northwestern Mutual sent a position statement responding to McNulty's amended charge.  *Id*., ¶ 12(c), Ex. 4 (LOPEZ-000013-58).  However, the EEOC has submitted to the Court only the March 3, 2025 discrimination charge (and response), omitting any reference to the amended charge or the conduct giving rise to McNulty's termination. Aakre Dec., Att. 1-3.

### EEOC Issues a Press Release Lambasting Northwestern Mutual in Response to the Company's Asserting Its Statutory Rights

On November 20, 2025, simultaneously with the institution of these proceedings, the EEOC issued a press release titled, "*EEOC Files Subpoena Enforcement Action Against Financial Services Giant Northwestern Mutual Over Allegations of DEI-Related Discrimination*." Lopez Dec., Ex. 7.   The press release features a quote from the Chair of the EEOC commenting on the agency's investigation of Northwestern Mutual, warning that the EEOC "will use the full extent of [its] authority" when confronted with such "clear indications" that an employer has violated Title VII:

> "Title VII charges the EEOC with confronting unlawful employment practices," **said EEOC Chair Andrea Lucas. "**When we see clear indications that an employer's DEI program may violate federal prohibitions against discrimination, we will use the full extent of our authority — including subpoena enforcement — to obtain the information needed to investigate and take appropriate action."

*Id*. The press release does not identify any practices reflecting these "clear indications" of violations, instead taking the company to task for failing to cooperate in the investigation. *Id*.

**Argument**

**I.** **There is No Valid Charge of "Class" Discrimination to Justify the EEOC's Investigation and Subpoena into Practices and Circumstances Unrelated to McNulty or Other Employees in His Same Position, Work Unit, or Location.**

The EEOC's attempt to enforce Requests 8-21 fails because there is no valid charge of class discrimination. The EEOC's authority to investigate suspected "class" discrimination requires a valid class-based charge of discrimination. *Shell Oil*, 466 U.S. at 65 ("we hold that the existence of a charge that meets the requirements set forth in § 706(b), 42 U.S.C. § 2000e-5(b) is a jurisdictional prerequisite to judicial enforcement of a subpoena issued by the EEOC"). A charge is valid, moreover, only if it identifies "the alleged unlawful employment practices" with "as much precision as [the claimant] can muster," including disclosure of the specific "methods by which the discrimination may have been effected." *Id*. at 63, 72-73. Further, the notice of charge that the EEOC must send to the employer also must "reveal to the employer all of the information that must be included in the charge itself …." *Id*. at 81.

Rather than complying with these mandates, the EEOC instead has elected to play a game of cat and mouse. Northwestern Mutual produced multiple documents to the EEOC describing corporate policies in furtherance of diversity and inclusion (Lopez Dec., Exs. 6A-G), and the EEOC has reviewed additional, similar corporate documents available on the Web, plus whatever documents McNulty turned over to the EEOC (*id*., ¶ 4). After reviewing these corporate policy documents, the EEOC told Northwestern Mutual that these policies gave rise to "obvious concerns" and issued a press release announcing the EEOC had discovered "clear indications" that Northwestern Mutual's policies and practices violate Title VII. *Id*., ¶¶ 4-10, and Ex. 7. Despite these broadcast statements to the media, the EEOC refuses to identify any

16

specific "diversity and inclusion" practices giving rise to its criticisms, much less "with as much precision as [it] can muster." Such obstinacy cannot be reconciled with the *Shell Oil* standards.

The only class-based allegations in the discrimination charge is that the company began "focusing on providing additional support and opportunities for women and people of color," providing "additional mentorship and promotional opportunities," and imposing unidentified "mandatory performance metrics … to advance and promote women and people of color." Lopez Ex. 2. The charge does not identify the nature of the "support" or "opportunities" allegedly given to women or minorities; the mentorship programs claimed to be unlawful; nor any "mandatory performance metrics." *Id*. Indeed, the charge does not disclose *any* of the particular "methods by which the discrimination may have been effected," much less "with much precision as they can muster."

Nor can McNulty or the EEOC claim they do not possess the facts necessary to disclose the challenged practices with the precision mandated by *Shell Oil*. McNulty has been collecting and critiquing Northwestern Mutual policies *for years*, and thus is able to identify and describe with the requisite precision the particular "support," "opportunities," "mentorships," "mandatory performance metrics," and other "methods" he is challenging as unlawful. *See* Dunning Dec., ¶ 7; Lopez Ex. 5 (LOPEZ-000061-62), *McNulty Discrimination Complaints and Responses*. The EEOC also has access to these corporate policies. Lopez Dec., ¶ 4. The EEOC's adamant refusal to divulge the particular practices giving rise to its investigation and public castigation of Northwestern Mutual reflects the agency's strategic decision to ignore its *Shell Oil* obligations.

In *EEOC v. Quad/Graphics, Inc*., 63 F.3d 642, 647 (7th Cir. 1995), the Seventh Circuit confirmed *Shell Oil*'s mandate that the charge "identify *as precisely as possible* the appropriate area of inquiry whether there is a violation of the Act." Because the EEOC did not have access

to any additional, specific facts that were not laid bare in the charge, the *Quad/Graphics* court concluded that the *Shell Oil* requirements were satisfied there. *Id.* at 647-48. By contrast, despite the EEOC's scrutiny of Northwestern Mutual's written policies and practices giving rise to its "obvious concerns," the charge and notice fail to identify *any* specific "support" or "opportunities" allegedly given to women or minorities; *any* particular mentorship programs claimed to be unlawful; *any* purported "mandatory performance metrics" in furtherance of "diversity and inclusion;" or *any* specific "methods" of discrimination being challenged. Unlike in *Quad/Graphics*, no dearth of facts is preventing the EEOC from complying with *Shell Oil*'s mandate to describe these alleged "methods" with "as much precision as they can muster."

Further, while McNulty conclusorily asserts that an undefined "Diversity Equity and Inclusion policy" somehow caused discrimination against him on the basis of his "sex (male), race (White), color, _and_ national origin (American-Irish)," the sworn facts in the charge identify only two instances of alleged *sex* discrimination (two white females who were promoted over McNulty). *Id.* at Ex. 2; Dunning Dec., ¶ 8. If McNulty claims that he has been passed over by persons of color as well, *Shell Oil* demands that he say so specifically, concretely and under oath.

Moreover, the single sentence in the charge alleging "class" discrimination is not rooted in *any* sworn facts, instead resting on the speculative assertion, "I *believe* Respondents [sic] policy has similarly discriminated against *others* based on their sex (male), race (White), color, national origin (American) in violation of Title VII of the Civil Right [sic] Act of 1964, as amended." *Id.*, Lopez Ex. 3. Contrary to the *Shell Oil* requirements governing the contents of "class" discrimination charges, McNulty fails to identify the "groups of persons" injured by the "policy," the "categories of employment positions" impacted, and most importantly, the

particular "methods" used to perpetrate the alleged discrimination. 466 U.S. at 72-73. Nor is McNulty's subjective "belief" a substitute for sworn "facts." *See* 42 U.S.C. § 2000e-5(b).

The statutory notice sent by the EEOC provides no *additional* details, conclusorily asserting that the "circumstances of the alleged discrimination are based on Color, National Origin, Race, Retaliation, [and] Sex" and "involve issues of Wages/Compensation, Terms/Conditions, [and] Promotion," adding the words "Suspension" and "Discharge" to the amended notice. Aakre Att. 2; Lopez Ex. 3. *Shell Oil*, however, requires the same *precise* description of the alleged unlawful practices in the *notice* that is required in the *charge*.

Northwestern Mutual is entitled to this disclosure to afford the company a fair opportunity to respond to the charge and the investigation. It matters much, for example, *precisely* what "additional support," "opportunities," "mentorships," "metrics," and "methods" are being challenged, because there must be a causal nexus between those practices and McNulty's alleged injury. *Muldrow v. City of St. Louis,* 601 U.S. 346, 354-55 (2024); *Arnold v. United Airlines, Inc.*, 142 F.4th 460, 470–71 (7th Cir. 2025). Once the "additional support," "opportunities," "mentorships," "metrics," and "methods" are identified, as required by *Shell Oil*, Northwestern Mutual will have the opportunity to show that no such practices existed; that the practices were modified or ended; or that McNulty was never injured by the practices. *Id.*

Rejecting a "reverse discrimination" claim on precisely this basis, the district court in *Bradley v. Gannett Co. Inc.,* No. 1:23-CV-1100 (RDA/WEF), 2024 WL 3905817, at *7 (E.D. Va. Aug. 20, 2024), held that the claimant's "allegations seeking to tie his non-selection to his race [were] vague and conclusory," failing to "make any connection" between the purported D&I policy and the challenged employment decision. *Accord Mangold v. PECO Energy,* Case No. 19-5912, 2021 WL 6072818, at *16 (E.D. Pa. Dec. 23, 2021) (no Title VII claim unless the

"employer's 'approach to diversity had some negative impact upon [the claimant's] employment situation," because "the mere existence of a policy promoting diversity awareness is not evidence of discrimination'"). *See also Prince v. Dep't of Corr.*, No. 615CV1855ORL22KRS, 2017 WL 10023750, at *5 (M.D. Fla. June 27, 2017) (rejecting validity of charge under *Shell Oil* due to claimant's refusal to provide the requisite, precise factual description of the challenged conduct).

Similarly, the EEOC's refusal to identify the purported "mandatory performance metrics" is particularly improper, because strategically withholding such details robs the company of the opportunity to defend itself. McNulty *and* the EEOC know from the written corporate policies they have reviewed that Northwestern Mutual *expressly rejects* mandatory diversity and inclusion metrics. *See, e.g., Diversity & Inclusion People Leader Goal Toolkit,* Lopez Dec., Ex. 6D (LOPEZ-000080, 84) (confirming D&I goals are *not* mandatory or "prescriptive" because "[t]here is no one-size-fits-all approach to building a culture of belonging," that the "company does not have quotas," that "goals are aspirational," that "[w]e must remain a meritocracy, and … must choose the best person for the job," and that "reverse discrimination" will not be tolerated). Since Northwestern Mutual's policies expressly prohibit "mandatory performance metrics," it is particularly important McNulty and the EEOC identify these purported metrics being challenged with "as much precision as [they] can muster." Indeed, the district court in *Bradley* criticized a similarly vague reference to the employer's purported D&I "policy" as being "far from clear," noting that the policies "[did] not define any specific goals other than as *an aspiration*" to achieve diversity and inclusion. 2024 WL 3905817, at *5.

Moreover, because Northwestern Mutual's employment practices are not static, but instead reflect consideration of the evolving regulatory and judicial pronouncements of lawful and unlawful conduct under Title VII, it is critically important the EEOC concretely and

specifically describe the particular employment practices being challenged. *See, e.g., Muldrow,* 601 U.S. at 353 n. 1 (rejecting the Seventh Circuit's longstanding "materially adverse employment action" requirement for Title VII claims). Accordingly, the practices being challenged, if they ever existed, may have been eliminated or modified before June 2024 (the first instance McNulty claims he suffered from unlawful discrimination). *See* Hanneman Dec., ¶ 2. Northwestern Mutual made this precise point to the EEOC, to no avail. Lopez Dec., ¶ 6.

Because McNulty alleges he was passed over for promotion by two female colleagues based on his sex, there *arguably* is a valid charge supporting the EEOC's investigation into McNulty's *individual* claim of discrimination. However, his conclusory assertions about an unlawful "Diversity Equity and Inclusion policy" and "class" discrimination against unidentified "others" in furtherance of that undefined "policy" falls far short of the *Shell Oil* standards.[6]

Accordingly, there is no basis to enforce Req. Nos. 8-21 of the subpoena, which by the EEOC's own admission seek class discovery into "the operation of the company's DEI policies and practices." EEOC Brief, ECF 2, p. 3. *See United Air Lines, Inc.*, 287 F.3d at 653 (7th Cir. 2002) (courts "may not enforce" subpoena requests untethered to a valid charge). Further, even a *valid* charge of "class" discrimination only permits discovery into practices and circumstances affecting "similarly situated" employees in the *same* position, work unit, and location as McNulty. *United Air Lines*, 287 F.3d at 654-55. Because Requests 8-21 are not so limited, they could not be enforced even if the charge had included the precise details required by *Shell Oil*.

---

[6] Even McNulty's individual discrimination charge is deficient under *Shell Oil*, because the charge attributes his failure to achieve the desired promotions to the inadequately described "Diversity Equity and Inclusion policy." Since McNulty only has a viable Title VII claim if he was *unlawfully* passed over based on his *sex*, even his individual discrimination charge depends upon this purported "policy." Accordingly, neither his individual nor class discrimination charge is valid under *Shell Oil*, though there are *additional* deficiencies in the latter.

## II. The EEOC's Refusal to Comply with the *Shell Oil* Standards is an Unlawful and Bad Faith Effort to Hinder Northwestern Mutual's Defense and Prevent the Company's Invocation of its Rights Under Section 713.

The EEOC's refusal to comply with *Shell Oil* by precisely identifying the specific employment practices being challenged is particularly problematic here, as its refusal to do so is preventing Northwestern Mutual from invoking Section 713 as a defense or bar to these proceedings. Upon the recent change in administration, the EEOC began repudiating decades of written pronouncements encouraging (under threat of litigation) a variety of proactive diversity and inclusion practices it had deemed lawful under Title VII for decades. *Compare* 1/15/2025, "*A Message from EEOC Chair Charlotte A. Burrows for 2025 Martin Luther King Jr. Day*"; *with* 1/21/2025 Executive Order 14173, "*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*," and 3/19/25 EEOC Release, "*What You Should Know About DEI-Related Discrimination at Work.*[7]

There is no *lawful* or "good faith" basis under *Shell Oil* for the EEOC's refusal to identify precisely what employment practices are being challenged and investigated. Because Section 713 provides a complete "*bar* to *any* … proceedings" challenging practices adopted in good faith reliance on EEOC written opinions and interpretations of Title VII, the EEOC's refusal to divulge the specific "support," "opportunities," "mentorships," "mandatory performance metrics," and "methods" challenged as unlawful under Title VII is particularly improper.

Insofar as Northwestern Mutual has found, no court has been called upon to address the consequences of the EEOC's evading the *Shell Oil* requirements for the purpose of depriving an

---

[7] *See* https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/ and https://www.eeoc.gov/wysk/what-you-should-know-about-dei-related-discrimination-work. Unfortunately, the former EEOC Chair's January 15, 2025 release has been removed from the government's website (https://content.govdelivery.com/accounts/USEEOC/bulletins/3ccdcfe) pursuant to the recent purge of such pronouncements. However, Northwestern Mutual has supplied the Court with this worm-holed document. Lopez Ex. 10.

employer of its Section 713 rights.  However, the Supreme Court has held that subpoenas issued for an "illegitimate purpose" may not be enforced, *McLane*, 581 U.S. at 77, and district courts may "refuse to enforce [a] subpoena if the EEOC acted in bad faith in its investigation of [the employer]." *EEOC v. Michael Const. Co.*, 706 F.2d 244, 250 (8th Cir. 1983) (citing *U.S. v. Powell*, 379 U.S. 48, 58 (1964)).  Presumably the EEOC will readily agree in its reply brief that purposefully ignoring *Shell Oil* to thwart Section 713 would be the epitome of bad faith, and that a subpoena issued in furtherance of such an investigation necessarily has been issued for an "illegitimate purpose."  This thus begs the question whether there is a *benign* explanation for the EEOC's repeated refusal to comply with *Shell Oil*.

The Supreme Court held in *Shell Oil* that the EEOC's disclosure of the particular challenged employment practices with precision is *mandatory*, emphasizing such disclosure is intended to facilitate cooperative and early resolutions.  Northwestern Mutual underscored these concerns with the EEOC, noting that the company and the EEOC have a shared interest in ensuring compliance with Title VII.  Since the EEOC has proclaimed in a press release to have discovered "clear indications" Northwestern Mutual's "diversity and inclusion" practices violate Title VII, *good faith* adherence to the agency's mission would compel its disclosure of the challenged practices and to explain the basis for its concerns – even *without* prodding by *Shell Oil*.  Lopez Dec., ¶¶ 5 and 11, and Ex. 1.

The EEOC's purposeful evasion of its obligations under *Shell Oil* is improperly preventing Northwestern Mutual from invoking its rights under Section 713, and its refusal to modify its patently improper subpoena requests is further evidence of that bad faith. The EEOC's remarkable decision to issue a press release castigating Northwestern Mutual as a lawbreaker and

obstructionist before the company has been presented with a valid charge or given a meaningful

opportunity to defend itself is further evidence of that bad faith.  Enforcement should be denied.[8]

### III.    The EEOC's Demand for Documents Reflecting Diversity and Inclusion Policies Applicable Exclusively to the Independent Contractor Sales Force Patently Exceeds the EEOC's Investigative Authority Under Title VII.

In addition to the preceding objections, EEOC's Requests Nos. 11-14 and 16-18 should

not be enforced because policies applicable exclusively to Northwestern Mutual's independent

sales agents are not relevant to the charge as a matter of law.  Illustrating the extraordinary

overreach of the subpoena, the EEOC has demanded a substantial volume of documents and data

about "diversity and inclusion" policies and programs applicable *exclusively* to the company's

independent contractor sales force.  *See* Brief, ECF 2, p. 9; Aakre Att. 6, Req. Nos. 11-14, 16-18;

Hanneman Dec., ¶¶ 3-6, 8.  Ironically, these *field* initiatives are the *only* "diversity and

inclusion" programs the EEOC has seen fit to identify in these proceedings – demonstrating the

importance of the "precision" demanded by *Shell Oil*. *Cf.* Req. Nos. 9-10, 15, 19-21.

Confronted with the objection that Title VII does not apply to independent contractors,

*Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th 1991), and that EEOC

discovery directed at policies applicable exclusively to independent contractors plainly exceeds

its investigative authority, the EEOC advances two meritless arguments. First, citing *EEOC v.*

*Peat, Marwick, Mitchell & Co.*, 589 F. Supp. 534 (E.D. Mo. 1984), the EEOC argues that there

just might be evidence out there calling into question the *bona fides* of the independent

---

[8]    Prior district court admonishments of the EEOC for its "unprofessional" conduct in issuing press releases casting employers in a negative light apparently are not an adequate deterrent.  *See, e.g.*, *E.E.O.C. v. Serrano's Mexican Restaurants, LLC*, No. CV 02-1608-PHX-FJM, 2007 WL 1992088, at *2 (D. Ariz. July 5, 2007) ("There is a big difference between promoting the public's right to know through keeping proceedings public, on the one hand, and affirmatively issuing press releases, on the other. *The United States, and its employees, have a special duty not to injure the reputations of its citizens*."); and *EEOC v. Banner Health*, No. CV-07-01424-PHX-FJM, 2009 WL 2365239, *1 (D. Ariz. July 28, 2009) (criticizing EEOC's "unprofessional" conduct in issuing a press release pillorying the employer). The EEOC's persistence in the face of these criticisms further demonstrates its bad faith.

contractor status of the sales force, possibly rendering them mislabeled common law employees. Second, the EEOC contends it is "investigating class allegations," after all, and "even non-employees may have relevant information about discrimination."

These arguments are misplaced for several reasons, starting with the fact that in *Peat, Marwick*, the EEOC was investigating alleged age discrimination under the ADEA – not Title VII. 589 F. Supp. at 535. As the Seventh Circuit explained in *EEOC v. Sidley Austin Brown & Wood,* 315 F.3d 696, 701 (7th Cir. 2002), the EEOC's investigative authority under the ADEA is far more expansive than under Title VII, because the "ADEA's grant of investigative authority to the Commission is not cabined by any reference to the charges." *Id.* at 701 (7th Cir. 2002). *Cf. United Air Lines*, 287 F.3d at 652-653 (EEOC "'is entitled to access only to evidence relevant to the charge under [a Title VII] investigation'"). Accordingly, the EEOC cannot justify its proposed, free-wheeling investigation of Northwestern Mutual in this *Title VII* investigation based on a decision examining EEOC's more expansive authority under the *ADEA*. *Id.*

Further, in *Peat, Marwick*, the EEOC was investigating whether the accounting firm's 1,375 members were independent contractors or mislabeled common law employees subject to the ADEA. Accordingly, the information sought in that subpoena was central to the charge – unlike here. 775 F.2d 928, 929-32 (8th Cir. 1985). Moreover, contrary to the EEOC's speculative assertion that Northwestern Mutual financial representatives might actually be mislabeled common law employees, multiple courts throughout the country have concluded that Northwestern Mutual's field sales agents are indeed *bona fide* independent contractors.[9] Thus, the EEOC's pursuit of this discovery is the classic, prohibited "fishing expedition."

---

[9] *See, e.g.*, *Holden v. Northwestern Mutual,* No. 07-C-0930, 2009 WL 440937, at *6–7 (E.D. Wis. Feb. 23, 2009); *Weary v. Northwestern Mutual,* 377 F.3d 522, 528 (6th Cir.2004); *Walfish v. Northwestern Mutual,* No. 2:16-CV-4981 (WJM), 2019 WL 1987013, at *9 (D.N.J. May 6, 2019); *Sofranko v. Northwestern Mutual,* No. CIV.A.

*footnote continued on next page…*

Finally, Northwestern Mutual sales agents do business in offices throughout the entire United States, selling products and services to consumers. Plocher Dec., ¶¶ 6-13. Conversely, Northwestern Mutual's employees work in the company's Milwaukee headquarters, performing separate and distinct roles there. *Id.*, ¶¶ 4-6. McNulty worked exclusively in Milwaukee during his tenure at Northwestern Mutual – never as a financial advisor in the field. Dunning Dec., ¶¶ 5-6. Nonetheless, Requests 11-14 and 17-18 seek discovery into field policies and programs inapplicable to McNulty and other Milwaukee employees. *See* Hanneman Dec., ¶¶ 3-6. Similarly, Request 16 encompasses multiple programs applicable only to the field sales force and communities where they do business, rather than limiting the request to programs applicable to the company's employees. *Id.*, ¶ 8.

These requests plainly exceed the restrictions imposed by the Seventh Circuit in *United Air Lines* and *Konica Minolta,* limiting class discovery into practices affecting employees in the *same* position, the *same* work unit, and the *same* location as the claimant. *Id.,* 287 F.3d at 654-55. *See also supra*, pp. 8-9 (citing additional decisions). This restraint upon EEOC overreach, the Seventh Circuit has explained, is essential to "prevent [the very] 'fishing expedition[]'" the Commission is pursuing here, otherwise rendering "the statutory language [requiring a link between the discovery and the specific charge of discrimination] a 'nullity.'" 287 F.3d at 653.

## IV. EEOC Demands for Documents Reflecting Undefined "Diversity and Inclusion" Programs and Initiatives are Too Indefinite for Enforcement.

The EEOC's demands for documents, "analyses," and data encompassing "any" Northwestern Mutual "diversity and inclusion" policies also are far too indefinite to enforce. *See*

---

2:06CV1657, 2008 WL 145509, at *8 (W.D. Pa. Jan. 14, 2008); *Nixon v. Northwestern Mutual,* 58 F. Supp. 2d 1269, 1274–75 (D. Kan. 1999); and *Andreas v. Northwestern Mutual.,* No. 07-CV-00312 JC/ACT, 2009 WL 10669240, at *3 (D.N.M. Jan. 28, 2009) (confirming independent contractor status, noting observation that "'no court or administrative agency has ever concluded that Northwestern Mutual's agents are employees'"). *See also* Plocher Dec., ¶¶ 4-13.

Req. Nos. 8-15. Requested documents must be "readily identifiable and definite enough to enable [respondent] to comply with the subpoena," *NLRB v. G. Rabine & Sons, Inc*., 2001 WL 1772333 at *5 (N.D. Ill. 2001), and "'particularized to such records as would show certain specific information.'" *Id*. (*quoting NLRB v. N. Trust Co*., 148 F.2d 24, 29 (7th Cir. 1945)).

Contrary to the straw man argument asserted by the EEOC, Northwestern Mutual has *never* claimed it does not understand what "diversity and inclusion" means. EEOC Brief, ECF 2, pp. 7-8. The concern the company has conveyed is that demands for documents reflecting "any" company "diversity and inclusion" policies, procedures, and training are incredibly overbroad and indefinite due to the substantial array of policies and practices falling under the umbrella of "diversity and inclusion." Lopez Ex. 10 (LOPEZ-000163-188, 197-215). As the EEOC acknowledges in *Best Practices of Private Sector Employer*, https://www.eeoc.gov/best-practices-private-sector-employers, "diversity and inclusion" encompasses a variety of initiatives beyond diverse slates and mentoring programs, such as wheelchair-friendly facilities, lactation rooms, flexible working hours, robust parental leave policies, adoption and surrogacy assistance, community outreach, and closed-captioning systems – just to name a few measures designed to make the workplace inclusive for everyone. Since the EEOC has announced its discovery of "clear indications" that Northwestern Mutual's practices violate Title VII, the Commission should have no problem identifying the particular policies (or at least the specific *types* of policies or programs) that the company is being asked to produce. And any such refined and reissued RFIs or subpoenas also must scrupulously comply with the *United Air Lines* limitations.

Because there is no justification for the EEOC's refusal to refine its requests, enforcement of Requests 8-15 should be denied. *See, e.g., Keathley v. Spire Inc.,* 348 F.R.D. 344, 347 (E.D. Mo. 2024) (rejecting requests for "DEI Policies" as "simply overbroad" and

"arguably encompass[ing] all or nearly all employment activities").  Indeed, multiple courts have refused to enforce directives targeting "diversity and inclusion" as too indefinite to enforce.[10] While the EEOC dismisses these decisions as "merely" addressing Constitutional concerns, the holdings confirm that the phrase "diversity and inclusion" is too indefinite to enforce in *any* context.  Enforcement should be denied.

### V. The EEOC Has Not Demonstrated the Relevancy of Personnel Files for Senior Executives, Department Heads, and Company Officers, Much Less a Basis for Disclosing the Sensitive Contents of Such Files to Mark McNulty.

This Court should reject the EEOC demand for personnel files for Northwestern Mutual's senior executives and officers (including its Chief Legal Officer) for two additional reasons.

First, the EEOC has not even *attempted* to meet its burden to show the relevancy of these sensitive files to McNulty's discrimination charge (nor should it be permitted to *first* offer to do so in its *reply* brief). *See* ECF 2, p. 5; *University of Pennsylvania v. EEOC*, 493 U.S. 182, 194 (1990) (holding the EEOC must make a "showing of relevance"); *Equal Emp. Opportunity Comm'n v. TriCore Reference Lab'ys*, 849 F.3d 929, 936–37 (10th Cir. 2017) (EEOC bears "burden … to show the relevancy of the subpoenaed information").

Second, the EEOC has reserved the "right" to show these sensitive personnel files to McNulty.  *See* Aakre Dec., ECF 3-7, pp. 67-68, 66-67.  While claimants may be shown portions of the EEOC's file if necessary to an investigation, this rule is subject to a well-established

---

[10] *See, e.g., Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.,* 779 F. Supp. 3d 53, 64-65 (D.D.C. 2025) (the directives "place a particular emphasis on "certain DEI practices," but "they fail to provide an actionable definition of what constitutes 'DEI' or a 'DEI' practice"); *Am. Pub. Health Ass'n v. Nat'l Institutes of Health,* 786 F. Supp. 3d 237, 259 n. 5 (D. Mass. 2025) ("The Court observes that neither the EOs, nor any of the policy statements to follow, nor counsel for the Public Officials, has, to date, provide a working definition of Diversity, Equity and Inclusion"); *San Francisco Unified Sch. Dist. v. AmeriCorps,* 789 F. Supp.3d 716, 749 (N.D. Cal. 2025) ("'one can imagine a wide range of viewpoints on what the values of diversity, equity, and inclusion mean when describing a program or practice'").  *Accord Chicago Women in Trades v. Trump,* 773 F. Supp. 3d 592, 606-08 (N.D. Ill. 2025); and *Am. Pub. Health Ass'n v. Nat'l Institutes of Health,* 145 F.4th 39, 46 (1st Cir. 2025).

exception for personnel files. *See EEOC v. Associated Dry Goods Corp.,* 449 U.S. 590, 604 (1981) ("The respondent was entitled only to assurance that each employee filing a charge against Horne would see information in no file other than his or her own."); *E.E.O.C. v. All. Residential Co.,* 866 F. Supp. 2d 636, 646 (W.D. Tex. 2011) (citing *Associated Dry Goods* to hold that claimant "is entitled to 'see information in no file other than ... her own'"); *EEOC v. Aon Consulting Inc.*, 149 F. Supp. 2d 601 (S.D. Ind. 2001) (barring the EEOC from showing the claimant other employees' personnel files); *E.E.O.C. v. St. John Hosp. & Med. Ctr.*, No. CIV.A. 12-50225, 2012 WL 3887626, at *10 (E.D. Mich. June 1, 2012) (same). These protections are particularly important here, given the EEOC's gross breaches of its confidentiality obligations in these proceedings (Lopez Dec., ¶¶ 16-17), and McNulty's animosity towards his former colleagues and his own breaches of trust and confidentiality (*id.*, Ex. 4 at LOPEZ-0044-45, 47-58).

None of the personnel files should be produced due to the EEOC's failure to meet its burden to show their relevancy. If the personnel files for Ms. Lund and Ms. Pulsfus are to be produced (the colleagues who received the challenged promotions), the EEOC should be prohibited from sharing those personnel files with McNulty or any other third person.

## VI. An Employer's Promulgation of an Affirmative Action Plan Is Not Evidence of Unlawful Discrimination Under Title VII.

Although the EEOC *mentions* Req. No. 8 by number, it again fails to meet its burden to explain its relevancy; indeed, the words "affirmative action plan" appear nowhere in its brief. In any event, the Seventh Circuit has held that the existence of an affirmative action plan is *not* relevant to prove discrimination. *McQuillen v. Wisconsin Educ. Ass'n Council,* 830 F.2d 659, 666 (7th Cir. 1987). The request should not be enforced.

## VII. This Court Should Not Excuse the EEOC of its Burden to Show Relevancy nor Rewrite the EEOC's Patently Overbroad Subpoena.

29

First, the Court should not enforce *any* of the other requests that the EEOC has failed to demonstrate are relevant. *Univ. of Pa.*, *supra*. For example, the EEOC alludes to "incomplete" responses to Req. Nos. 1, 4, 5, and 7, but fails to identify what additional information is required, much less its relevance. ECF 2, pp. 2-3.[11] Second, Northwestern Mutual has demonstrated the subpoena's improper scope, *supra*, §§ I-VI, yet the EEOC refused to modify *any* of the requests, presumably hoping the Court will rewrite the subpoena for them. Multiple courts have refused to do so, however, because "'[m]otion practice is not a series of trial balloons where you [submit] what you think is sufficient, [you] see how it flies, and if it does not, you go back and try again.'" *Chavarria v. Bros. Grp. Fleet, Inc.,* No. 21 C 5174, 2023 WL 1451529, at *4 (N.D. Ill. Feb. 1, 2023). While a litigant may be "thinking 'there's no harm in trying' and maybe a lax court won't see what is being attempted," the court held in *Davis v. Mitchell*, No. 19 C 3212, 2022 WL 2073010, at *1–2 (N.D. Ill. June 9, 2022), "that sort of thinking misperceives both the lawyers' responsibilities and ignores the fact that it is not the court's job to redefine and redraft overbroad discovery requests." *Accord Kinon Surface Design v. Hyatt Int'l Corp.,* No. 19 C 7736, 2022 WL 787956, at *2-3 n. 1 (N.D. Ill. Mar. 15, 2022) (holding that the "court is *prohibited* from doing so by the very nature of its role in our justice system").

The Court should not reward EEOC intransigence. Enforcement should simply be denied.

### Conclusion

For each of the preceding reasons, the EEOC's motion should be denied.

---

[11] There are no records responsive to Requests 19-21, because progress in pursuing *aspirational* diversity and inclusion goals chosen by Northwestern Mutual employees and people managers are *neither* mandatory *nor* tracked by the company. Hanneman Dec., ¶ 7. Nor has Northwestern Mutual "refused" to produce Ms. Hanneman for an interview, as claimed by the EEOC. ECF 2, p. 3. Northwestern Mutual told the EEOC that the company would reconsider its response to the RFI and interview request of Ms. Hanneman after the EEOC complies with its *Shell Oil* and *United Airlines* obligations, identifying the specific employment practices being challenged. *See* Lopez Ex. 10 (LOPEZ-000198-215). Northwestern Mutual cannot adequately prepare its witnesses for interviews unless fully and fairly informed of the charges.

Dated this 9th day of January, 2026.

s/ John A. Haase
John A. Haase
State Bar No. 1027536
Mark O. Thomson
State Bar No. 1120598
Godfrey & Kahn, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Phone:  414-273-3500
Fax:  414-273-5198
Email:  jhaase@gklaw.com
mthomson@gklaw.com

*Attorneys for Respondent THE
NORTHWESTERN MUTUAL LIFE
INSURANCE CO.*

37726086.1